AP-77,021
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 1/30/2015 12:33:47 PM
Accepted 2/3/2015 9:56:16 AM
ABEL ACOSTA
CLERK

FILED IN
COURT OF CRIMINAL APPEALS

February 3, 2015

ABEL ACOSTA, CLERK

*Oral Argument is Requested*

No. AP-77,021

IN THE COURT OF CRIMINAL APPEALS
OF TEXAS

———————

**NAIM RASOOL MUHAMMAD**,
Appellant

v.

**THE STATE OF TEXAS**,
Appellee

———————

*On appeal from the Criminal District Court No. 4 of Dallas County, Texas
In Cause No. F11-00698*

———————

**STATE'S BRIEF**

———————

|  | *Counsel of Record:* |
|---|---|
| Susan Hawk | Jaclyn O. Lambert (SBN 24049262) |
| Criminal District Attorney | Rebecca D. Ott (SBN 24074842) |
| Dallas County, Texas | Lisa Smith (SBN 00787131) |
|  | Assistant District Attorneys |
|  | Frank Crowley Courts Building |
|  | 133 N. Riverfront Blvd., LB-19 |
|  | Dallas, Texas 75207-4399 |
|  | (214) 653-3625 |
|  | (214) 653-3643 *Fax* |
|  | joconnor@dallascounty.org |

*Attorneys for the State of Texas*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. VII

STATEMENT REGARDING ORAL ARGUMENT ....................................................... XIII

STATEMENT OF THE CASE................................................................................ 1

STATEMENT OF FACTS.................................................................................... 1

   A. EVIDENCE AT GUILT-INNOCENCE ................................................................. 1

   B. THE STATE'S PUNISHMENT EVIDENCE ........................................................ 11

   C. APPELLANT'S PUNISHMENT EVIDENCE ........................................................ 26

   B. THE STATE'S REBUTTAL EVIDENCE ............................................................. 33

SUMMARY OF ARGUMENT............................................................................... 35

ARGUMENT................................................................................................. 39

   ISSUES 1-20: DENIAL OF DEFENSE CHALLENGES FOR CAUSE.......................................... 39

     *The Trial Court Properly Denied Appellant's Challenges for Cause* ............... 43

       Issue 1: Milton Powell ......................................................... 43

       Issue 1: Milton Powell ......................................................... 43

       Issue 2: Georgia S. Nichols ................................................... 48

       Issue 3: Dee Jay Earley ........................................................ 53

       Issue 4: Timothy Tinsley ....................................................... 57

       Issue 5: Robin Linn ............................................................. 61

       Issue 6: Charles Stout.......................................................... 63

       Issue 7: Allen Harrington...................................................... 64

Issue 8: Anthony Morrison .......................................................................... 67

Issue 9: Enriquez Martinez ......................................................................... 70

Issue 10: Paul Zugelder .............................................................................. 72

Issue 11: David Hornstein........................................................................... 75

Issue 12: Andrea Griffith ............................................................................ 76

Issue 13: Bradford McCutheon.................................................................... 77

Issue 14: Elvira Corpus ............................................................................... 78

Issue 15: Temple Koestner ......................................................................... 81

Issue 16: Nancy Munn................................................................................. 85

Issue 17: Ernest Hand................................................................................. 88

Issue 18: Elizabeth McDaniel...................................................................... 92

Issue 19: Arleen Jimenez ............................................................................ 93

Issue 20: Dan Blanks................................................................................... 94

ISSUES 21 AND 22: CONSTITUTIONAL RIGHT TO FAIR AND IMPARTIAL JURY ........................ 96

*Appellant Was Not Deprived of a Lawfully Constituted Jury* ......................... 96

ISSUES 23-26: ADMISSION OF AUTOPSY PHOTOGRAPHS ............................................... 96

*Applicable Law.......................................................................................* 97

*The Trial Court Did Not Abuse its Discretion by Overruling Appellant's
Objections to State's Exhibits 4-9 and 11-23................................................* 98

*The Trial Court Did Not Abuse its Discretion by Overruling Appellant's
Objections to State's Exhibits 77 and 78 ....................................................* 102

ISSUES 27 AND 41: JURY ARGUMENT................................................................... 104

*Applicable Law* ................................................................ 104

*The Trial Court Did Not Err By Overruling Appellant's Objection to the State's Closing Argument at Guilt-Innocence* ............................................. 106

*The Trial Court Did Not Err by Overruling Appellant's Objection to the State's Closing Argument at Punishment* ................................................... 113

ISSUE 28: ADMISSION OF APPELLANT'S STATEMENTS TO CPS WORKER ............................ 119

*Applicable Law* ................................................................ 120

*Womack's Testimony Was Properly Admitted* ...................................... 123

*Any Error Harmless* ............................................................ 124

ISSUE 29: ADMISSION OF STATE'S EXHIBIT 173 ............................................. 124

*Applicable Law* ................................................................ 126

*The Trial Court Did Not Abuse its Discretion by Admitting State's Exhibit 173* ................................................................ 127

*Any Error Harmless* ............................................................ 128

ISSUES 30-32: ADMISSION OF TESTIMONY FROM REFRESHED MEMORY .......................... 129

*Applicable Law* ................................................................ 129

*Officer Chris Havens* .......................................................... 130

*Officer Harold Andrews* ........................................................ 132

*Officer Brandon Hernandez* ..................................................... 134

ISSUES 33 AND 37: TESTIMONY OF OFFICER DAVID SOLOMON ................................. 135

*The Trial Court Did Not Err, and Appellant Was Not Harmed, by the Admission of Officer Solomon's Testimony* ............................................. 135

ISSUE 34: TESTIMONY OF WARDEN MELODYE NELSON ........................................ 138

iv

*The Trial Court Did Not Err, and Appellant Was Not Harmed, by the Admission of Warden's Nelson's Testimony*.............................................. 138

ISSUE 35: DENIAL OF HEARING ON EXTRANEOUS OFFENSES AND BAD ACTS ...................... 141

*Applicable Law*................................................................................. 143

*Applicability of Mitchell v. State*.................................................... 144

*Appellant Has Not Shown an Abuse of Discretion or Harm* ......................... 145

ISSUE 36: DENIAL OF MOTION FOR MISTRIAL ............................................................. 148

*Applicable Law*................................................................................. 150

*The Trial Court Did Not Abuse its Discretion by Denying Appellant's Motion for Mistrial* ...................................................................... 150

ISSUES 38 AND 39: CROSS-EXAMINATION OF APPELLANT'S EXPERTS ............................. 151

*Applicable Law*................................................................................. 152

*Dr. Kellie Gray-Smith*....................................................................... 152

*Dr. Gilbert Martinez*........................................................................ 158

*Error, If Any, Was Harmless* ........................................................... 161

ISSUE 40: TRIAL COURT'S STATEMENT REGARDING SEQUESTRATION ............................. 162

*Applicable Law*................................................................................. 165

*The Trial Court's Statement Was Not an Improper Comment on the Weight of the Evidence* ................................................................ 166

*The Trial Court's Comment Was Not Calculated to Benefit the State or Prejudice Appellant*............................................................... 169

ISSUE 42: LEGAL SUFFICIENCY OF FUTURE DANGEROUSNESS SPECIAL ISSUE...................... 170

*Applicable Law*................................................................................. 170

*The Evidence is Legally Sufficient to Support the Jury's Finding of Future Dangerousness* .................................................................................. 172

Issues 43-54: Federal Constitutional Issues ........................................ 179

PRAYER ..................................................................................... 183

CERTIFICATE OF COMPLIANCE .......................................................... 184

CERTIFICATE OF SERVICE .................................................................. 184

## TABLE OF AUTHORITIES

**Cases**

*Adanandus v. State*,
866 S.W.2d 210 (Tex. Crim. App. 1993) ........................................................ 143

*Arzaga v. State*,
86 S.W.3d 767 (Tex. App.—El Paso 2002, no pet.)......................................... 146

*Becknell v. State*,
720 S.W.2d 526 (Tex. Crim. App. 1986) ...................................................166, 169

*Berry v. State*,
233 S.W.3d 847 (Tex. Crim. App. 2007) ....................................................121, 123

*Brown v. State*,
270 S.W.3d 564 (Tex. Crim. App. 2008) .......................... 111, 112, 113, 118, 119

*Broxton v. State*,
909 S.W.2d 912 (Tex. Crim. App. 1995) ........................................................ 154

*Campbell v. State*,
610 S.W.2d 754 (Tex. Crim. App. [Panel Op.] 1980)...................................... 105

*Cantu v. State*,
939 S.W.2d 627 (Tex. Crim. App. 1997) ........................................................ 152

*Carroll v. State*,
916 S.W.2d 494 (Tex. Crim. App. 1996) ........................................................ 152

*Carter v. State*,
614 S.W.2d 821 (Tex. Crim. App. [Panel Op.] 1981)...................................... 118

*Chambers v. State*,
866 S.W.2d 9 (Tex. Crim. App. 1993) ............................................................ 152

*Clark v. State*,
878 S.W.2d 224 (Tex. App.—Dallas 1994, no pet.) ........................................ 166

*Coble v. State*,
   871 S.W.2d 192 (Tex. Crim. App. 1993) (en banc) ........................................ 105

*Colburn v. State*,
   966 S.W.2d 511 (Tex. Crim. App. 1998) ........................................................ 41

*Druery v. State*,
   225 S.W.3d 491 (Tex. Crim. App. 2007) ...................................................... 173

*Escamilla v. State*,
   143 S.W.3d 814 (Tex. Crim. App. 2004) ...................................................... 182

*Estrada v. State*,
   313 S.W.3d 274 (Tex. Crim. App. 2010) ................................................108, 171

*Feldman v. State*,
   71 S.W.3d 738 (Tex. Crim. App. 2002) ...................................................40, 41

*Flowers v. State*,
   220 S.W.3d 919 (Tex. Crim. App. 2007) ........................................ 126, 127, 128

*Freeman v. State*,
   340 S.W.3d 717 (Tex. Crim. App. 2011) ...................................................... 105

*Gallo v. State*,
   239 S.W.3d 757 (Tex. Crim. App. 2007) ........................................97, 101, 139

*Gamboa v. State*,
   296 S.W.3d 574 (Tex. Crim. App. 2009) ........................................147, 151, 168

*Gray v. State*,
   233 S.W.3d 295 (Tex. Crim. App. 2007) ........................................................ 96

*Guidry v. State*,
   9 S.W.3d 133 (Tex. Crim. App. 1999) .......................................................... 165

*Hawkins v. State*,
   135 S.W.3d 72 (Tex. Crim. App. 2004) ........................................................ 150

*Hoang v. State*,
997 S.W.2d 678 (Tex. App.—Texarkana 1999, no pet.)............................166, 167

*Human v. State*,
749 S.W.2d 832 (Tex. Crim. App. 1988 ...................................................... 127

*Jackson v. State*,
992 S.W.2d 469 (Tex. Crim. App. 1999) ...................................................... 145

*Keeton v. State*,
724 S.W.2d 58 (Tex. Crim. App. 1987) ........................................................ 171

*Kemp v. State*,
846 S.W.2d 289 (Tex. Crim. App. 1992) ..........................................143, 145, 147

*Linder v. State*,
828 S.W.2d 290 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd) .................. 111

*Long v. State*,
823 S.W.2d 259 (Tex. Crim. App. 1991) ...................................................... 101

*Mann v. State*,
13 S.W.3d 89, 94 (Tex. App.—Austin 2000), *aff'd*, 58 S.W.3d 132, (Tex. Crim. App. 2001)................................................................................................ 146

*McCoy v. State*,
877 S.W.2d 844 (Tex. App.—Eastland 1994, no pet.) .............................129, 135

*McFarland v. State*,
845 S.W.2d 824 (Tex. Crim. App. 1992) ...................................................... 160

*Miranda v. Arizona*,
384 U.S. 436 (1966) ................................................................................ 121

*Mitchell v. State*,
931 S.W.2d 950 (Tex. Crim. App. 1996) ...................................................... 144

*Mosley v. State,*
983 S.W.2d 249 (Tex. Crim. App. 1998) ...................................................... 150

*Narvaiz v. State*,
  840 S.W.2d 415 (Tex. Crim. App. 1992) ........................................................ 160

*Nenno v. State*,
  970 S.W.2d 549 (Tex. Crim. App. 1998) ........................................................ 118

*Palermo v. State*,
  992 S.W.2d 691 (Tex. App.—Houston [1st Dist.] 1999, no pet.) .................... 110

*Paredes v. State*,
  129 S.W.3d 530 (Tex. Crim. App. 2004) ........................................................ 97

*Powell v. State*,
  898 S.W.2d 821 (Tex. Crim. App. 1994) ................................................143, 147

*Prystash v. State*,
  3 S.W.3d 522 (Tex. Crim. App. 1999) ........................................................... 145

*Ripkowski v. State*,
  61 S.W.3d 378 (Tex. Crim. App. 2001) .......................................................... 102

*Sadler v. State*,
  977 S.W.2d 140 (Tex. Crim. App. 1998) ........................................................ 40

*Saldano v. State*,
  232 S.W.3d 77 (Tex. Crim. App. 2007) ......................................... 41, 42, 43, 182

*Simon v. State*,
  203 S.W.3d 581 (Tex. App.—Houston [14th Dist.] 2006, no pet.)............166, 169

*Solomon v. State*,
  49 S.W.3d 356 (Tex. Crim. App. 2001) .......................................................... 162

*Spence v. State*,
  795 S.W.2d 743 (Tex. Crim. App. 1990) ........................................................ 143

*Standefer v. State*,
  59 S.W.3d 177 (Tex. Crim. App. 2001) .....48, 53, 56, 58, 65, 69, 71, 75, 76, 80, 91

*Threadgill v. State*,
  146 S.W.3d 654 (Tex. Crim. App. 2004) ........ 40, 41, 45, 47, 59, 67, 80, 83, 85, 87

*Torres v. State*,
  92 S.W.3d 911 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) ................. 110

*Turner v. State*,
  805 S.W.2d 423 (Tex. Crim. App. 1991) ....................................................... 154

*Walters v. State*,
  247 S.W.3d 204 (Tex. Crim. App. 2007) ....................................................... 161

*Wardrip v. State*,
  56 S.W.3d 588 (Tex. Crim. App. 2001) ......................................................... 171

*Welch v. State*,
  993 S.W.2d 690 (Tex. App.—San Antonio 1999, no pet.).............................. 146

*Wesbrook v. State*,
  29 S.W.3d 103 (Tex. Crim. App. 2000) ......................................................... 105

*Wilkerson v. State*,
  173 S.W.3d 521 (Tex. Crim. App. 2005) ...........................................121, 122, 123

*Williams v. State*,
  958 S.W.2d 186 (Tex. Crim. App. 1997) ...............................................97, 98, 137

*Young v. State*,
  283 S.W.3d 854 (Tex. Crim. App. 2009) ......................... 104, 143, 147, 171, 172

*Young v. State*,
  891 S.W.2d 945 (Tex. Crim. App. 1994) ................................. 130, 132, 133, 135

**Statutes**

Tex. Code Crim. Proc. Ann. art. 13.17 (West 2005) ............................................ 46

Tex. Code Crim. Proc. Ann. art. 35.16(a)(9) (West 2006) ...............................40, 73

Tex. Code Crim. Proc. Ann. art. 35.16(b)(3) (West 2006).................................... 40

Tex. Code Crim. Proc. Ann. art. 35.16(c)(2) (West 2006) ................................40, 46

Tex. Code Crim. Proc. Ann. art. 35.23 (West 2006) ....................................165, 166

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(a)(1) (West Supp. 2014) ................ 143

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(b)(1) (West Supp. 2014) ................ 170

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(c) (West Supp. 2014) ..................... 170

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(h) (West Supp. 2014) ........................ 1

Tex. Code Crim. Proc. Ann. art. 38.05 (West 1979) ......................................... 165

**Rules**

Tex. R. App. P. 33.1(a) .... 43, 49, 54, 65, 70, 78, 81, 89, 94, 107, 108, 131, 154, 156, 159

Tex. R. App. P. 38.1(i) ................................................................................. 108

Tex. R. App. P. 44.2(b) ...........111, 113, 118, 119, 124, 128, 140, 161, 162, 166, 169

Tex. R. Evid. 104................................................................................... 145

Tex. R. Evid. 401 .................................................................................97, 137

Tex. R. Evid. 403 ...................................................................................... 98

Tex. R. Evid. 611(b) ...............................................................................152, 156

Tex. R. Evid. 612................................................................................... 129

Tex. R. Evid. 702................................................................................... 139

**Constitutional Provisions**

U.S. CONST. amend. V...................................................................... 121

## STATEMENT REGARDING ORAL ARGUMENT

The State requests the opportunity to present oral argument if the Court

grants appellant's request to argue.

**TO THE HONORABLE COURT OF CRIMINAL APPEALS**:

The State of Texas submits this brief in response to the brief of appellant, Naim Rasool Muhammad.

## STATEMENT OF THE CASE

This is an automatic appeal from a sentence of death. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(h) (West Supp. 2014). A Dallas County jury found appellant guilty of capital murder for drowning his two sons in the same criminal transaction. (CR1: 2; CR2: 395-400, 401, 410-13; RR44: 39). In accordance with the jury's answers to the special issues, the trial court sentenced him to death on May 23, 2013. (CR2: 402-07, 408-09, 410-13; RR50: 100-04). Appellant presents fifty-four allegations of reversible error.

## STATEMENT OF FACTS

### A. Evidence at Guilt-Innocence

Kametra Sampson dated appellant for six years and they had three children together: Naim Muhammad, Elijah Muhammad, and Jeremiah Muhammad. (RR43: 76-77). Kametra ended her relationship with appellant in December of 2010. (RR43: 77).

1

In August of 2011, Kametra and her sons were living with Kametra's mother, Priscilla Sampson, on Terrell Street in Dallas. (RR43: 31-32, 59, 79-80). Although Kametra and appellant were broken up, appellant showed up at Priscilla's annual back-to-school barbecue on August 20, 2011. (RR43: 33-37, 60, 81). Kametra arrived late to the barbecue with the boys and her boyfriend, Eric Smith. (RR43: 34, 36-37, 87). Appellant confronted Kametra, telling her he did not want another man raising his sons. (RR43: 38-39, 90-91). Kametra sent the boys inside the house and her argument with appellant escalated. (RR43: 39-40, 91). Kametra's grandfather intervened and asked appellant to leave. (RR43: 40, 61, 91). Appellant returned later that evening with his mother to pick up the boys, but Kametra and the boys were not home. (RR43: 41, 92).

Appellant returned to Priscilla's house around 6:00 a.m. on the morning of August 22, 2011. (RR43: 42, 93). It was the first day of kindergarten for the eldest son, Naim. (RR43: 42, 62). Appellant asked to see his sons, but Priscilla would not let him in. (RR43: 43, 93). Kametra came to the door and told appellant he was not wanted there and needed to leave. (RR43: 22, 93-94). Priscilla's neighbor, Phyllis Lewis, was outside when appellant arrived and overheard them exchange

2

words at the front door. (RR43: 22). About thirty minutes later, Phyllis saw appellant drive by the house on Terrell Street. (RR43: 15-16, 20-21).

Priscilla left the house with her youngest daughter, Jamie, to catch the bus and Kametra walked down Terrell Street toward Frazier Elementary with Naim and Elijah. (RR43: 44-45, 79, 95, 125). Kametra's youngest son, Jeremiah, stayed home with her brother, Brandon Turner. (RR43: 45, 64). As Kametra, Naim, and Elijah reached the end of Terrell Street and crossed over Dolphin Street, appellant swerved in front of them and jumped out of the vehicle he was driving. (RR43: 96-97, 123-24). He demanded that they get in the car with him or he would hit Kametra with a large rock he picked up off the ground. (RR43: 97-98, 124-25). Kametra and the boys complied. (RR43: 98). Appellant continued driving in the direction of the school, but when they reached the front of the school, appellant turned the opposite direction and told them that Naim wasn't going to school today. (RR43: 100).

Kametra began crying and pleading with appellant to take Naim to school. (RR43: 100-01). Appellant drove erratically and alternated between telling Kametra they needed to get back together and yelling, hitting her, and threatening to kill her and the boys. (RR43: 102-03, 106, 112). After driving

3

around for over an hour, they pulled up behind a constable near the intersection of Camp Wisdom and R. L. Thornton Freeway. (RR43: 104, 126). Kametra jumped out of the vehicle in the hopes of getting some help from the constable. (RR43: 105-08). Appellant grabbed her, but she was able to pull away and escape. (RR43: 109, 129). Kametra banged on the passenger window of the constable's vehicle and begged for help. (RR43: 110). As the constable directed her to the Shell gas station at the intersection, appellant swerved around the car in front of him, jumped the curb, and sped through the red light. (RR43: 110-11, 127).

The constable pulled into the Shell gas station and called the police for Kametra. (RR43: 112-13). Appellant's sisters, Aqueelah Green and Sekinah Muhammad, were called and also came to the Shell gas station. (RR43: 114, 144, 146). Kametra went with Aqueelah to her brother's house nearby on Songwood Street in the hopes of finding appellant, but he was not there and Aqueelah drove Kametra back to the Shell station. (RR43: 115, 117, 147-48).

Shortly after dropping off Kametra, Aqueelah received a phone from appellant. (RR43: 150). When she asked where Naim and Elijah were, appellant told her they were "gone with Abdullah." (RR43: 150-51, 154). Abdullah was Aqueelah's and appellant's eldest brother who was deceased. (RR43: 150-51, 159-

4

60). When Aqueelah asked what appellant meant by that, he said, "They gone. They are dead." (RR43: 151, 153). Appellant hung up, but he called Aqueelah back a short time later. (RR43: 152). Aqueelah was driving during the second phone call and arrived at her brother's house on Songwood while she was still on the phone with appellant. (RR43: 152-54). One of the police officers at the house asked her to switch on her speakerphone and gave her specific questions to ask appellant. (RR43: 154-55). At the officer's direction, she asked appellant if he killed the kids and he replied, "Yes." (RR43: 155). When she asked how he killed his kids, he said he drowned them. (RR43: 155). He told her he killed Naim first and then Elijah. (RR43: 155). When she asked appellant where the kids were, he said he "didn't know" and that they were "in the creek somewhere." (RR43: 155).

This information was still unknown to Kametra and her family. Priscilla returned home around 10:00 a.m. and Kametra arrived shortly after her. (RR43: 45-46, 68, 117). Kametra had a bloody nose, blood on her clothes, red and swollen eyes, and was very upset. (RR43: 46, 68, 117). She told Priscilla and Brandon about what had happened with appellant on the way to school. (RR43: 46, 117). Brandon told them that appellant had tried to break into the house shortly before they got home. (RR43: 45-46, 68, 117). Brandon explained that he

5

heard someone kick a window in the back of the house and break the glass. (RR43: 52-56, 65). He went to investigate and saw appellant trying to enter the house through the window. (RR43: 65). The window led into the room where Jeremiah was sleeping. (RR43: 65). Brandon asked appellant what he was doing; when appellant did not respond and just kept trying to come in, Brandon pushed him back out of the window. (RR43: 65-66, 73). After appellant picked himself up and was running away toward the back fence, he told Brandon: "Your nephews are dead now." (RR43: 66-67, 70-71). Brandon did not think anything of it because he thought the boys were with Kametra on the way to school. (RR43: 67). When Brandon relayed this information to Kametra, she became hysterical. (RR43: 68-69, 117). They called 911 and Kametra left with the police officers who responded to the call. (RR43: 47, 69, 117-18). Later that day, Priscilla was taken by officers to Dallas Police headquarters. (RR43: 48). There, both she and Kametra learned that Naim and Elijah were dead. (RR43: 48, 119).

Christal Fewell hung out with appellant at his brother's house on Songwood Street the night before the offense. (RR42: 143-46). Christal met appellant through her cousin and they had been dating for two to three months. (RR42: 141-42). Appellant asked to borrow Christal's car the next morning so he could

6

take his son to school. (RR42: 145). About an hour after appellant left, Christal got out of bed, showered, and then began to worry about the whereabouts of appellant and her car. (RR42: 150-51). A short time later she started receiving phone calls from appellant's family members asking: "Where is Rasool?" (RR42: 151-52). She also received a phone call from the Dallas Police Department and provided them with a description of her car. (RR42: 154-55). When Christal was leaving the house on Songwood, she saw her car drive down the street in front of the house. (RR42: 154-55). She immediately called the Dallas Police back and reported the sighting of her car. (RR42: 154-56). Appellant's mother, Naimah Muhammad, pulled up to the house at this time and was looking for appellant. (RR42: 154-56). Shortly thereafter, several Dallas Police Officers also arrived at the house. (RR42: 154-56). Christal received a phone call from appellant on her cell phone; however, he would not tell her his whereabouts and only wanted to talk to his mother. (RR42: 157-58).

The police officers eventually left the house on Songwood to search for appellant, and Christal left with Naimah because she claimed to know the location of Christal's car. (RR42: 158-59; RR43: 175). They drove down the street and appellant jumped into the backseat of Naimah's car. (RR42: 160; RR43: 175).

Naimah drove a short ways further and dropped Christal off at the location where appellant had left her car. (RR42: 161; RR43: 175-76). Naimah told Christal to hug and kiss her child when she got home and tell him she loved him. (RR42: 161, 173). As Christal was driving home, she was pulled over by several police officers and taken to Dallas Police Headquarters for questioning, where she learned about the events of the morning and what appellant had done. (RR42: 161-62). A search of Christal's car revealed mud on the interior. (State's Exhibits 25-36).

After Naimah dropped off Christal at her car, appellant told her where to drive to find Naim and Elijah. (RR43: 176-77). From the service road of IH-35, they turned on Brookside Drive and drove to a heavily wooded area at the end of the road with a steep incline down to a shallow creek. (RR43: 176-77, 186, 191-92, 199-200). Naimah waited at the top next to a sewer manhole cover while appellant went down to the creek and retrieved the boys one at a time. (RR43: 177-78, 194). Appellant brought Naim up from the creek first. (RR43: 178, 194). He laid him on the ground and Naimah attempted to perform CPR. (RR43: 178-79, 194). Appellant went back down and retrieved Elijah from the creek. (RR43: 179, 194). After Naimah's attempts at CPR were unsuccessful, appellant put both boys in the backseat of her vehicle. (RR43: 179-80). They left the creek and drove back

toward the house on Songwood, but before they arrived appellant jumped out of the vehicle. (RR43: 180-81). Naimah pulled into a parking lot on Ledbetter Road. (RR43: 182). She saw an officer driving by, so she flagged him down and told him that her grandbabies were in the back of her car. (RR43: 182-83). When the police searched and photographed Naimah's car, the backseat was muddy and wet. (RR43: 190).

Appellant was eventually captured by police later that day. Michael Yeric, a homicide detective with the Dallas Police Department, interviewed appellant at the police headquarters when he was brought into custody. (RR43: 209-14; State's Exhibits 152-53, 167). Detective Yeric read appellant his rights, and appellant indicated that he wanted to waive those rights and speak with the detective. (RR43: 217, 233-34, 237-38). Appellant told Detective Yeric that he had borrowed his friend Christal's car that morning because he wanted to take his son to his first day of school. (RR43: 239). He went to Priscilla's home around 6:30 a.m., but was not allowed to see his kids. (RR43: 239). Appellant found Kametra and the boys as they were walking to school, forced them into the car with him, and began driving around. (RR43: 239-40). As they approached Camp Wisdom on the service road of R. L. Thornton freeway, appellant and Kametra saw a

9

constable's car. (RR43: 241). Appellant told Kametra, "Don't get out of this car," and "if you jump out of this car, you don't care about your kids." (RR43: 241). Kametra jumped out of the car and went to the passenger side of the constable's car, and appellant drove off. (RR43: 241). Appellant admitted to then driving to the creek and drowning Naim and Elijah. (RR43: 220, 241).

When Detective Yeric visited the scene of the drowning, he noticed a security camera mounted outside of Spirit Depot, a liquor store on the corner of Brookside Drive and the service road. (RR43: 221-22, 225). Detective Yeric obtained the video footage recorded by this camera on August 22, 2011. (RR43: 221-22; State's Exhibits 155-68). The video footage showed that appellant first drove down Brookside Drive in Christal's car at 8:53 a.m. and exited a short time later. (RR43: 222-23, 230). It then showed Naimah's car drive down Brookside Drive at 12:15 p.m. and exit a short time later. (RR43: 223, 230). This video footage corroborated the information relayed to the detective by appellant, Naimah, and other witnesses they interviewed during their investigation. (RR43: 233).

Dr. Tracy Dyer, a board-certified forensic pathologist and staff medical examiner at the Southwestern Institute of Forensic Sciences ("SWIFS"), supervised

the autopsies of 3-year-old Elijah Muhammad and 5-year-old Naim Muhammad. (RR42: 115-39). Both Elijah and Naim arrived at SWIFS in wet clothing with dirt and debris scattered across their bodies. (RR42: 120-22, 134). Both boys had scratches on their heads and hands; additionally, Elijah had scratches on his back, legs, and feet. (RR42: 120-26, 136-37; State's Exhibits 4-8, 10-21, 24). The internal examination revealed that Elijah had bruising on his scalp, dirt and debris in his airway, and an abundant amount of fluid in his lungs. (RR42: 126-30; State's Exhibits 22-24). Naim also had bruising on his scalp and fluid in his lungs. (RR42: 137-38; State's Exhibits 9-10). Dr. Dyer determined that the cause of death for both Elijah and Naim was drowning and that their manner of death was homicide. (RR42: 130-31, 138-39; State's Exhibits 10, 24).

After hearing this evidence, the jury returned a verdict of guilt in approximately eight minutes. (RR44: 34, 41).

### B. The State's Punishment Evidence

During punishment, the State presented evidence showing that appellant's experience with the criminal justice system began at a young age and spanned a period of about twenty years. This evidence was presented through business

records of prior criminal convictions, as well as live testimony regarding various extraneous adjudicated and unadjudicated offenses.[1]

On January 30, 1993, appellant was arrested for burglary of a coin-operated machine. (RR44: 111-12). Appellant and a cohort were removing quarters from a vacuum cleaner at a car wash. (RR44: 112-13). When Dallas Police Officer John James and his partner arrived at the location, appellant and his cohort fled. (RR44: 114). Appellant, who was thirteen years old at the time, was apprehended a few blocks away and taken to the juvenile jail. (RR44: 114-15).

On February 26, 1993, Ivis Wright, a single mother of three, returned home to find her back door had been kicked in and several items had been stolen from her home, including a VCR, Nintendo gaming system, a cordless phone, money, and candy. (RR44: 119-21). Five juvenile boys were apprehended fleeing Wright's home and placed under arrest for burglary. (RR44: 121, 124-27). Officer Chris Havens identified Naim Rasool Muhammad as one of the perpetrators. (RR44: 127). On October 4, 1993, Dallas Police Officer David Solomon responded to a call

---

[1] The judge gave both an oral and written instruction to the jury that they were not to consider extraneous offenses for any purpose unless they found and believed beyond a reasonable doubt that appellant committed the offenses, if any were committed, and even then they could only consider them in determining their answers to the special issues. (RR45: 41-42; CR2: 406).

12

reporting an auto theft in progress. (RR45: 82-84, 126-27). Officer Solomon pulled over a vehicle matching the description of one of the stolen vehicles and appellant was one of the passengers. (RR45: 86, 88, 127-28). Officer Solomon determined that the passengers were not involved in the reported auto theft; however, Officer Solomon arrested appellant because he had outstanding warrants for two charges of burglary of a habitation, one of which was for the burglary Wright's home. (RR45: 89, 97-99, 100-01, 103, 128-30).

On June 16, 1993, appellant was arrested for possession of a stolen vehicle. (RR45: 48-49, 51). Former Dallas Police Officer Sekethia Tejada pulled up behind a Cadillac, ran the plates, and realized it was a stolen vehicle. (RR45: 48-49). When she pulled the vehicle over, there were two young men inside; appellant, who was fourteen years old at the time, was the passenger. (RR45: 50-51). The steering column was broken and they had managed to start the engine without a key. (RR45: 51).

On April 5, 1994, appellant committed burglary of a habitation. (RR44: 109; State's Exhibit 170). On May 25, 1994, a juvenile Order of Adjudication and Judgment of Disposition with No Placement was entered and appellant was sentenced to 12 months' probation. (RR44: 109; State's Exhibit 170).

13

On July 27, 1994, Dallas Police received a call reporting a burglary of a vehicle that was in progress. (RR44: 140-41). Lieutenant Harold Andrews was driving around the area where the burglary occurred and spotted appellant, who matched the description of one of the suspects. (RR44: 142). Lt. Andrews detained appellant and brought him back to the scene of the burglary, where he was identified by the complainant as one of the perpetrators. (RR44: 142-43).

On August 18, 1994, appellant committed unauthorized use of a motor vehicle and evading arrest. (RR44: 108-09; State's Exhibit 171). A juvenile Order of Adjudication and Judgment of Disposition with Placement was entered on September 9, 1994, sentencing appellant to 12 months' probation to be served in the custody of Daytop Village. (RR44: 108-09; State's Exhibit 171).

Daytop Village provides a 9-month program for 13 to 18 year olds and is designed to rehabilitate juveniles so that they do not end up in "the system." (RR46: 9-11, 13). If a juvenile completes the program at Daytop, they are returned to their family; if not, they are sent to the Texas Youth Commission ("TYC"), a correctional facility for youth offenders. (RR46: 11, 13, 38). Youths attending Daytop are given multiple opportunities to succeed in the program. (RR46: 12-13, 34). Daytop operates using the merit system and infractions are judged by peers,

14

not adults. (RR46: 10-11, 13). Daytop residents attend school, enjoy recreation time, participate in group meetings, and also receive one-on-one counseling. (RR46: 17-18). During his stay at Daytop, appellant had many difficulties and was placed on a behavior contract in an effort to change his aggressive behavior toward other residents. (RR46: 16; State's Exhibit 177). Despite this contract, on July 1, 1995, appellant physically assaulted another resident on two separate occasions. (RR46: 16-17, 26; State's Exhibit 177). Due to the two new assaults, as well as the prior infractions resulting in the behavior contract, the leaders of the program voted to discharge applicant from Daytop and send him to TYC. (RR46: 16-19, 32-33; State's Exhibit 177).

While in TYC, appellant committed multiple infractions. On September 16, 1995, appellant was written up for disruptive behavior and threatening staff. (RR46: 83). After being repeatedly instructed to be quiet, appellant stated that he would like to "beat somebody down." (RR46: 83). He then looked at former TYC correctional officer Linda Parker and said "especially females." (RR46: 81-83). On December 12, 1995, appellant was written up for disruption of the program and possession of razor blades and crushed aspirin. (RR46: 56, 59; State's Exhibit 178). According to former TYC correctional officer Michael Jaco, the inmates snorted

15

crushed aspirin to get high and often used razor blades to create weapons. (RR46: 52-53, 56-57). Appellant was trading the contraband for snacks. (RR46: 56, 63; State's Exhibit 178). On January 11, 1996, appellant was written up multiple times for aggressive behavior toward other inmates, disruptive behavior in the classroom, disobeying staff, and calling a pregnant female correctional officer a "fat mother-fucker." (RR46: 70-72). On August 17, 1996, appellant was written up for a disruption on the volleyball court. (RR46: 77). When he was asked to leave, appellant became explosive and cursed at staff members. (RR46: 77). He called former TYC correctional officer Kenneth Allen a "fat mother-fucker" and told him "fuck your mother." (RR46: 74-75, 77-78). On August 27, 1996, appellant was written up for rubbing his erect penis against the leg of his teacher, Nina Adams. (RR47: 18-24). On September 15, 1996, appellant was written up for fighting. (RR46: 40-42). He and his cohort assaulted another inmate while he was being held down on a toilet. (RR46: 40-42). On September 20, 1996, he was written up for being disruptive in the dining hall. (RR46: 78-79).

According to former correctional officer Gail Hamilton, appellant was not a law abiding person while at TYC. (RR46: 36-37, 46). Many of the correctional

officers at TYC tried to talk to appellant and encourage him to stop the progression of his criminal behavior to no avail. (RR46: 44-45, 54-55).

Appellant was released from TYC in December of 1996 and resumed his criminal activity shortly thereafter. On July 30, 1997, appellant committed burglary of a vehicle and evading arrest. (RR44: 109; State's Exhibits 172, 173). On September 19, 1997, he pleaded guilty to each offense and was sentenced to 12 months' probation in each case, but he was subsequently revoked for failing to comply with the conditions of his probation. (State's Exhibit 172, 173).

On December 4, 1997, appellant committed theft at a Lowe's store in Collin County. (RR44: 108; State's Exhibit 174). On September 28, 1998, he pleaded guilty to the charge and was sentenced to probation for one year, but he was subsequently revoked and sentenced to 180 days' confinement. (State's Exhibit 174).

On January 27, 1998, appellant committed burglary of a vehicle. (RR44: 109-10; State's Exhibit 175). On February 11, 1998, he pleaded guilty to the charge and was sentenced to 180 days' confinement. (RR44: 109-10; State's Exhibit 175).

On July 4, 1999, Garland Police Officer Brandon Hernandez and several other officers responded to a burglary alarm at a car lot off Forest Lane in Dallas. (RR45: 60-63). Officer Hernandez and his partner spotted appellant walking away from the business toward a suspicious vehicle that was running but did not have its lights on. (RR45: 63-64). When another officer approached the vehicle on foot, the vehicle sped away. (RR45: 64-65). Officer Hernandez and his partner chased the vehicle and made a felony traffic stop. (RR45: 65). Appellant and two other passengers were removed from the vehicle and the officers found a loaded shotgun inside. (RR45: 65-66). They also found a bag of marijuana and a screwdriver, a common burglary tool, just outside the vehicle that appeared to have been thrown out by the passengers. (RR45: 66-67). When the officers checked appellant's name and date of birth in their system, they discovered he had outstanding felony and probation warrants. (RR45: 69, 70-71). All three passengers of the vehicle were arrested. (RR45: 70-71).

On April 7, 2001, Jeanette Harris, appellant's next door neighbor at the time, caught appellant peeping at her through the bathroom window when she was in the shower. (RR45: 43-45). When Harris confronted appellant about the

incident, he threatened to "whip [her] ass." (RR45: 45-46). Harris called the police and appellant fled. (RR46: 45).

On April 20, 2009, Dallas Police Officer Ryan Foster and his partner responded to a disturbance call in South Dallas. (RR45: 132-33, 140). Sekinah Muhammad, appellant's sister, was upset and was bleeding from the back of her head. (RR45: 133-35). Appellant and Sekinah had gotten into an argument. (RR47: 28-29). When appellant refused to leave, Sekinah came toward appellant with a hammer. (RR47: 28-29, 32-33). Appellant took the hammer from her and hit her in the head with it two times. (RR45: 138-39; RR47: 28-29, 32-35). Appellant was apprehended a few blocks away from the offense and arrested for assault. (RR45: 138-40).

Appellant pleaded guilty to the aggravated assault of his sister and was placed on probation on September 15, 2009. (RR46: 141-43, 147; RR47: 37; RR49: 99-100; State's Exhibit 185). Appellant violated the conditions of his probation on many occasions. He was ordered to wear an electronic monitoring device on September 25, 2009, but was arrested four days later for failing to comply with the electronic monitoring requirements. (RR46: 143-44). Over the next nine months, appellant failed to comply with several other conditions of his probation

by testing positive during multiple urinalysis tests, failing to regularly report to his probation officer, failing to complete any community service hours, failing to complete anger management, failing to attend Narcotics Anonymous meetings, and failing to pay the required fees and court costs. (RR46: 144, 148-49, 150-51). Despite these numerous violations, in June of 2010, appellant was continued on probation and sent to an intermediate sanctions facility ("ISF") to complete a cognitive track program. (RR46: 152, 163). Appellant completed the program and was released in January of 2011; however, one month later he was arrested for a family violence assault against Kametra and absconded from probation for the next five months. (RR46: 152-53). He had a warrant out for his arrest for violating his probation at the time he was arrested the instant offense on August 22, 2011. (RR46: 154).

Appellant did not voluntarily turn himself in after drowning his two sons. He evaded police for most of the day, but was eventually captured. After the boys' bodies were found in the back of Naimah's car, several police officers set up a perimeter of the area and continued to search for appellant with the assistance of the helicopter unit. (RR46: 104, 107-11). Eventually appellant was spotted on foot, and five to six officers pursued him in a foot-chase. (RR46: 111-12). They

finally captured him in the bottom of an empty creek bed and appellant resisted arrest by fighting, pushing and kicking the officers. (RR46: 112-13). The officers had to use a Taser at least three times in order to gain control and place him in handcuffs. (RR46: 113-14).

While confined in Dallas County Jail and awaiting trial for capital murder, appellant had several disciplinary violations. On October 25, 2011, when appellant was instructed that he would be changing cells, he refused and had to be forcibly moved to another cell by two guards. (RR47: 101-03). Appellant was given five days of restrictions as a result, which meant that he was moved into a single cell and not allowed to go to the commissary, have visitation, or make personal phone calls other than to his attorney for five days. (RR47: 105). On April 25, 2012, appellant was unhappy about the tray of food he was served and refused to return the plastic tray until the guard served him another tray. (RR47: 104). When the guards went into appellant's cell to cease the food tray, appellant swung at one of them and the guards had to use force to detain him. (RR47: 104-05). As a result of this infraction, appellant was given twenty-five days of restrictions. (RR47: 105). On March 26, 2013, appellant was written up for fighting another inmate and received fifteen days of restrictions. (RR47: 111-12). On November 24,

21

2012, in a jail phone call to his brother Jamal, appellant told his brother that the only reason he had not "fired off on some of these fools" was because he wanted to keep up with his sports and visits. (RR47: 136–38; State's Exhibit 184).

In addition to appellant's lengthy history of criminal behavior and disrespect toward any person of authority, the State also presented evidence of appellant's violence toward Kametra throughout their relationship. Kametra met appellant in the summer of 2005 when she was fifteen years old and they began dating. (RR46: 169-70). They had been dating for two to three weeks when appellant became violent with her. (RR46: 176). The first incident of violence happened in the backyard of appellant's house following a verbal argument. (RR46: 177). Kametra told appellant she was leaving and he grabbed her, threw her in the back seat of his car, hit her with his fists multiple times, and told her she was not leaving. (RR46: 177-78).

Appellant's violence toward Kametra occurred once or twice a week in the beginning of their relationship, but escalated over the last few years they were together. (RR46: 179-80, 202). If Kametra burnt the rice, stayed outside too long with her sister, spoke disrespectfully to appellant, or questioned appellant about the way he was spending her money, appellant responded with physical abuse.

(RR46: 202-03, 210-13). When Kametra found out she was pregnant with their first child, Naim, appellant became upset and asked her to have an abortion. (RR46: 186-87, 188-89). He also encouraged her to drink bleach or attempt to abort the baby using a wire hanger. (RR46: 188). When Kametra refused to abort the baby, he punched and kicked her in the stomach in an effort to make her have a miscarriage. (RR46: 187-88, 191). Appellant repeated this abusive behavior when Kametra became pregnant with Elijah. (RR46: 195-96). Kametra's sister, Gabrielle Armstead ("Gabby"), witnessed the abuse and repeatedly encouraged Kametra to leave appellant. (RR46: 210-13).

In December of 2010, Kametra had grown tired of appellant being in and out of jail, failing to work, and being physically abusive towards her, so she decided to leave him. (RR46: 218-20). She and the boys left with her sister Gabby and stayed in a motel. (RR46: 221-22). For the next few months, they bounced around between the motel, shelters, and Priscilla's house. (RR46: 221-23, 225). Kametra resorted to prostitution in order to make money for food, diapers, the motel, and her newly developed drug addiction. (RR46: 222, 224). After a few months, Kametra checked into Nexus, a drug abuse treatment facility, and received the help she needed. (RR46: 222, 224-25, 249-51). Despite the hard

23

times she encountered over the months after leaving appellant, she knew that leaving him was the right decision and never got back together with him. (RR46: 222).

After the breakup, appellant continued to use violence to make Kametra comply with his demands. In February of 2011, when Kametra and the boys were were staying with her mother, appellant came over and wanted to take Naim and Elijah with him.  (RR46: 228-30). When Kametra told him no, appellant punched Kametra in the face, grabbed Naim from inside the house, and kicked in the side door of the house to escape. (RR46: 230-35). Kametra called the police, who located appellant a short time later and brought Naim home. (RR46: 233-36).

In March of 2011, Kametra borrowed Gabby's car to pick up the boys from appellant's house. (RR46: 236-37). Appellant insisted that Kametra take him to the store and got in the car with them. (RR46: 239).  When Kametra refused, appellant choked her until she passed out. (RR46: 240). She awoke inside appellant's house and when she attempted to leave, appellant hit her in the head with a heavy object. (RR46: 241). Kametra finally convinced appellant to let her return Gabby's car. (RR46: 242-43). When they exited the car, Gabby saw that Kametra was bleeding and called the police. (RR46: 243). Appellant was carrying

Elijah and threatened to kill him if Kametra did not go with him. (RR46: 245-46). The police were driving around searching for appellant and when they spotted him, appellant took off running. (RR46: 247). Initially he was still holding Elijah, but he threw him down and kept running. (RR46: 247-48). Following this incident, CPS instructed Kametra that appellant was not allowed to have unsupervised visitation with the boys. (RR46: 250).

In light of this history, Kametra was afraid of appellant and believed his threats to kill her, Naim, and Elijah on the day of the offense. (RR46: 252). Kametra believed that if she had done anything differently that day, the outcome would be worse and they would all be dead right now. (RR46: 252). She also believes that Jeremiah would be dead if Brandon had not been at her mother's house that morning. (RR46: 252).

Since the day of the offense, appellant has continued to blame others for his actions. At the end of his police interview, appellant asked Detective Yeric to tell Kametra that she was the reason he did it. (RR47: 118). While in jail, appellant wrote a letter to Kametra's mother stating, "I wished that I could have just talked to [Kametra] about this, but she should have never jumped out of the car and did what she did...this may sound crazy, but tell her I love her still and wish she would

25

have just listened to me that day because I didn't want this to happen." (RR46: 256; State's Exhibit 42).

## C. Appellant's Punishment Evidence

At punishment, appellant presented evidence of the neglect, violence, and sexual abuse he suffered during his childhood. Appellant had five siblings: Abdullah, Jamal, Aqueelah, Sekinah, and Rashad. (RR47: 140, 169-70, 183-84). Their mother, Naimah, was married to Roger Mopping when the children were young, until about the time that Jamal was in fifth grade. (RR47: 141, 170-71). Roger was the biological father of Jamal and Aqueelah. (RR47: 141, 183, 233, 248). Abdullah and appellant were told that their biological father was a man named Lynn, but no one knew for sure. (RR47: 149-50, 154, 183-84, 233, 248-49). None of them knew who the biological father of Sekinah or Rashad was. (RR47: 149, 162-63, 184, 248-49). Naimah was a drug-addicted prostitute who was rarely home. (RR47: 148, 150, 184-86, 231, 235-36; RR48: 31, 38-39, 47). Roger also became addicted to drugs. (RR47: 149-50, 186, 234-35, 238). Roger loved Naimah but eventually left her because she kept getting pregnant by other men. (RR47: 249).

After Roger left, Naimah and the children moved in with Naimah's mother Dorothy May Butler ("Madea"), who was confined to a wheelchair. (RR47: 152-53, 187-88). Even though Madea was crippled and regularly needed assistance from the children, this was the only stable portion of their childhood that they could recall. (RR47: 152-53, 187-88). After Madea passed away, Naimah was married to Joe Johnson for a short time. (RR47: 142, 159). While Joe did work and put a roof over their head, he was an alcoholic and appeared to care more about his hogs than the children. (RR47: 159-61, 198-99, 245; RR48: 47). When Joe left Naimah, the children lived with a variety of different people. (RR47: 161, 164, 193, 206-08; RR48: 29, 45). The girls were taken in by family members and somewhat protected; however, the boys, who were all already involved in the juvenile system, were forced to fend for themselves. (RR47: 164, 177, 207; RR48: 29-30, 45-46, 52, 55). According to Jamal, they ate out of dumpsters and resorted to crime to make money. (RR47: 164-65).

Throughout their childhood, appellant and his siblings were regularly exposed to drugs and violence in their home. Naimah, her brothers, and her sister, Tina, drank alcohol and smoked cracked cocaine together at the house and these binges frequently ended with violent fights. (RR47: 167, 194-95; RR48: 39,

42-43). Naimah and Tina fought the most, and Tina was sent to prison for twenty years for stabbing Naimah in the face during one of their arguments. (RR47: 156-57, 195-97; RR48: 42). Naimah was also violent toward the children when she believed they were taking her drugs away. (RR47: 166, 189-92).

The children were also victims of sexual abuse. Abdullah, the eldest brother, sexually assaulted Aqueelah, Sekinah and appellant. (RR47: 202-03; RR48: 40-41). Aqueelah and Sekinah recalled that he would frequently come into their room at night and rub his penis on them, fondle them, and ejaculate on them. (RR47: 202-03; RR48: 40-41). According to appellant, Abdullah played with his penis and made appellant play with his. (Defendant's Exhibit 11). Appellant also reported that he was sexually abused around age four or five by an older woman who asked him to have sex with her. (Defendant's Exhibit 11).

Both Aqueelah and Sekinah graduated from high school due to the guidance they received from the friends and relatives who helped take care of them in Naimah's absence. (RR48: 31-32, 37). However, no one encouraged the boys to attend school or stay out of trouble. (RR47: 204; RR48: 31-32, 46). To the contrary, the eldest brother, Abdullah, taught Jamal to steal and commit crimes, and that way of life was then passed on to appellant and Rashad. (RR47: 153-55,

28

205; RR48: 32). Like appellant, Abdullah, Jamal and Rashad were involved in a number of juvenile and adult crimes and spent time in prison. (RR47: 157-58, 163, 205-06; RR48: 29). Abdullah was shot in the chest when he was eighteen years old and survived; however, he died from complications related to that gunshot wound in January of 2011. (RR47: 158).

With regard to appellant's medical history, the defense presented evidence that appellant was struck by an automobile around age three and had to go to the hospital. (RR48: 177-78; Defendant's Exhibit 11). In 2009, appellant started having brain seizures and has been receiving treatment for epilepsy since that time. (RR48: 178-79; Defendant's Exhibit 11).

Dr. Gilbert Martinez, a clinical neuropsychologist, was hired by the defense to test appellant's cognitive and intellectual functioning. (RR48: 100-02). In order to form the opinions offered by his testimony, Dr. Martinez examined appellant's medical records and a previous psychological evaluation conducted in 1994 when appellant was in the juvenile system. He also conducted a clinical interview of appellant and administered a battery of psychological tests on appellant. (RR48: 102-04, 106-07, 111-12, 141; Defendant's Exhibit 11). With regard to his intellectual functioning, appellant received a full-scale IQ score of 76. (RR48: 114-

16, 124-25; Defendant's Exhibit 11). According to Dr. Martinez, appellant is not mentally retarded, but his IQ score falls in the borderline range of intellectual functioning. (RR48: 114-16, 124-25, 133; Defendant's Exhibit 11).

With regard to appellant's cognitive functioning, Dr. Martinez diagnosed appellant with mild neurocognitive disorder. (RR48: 122-24; Defendant's Exhibit 11). Appellant does not have severe cognitive or memory deficits, but he does have deficits in executive functioning. (RR48: 118-19, 122-24, 133). Dr. Martinez explained that a person with deficits in executive functioning has poor judgment and reasoning and may have difficulty making decisions, controlling their thinking and behavior, and learning from their mistakes. (RR48: 111, 123-24, 126-27, 134-35, 164-65). Dr. Martinez believes that appellant's deficits in executive functioning may be due to the combined effect of his epilepsy, the head injury he sustained as a child, and the lack of emotional support he received as a child. (RR48: 127-29, 133; Defendant's Exhibit 11). Appellant's chronic drug use could be a contributor to his deficits in executive functioning, or appellant's choice to use drugs could be the result of those deficits and his poor judgment. (RR48: 131, 133).

Dr. Kellie Gray-Smith testified as an expert on special education and the multicultural aspects of psychology. (RR49: 11-14). Dr. Gray-Smith, a licensed psychologist and licensed specialist in school psychology, is currently employed as the special education coordinator for Plano Independent School District. (RR49: 11-12). In her field of study, it is well-documented that different cultures treat the intervention and treatment of medical, mental health, and educational needs differently. (RR49: 15, 59). With regards to special education, there has historically been distrust within the African-American community of special education services and a negative stigma attached to a child who accepts those services. (RR49: 15-16, 59). These beliefs are often perpetuated by black leaders, especially in the church. (RR49: 16).

Special education was developed and designed to address students' academic, emotional-behavioral, and social needs. (RR49: 17). She explained that academic failure can develop for a number a reasons and it is not uncommon for an emotional disturbance to cause academic failure or vice versa. (RR49: 18-19, 59-60). Many behaviors – such as fighting, profanity, disrespect, and non-compliance – are perceived to be choice-based behaviors when sometimes they are actually caused by an underlying emotional, behavioral, or academic

disability. (RR49: 19-20). Literature shows that students whose needs are not recognized and addressed by an early age are at risk for chronic school failure, removal from school, school dropout, unemployment, substance abuse, criminal activity, and confinement in the penitentiary. (RR49: 21-24). If there is no intervention or treatment, the student can develop oppositional defiant disorder, conduct disorder and, eventually, anti-social personality disorder. (RR49: 42-43, 45). According to Dr. Gray-Smith, it is common for people with this behavior pattern to end up in jail. (RR49: 43-44, 73). This is what is known within the psychological community as the "school-to-prison pipeline," and it is most prevalent with African-American males. (RR49: 44).

Dr. Gray-Smith reviewed appellant's school records, the psychological evaluation done in 1994 when appellant was a juvenile, and the report of Dr. Gilbert Martinez. (RR49: 26-27, 41). Dr. Gray-Smith testified that appellant's school records demonstrate that appellant experienced chronic school failure starting in elementary school that went unaddressed. (RR49: 29-30, 33). In her opinion, this pattern of school failure was consistent with oppositional defiant disorder. (RR49: 56-57). She believed appellant's behavioral problems continued and escalated due to the school district's failure to provide effective intervention

and assistance to appellant. (RR49: 30-31, 33, 35, 61). In her opinion, appellant's school and psychological records suggest that he has anti-social personality disorder. (RR49: 58, 66-67, 72).

### D. The State's Rebuttal Evidence

Melodye Nelson, a 24-year veteran of the Texas Department of Criminal Justice-Institutional Division ("TDCJ"), testified as an expert on the prison system in Texas. (RR49: 101-47). Warden Nelson previously worked as a correctional officer on death row and is now the senior warden over the Mountain View and Hilltop female prison facilities. (RR49: 101-02). Warden Nelson testified generally about how inmates are classified and housed and the opportunity for violence within the prison system. (RR49: 102-47).

She explained that general population inmates are classified as a "G1" through "G5," with G1's and G2's being the inmates with the least amount of supervision. (RR49: 105, 123). There is also administrative segregation and death row, which are much more restrictive. (RR49: 105, 123, 135). An inmate's initial classification is not based on the crime committed, but rather on the sentence received, his behavior during any previous incarceration, and whether he is a member of a documented gang. (RR49: 105, 123-24, 126-28, 140). An inmate

33

serving a sentence of 50 years or more who has served less than ten years is automatically going to be classified as a G3. (RR49: 109, 124). That person can move up or down within the classification system depending on their behavior. (RR49: 110-11, 127-31, 135-36, 146-47). This means a person convicted of capital murder and sentenced to life without parole and who is not a documented member of a gang would be classified as a G3; the only distinction, however, is that person would never move down below a G3 classification. (RR49: 107, 109-10, 111-12, 125-26).

Inmates classified as G1's, G2's and G3's live in dormitories or cell blocks and can walk around unescorted throughout their prison facility. (RR49: 105-06, 107, 14-41). A capital murderer sentenced to life without parole who is classified as a G3 can shower, work, eat, go to school, go to the library and recreate like any other G3 in the general population. (RR49: 107, 109). In contrast, inmates on death row are housed in single cells and confined approximately 23 hours per day. (RR49: 114). They are allowed visitation and limited recreation, but they are strip-searched prior to leaving their cell and are always escorted in restraints with two correctional officers. (RR49: 114).

According to Warden Nelson, the Texas prison system is a well-run organization. (RR49: 121, 143). Nonetheless, there is an opportunity for violence throughout the prisons, regardless of classification level. (RR49: 112, 118, 131, 144). Even on death row, the most secure unit in Texas, violence occurs. (RR49: 112-13). Whether an inmate will commit acts of violence depends on the individual inmate and his demeanor. (RR49: 133-34, 136, 142). Inmates get creative in making weapons and use whatever they have access to, including typewriter rods, nails, screws, rocks, and sharpened chicken or pork bones. (RR49: 115-17).

## SUMMARY OF ARGUMENT

*Issues 1-20*: The trial court properly denied appellant's challenges for cause against twenty prospective jurors. All of the denials were proper, and appellant has not shown that he was denied the use of a statutorily provided peremptory challenge.

*Issues 21-22*: Appellant's argument that he was deprived of a lawfully constituted jury lacks merit. Appellant has failed to prove that any of the trial court's rulings on any of the challenges resulted in the seating of a juror who was biased or prejudiced.

*Issues 23-26*: The trial court did not abuse its discretion by admitting autopsy photographs of the victims. The photographs were relevant and necessary to assist the medical examiner with her testimony and to link the victims to this testimony, and their probative value was not outweighed by the danger of unfair prejudice

*Issues 27 and 41*: The trial court properly overruled appellant's objections to the State's closing argument during both the guilt-innocence and punishment phases of trial because the complained-of arguments fell within the permissible areas of argument. Further, given the overwhelming evidence supporting the jury's guilty verdict and their answers to the special issues, any error was harmless.

*Issue 28*: The trial court did not abuse its discretion by admitting testimony regarding appellant's statements to CPS investigator Pamela Womack. Because Womack was not an agent of law enforcement, she was not required to comply with *Miranda*.

*Issue 29*: The trial court did not abuse its discretion by admitting State's Exhibit 173, certified business records pertaining to appellant's 1997 conviction

for evading arrest. The totality of the evidence sufficiently linked appellant to the conviction.

*Issues 30-32*: The trial court properly overruled appellant's objections to the testimony of police officers Chris Havens, Harold Andrews, and Brandon Hernandez. These officers properly used police reports to refresh their memory and then testified from their refreshed memory.

*Issues 33 and 37*: The trial court did not abuse its discretion by admitting the testimony of Officer David Solomon regarding his arrest of appellant. His testimony was relevant to link appellant to an unadjudicated burglary offense previously presented by the State, and it did not leave a false impression that appellant was involved in a different offense.

*Issue 34*: The trial court properly admitted the expert testimony of Warden Melodye Nelson as her testimony was relevant and helpful to the jury in deciding the first special issue. Alternatively, any error in the admission of this testimony was harmless.

*Issue 35*: The trial court satisfied its duty to conduct a threshold determination of the admissibility of extraneous offenses. Any error in the trial court's failure to grant appellant's request for a separate hearing was harmless

because the State clearly proved each extraneous offense presented during the punishment phase.

*Issue 36*: Where the trial court granted appellant's request and instructed the jury to disregard inadmissible testimony, it did not abuse its discretion in denying appellant's motion for mistrial.

*Issues 38 and 39*: Appellant failed to preserve his complaints regarding the cross-examination of his experts for appellate review. In any event, the trial court did not err by permitting the State to cross-examine Dr. Kellie Gray-Smith and Dr. Gilbert Martinez regarding antisocial personality disorder, an issue within their area of expertise and clearly relevant to appellant's death-worthiness.

*Issue 40*: The trial court's statement regarding sequestration was not an improper comment on the weight of the evidence. Regardless, appellant was not harmed by the trial court's comment because it was not calculated to benefit the State or prejudice appellant's rights.

*Issue 42*: The evidence was legally sufficient to support the jury's answer to the future dangerousness special issue. Based upon the facts of the instant offense, as well as the evidence of appellant's past acts of crime and violence, a

rational jury could find that appellant would constitute a continuing threat to society.

*Issues 43-54*: Appellant's admittedly meritless federal constitutional challenges to the Texas death penalty statute are presented only to preserve the complaints for federal habeas review. And while appellant invites this Court to revisit its prior holdings against his position, he provides no new authority for this Court or the State to address.

## **ARGUMENT**

### **Issues 1-20: Denial of Defense Challenges For Cause**

In issues 1 through 20, appellant claims the trial court violated statutory and constitutional law by erroneously causing him to use all fifteen of his statutorily allotted peremptory strikes plus two additional strikes on persons who should have been removed for cause. Moreover, he contends that the trial court forced him to accept an objectionable juror after denying his request for additional strikes. (Appellant's Brief, pp. 20-87).

The trial court properly denied all of appellant's challenges for cause. Thus, his contentions are without merit and should be overruled.

### Applicable Law

A veniremember may be challenged for cause if, among other reasons, he possesses a bias or prejudice in favor of or against the defendant or he possesses a bias against an aspect of the law upon which the State or the defendant is entitled to rely. *See* Tex. Code Crim. Proc. Ann. arts. 35.16(a)(9), (b)(3), (c)(2) (West 2006); *Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Crim. App. 2004). A "bias against the law" is the refusal to consider or apply the relevant law. *Sadler v. State*, 977 S.W.2d 140, 142 (Tex. Crim. App. 1998). The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. *Threadgill*, 146 S.W.3d at 667.

Appellant has the burden of establishing that his challenge for cause is proper. *See Feldman v. State*, 71 S.W.3d 738, 747 (Tex. Crim. App. 2002). Before a prospective juror can be excused for bias, the law must be explained to him and he must be asked whether he can follow that law regardless of his personal views. *Threadgill*, 146 S.W.3d at 667. Appellant does not meet his burden of establishing that his challenge for cause is proper until he has shown that the veniremember understood the requirement of the law and could not overcome his prejudice well enough to follow it. *See Feldman*, 71 S.W.3d at 747.

When reviewing a trial court's decision to deny a challenge for cause, the appellate court looks at the entire record to determine if there is sufficient evidence to support the ruling. *Feldman,* 71 S.W.3d at 744. The appellate court reviews a trial court's ruling with "considerable" or "great" deference because the trial judge is in the best position to evaluate the prospective juror's demeanor and was present to observe the juror and listen to his tone of voice. *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007); *Threadgill*, 146 S.W.3d at 667. Particular deference is given when the prospective juror's answers are vacillating, unclear, or contradictory. *Threadgill*, 146 S.W.3d at 667. The appellate court reverses a trial court's ruling on a challenge for cause "only if a clear abuse of discretion is evident." *Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Crim. App. 1998). When the venireperson is persistently uncertain about his or her ability to follow the law, the reviewing court does not second guess the trial court. *Id.*

To prevail on a claim of erroneous denial of a challenge for cause, the defendant must object to the trial court that he is compelled to try his case with at least one individual on the jury who he would have removed with a peremptory challenge had one been available to him. Harm from the erroneous denial of a defense challenge for cause occurs: (1) when a defendant uses a

41

peremptory challenge to remove a veniremember whom the trial court should have excused for cause at the defendant's request, (2) the defendant uses all of his statutorily allotted peremptory challenges, and (3) the defendant unsuccessfully requests an additional peremptory challenge which he claims he would use to remove another veniremember whom the defendant identifies as "objectionable" and who actually sits on the jury. *Saldano*, 232 S.W.3d at 91. When this occurs, the trial court's erroneous denial of a challenge for cause harms the defendant by wrongfully depriving him of at least one of his statutory peremptory challenges that he could have used to remove the juror whom he has identified as objectionable. *Id*.

The parties asserted their challenges for cause and peremptory challenges at the conclusion of each prospective juror's individual voir dire. Appellant exhausted all fifteen of his statutory peremptory strikes and two additional strikes granted by the court. (RR36: 176-77; RR37: 85). The court denied appellant's request for a third additional strike to exercise on Ernest Hand, whom appellant identified as objectionable. (RR39: 90-91). Since appellant received two extra peremptory challenges, appellant must show that the trial court erroneously denied at least three of his challenges for cause to the other veniremembers

42

identified in issues one through twenty. *See, e.g., Saldano,* 232 S.W.3d at 93

(noting that the defendant would have to show the trial court erroneously denied

his challenges for cause to three of the complained-of venire members because

he received two extra peremptory strikes).

### *The Trial Court Properly Denied Appellant's Challenges for Cause*

### Issue 1: Milton Powell

Appellant exercised his first peremptory strike against Milton Powell. (RR6:

161-62). At trial, appellant objected that Powell should be excused for cause

because (1) he was "death prone," (2) he would give a police officer witness an

"elevated level of credibility," and (3) he would find appellant guilty regardless of

the State's failure to prove a "technicality." (RR6: 160-61). On appeal, appellant

contends Powell also should have been excused because he would not give

meaningful consideration to appellant's mitigation evidence. (Appellant's Brief,

pp. 22-23).

Appellant's complaint about Powell's inability to consider his mitigation

evidence is not preserved for review because it was not raised at trial. *See* Tex. R.

App. P. 33.1(a) (providing that a timely specific trial objection is prerequisite to

presenting a complaint on appellate review). Nevertheless, appellant fails to demonstrate error in the denial of his challenge on any ground argued on appeal.

*"Death Prone"*

Appellant claims Powell's answers showed that, if he found appellant guilty of capital murder, then he would automatically answer the special issues in such a manner to return a death verdict. (Appellant's Brief, p. 21-22). The record reflects the contrary. During questioning by both sides, Powell described his duty to follow the law governing the special issues as "a tremendous responsibility." He insisted that he would carefully consider the evidence as it related to those issues and that he would not return a death sentence simply because he found appellant guilty. When asked by defense counsel if his ability to follow the law would be impaired if the offense involved the death of a child, Powell stated only that it would influence his answers to the special issues and make his task more difficult. (RR6: 120, 122, 124, 137, 140-41, 147-48, 155-56). The court properly concluded that Powell was not death prone.

*Police Officer Credibility*

Appellant contends Powell's answers showed he "would give any police officer automatic credibility before hearing the witness" and that he "would judge

a law enforcement officer using a different criteria [sic] to determine credibility than other witnesses." (Appellant's Brief, p. 22). In his questionnaire, Powell stated that he believed police officers were more likely to tell the truth than the average person. (RR6: 123). During questioning at trial, the prosecutor explained to Powell that the law required him to treat all witnesses as equals at the outset, and that he must wait until he heard their testimony before assessing their credibility. Powell responded that he understood this law and would follow it. (RR6: 123).

During questioning by defense counsel, Powell again admitted his tendency to believe officers and to give them an "elevated level of credibility." (RR6: 133). Defense counsel did not question Powell about whether this tendency would affect his ability to follow the law, however. Thus, this statement did not impeach or contradict Powell's earlier assurances during the prosecutor's questioning on the matter. Even if it did, the statement merely presented the trial court with a fact question which it was free to resolve against appellant. *Threadgill,* 146 S.W.3d at 667 (holding particular deference is given to trial court's ruling on a challenge for cause when the prospective juror's answers are vacillating, unclear, or contradictory).

*State's Burden of Proof*

Appellant contends Powell's testimony showed that "he would have a hard time finding someone not guilty if the State failed to prove all of the elements of the indictment." (Appellant's Brief, p. 23). In support of this contention, appellant cites Powell's testimony during defense questioning that he would "probably still convict" if the indictment alleged Dallas County but the State proved the crime occurred in Tarrant County. (RR6: 130-31). Powell made similar statements on two other occasions during defense questioning. (RR6: 137, 140). None of these statements required Powell's excusal for cause.

At trial, defense counsel challenged Powell for refusing to require the State "to prove beyond a reasonable doubt all the allegations in the indictment . . ." (RR6: 161). The State is not required to prove venue beyond a reasonable doubt. Proof by a preponderance of the evidence satisfies the State's burden. Tex. Code Crim. Proc. Ann. art. 13.17 (West 2005). Admittedly, the State also misstated the law governing its burden of proof on venue. (RR6: 107-08). Nevertheless, Powell cannot be deemed biased for refusing to hold the State to a higher standard of proof than the law requires. Tex. Code Crim. Proc. Ann. art. 35.16(c)(2).

Even if appellant was entitled to a juror who would require a greater degree of proof, the court did not abuse its discretion in overruling the challenge to Powell. When initially questioned by the prosecutor on the matter, Powell stated that he would hold the State to its burden of proving every element, including venue, beyond a reasonable doubt. (RR6: 107-08). Furthermore, Powell's statements during defense questioning that he "probably would still convict" and that he "might overlook" or "tend to overlook that technicality" were not emphatic refusals to hold the State to its burden. Thus, resolution of this conflict in Powell's testimony against appellant was reasonable and within the court's discretion. *Threadgill*, 146 S.W.3d at 667.

*Mitigation Bias*

Lastly, appellant contends Powell should have been excused because he "could not give meaningful consideration to any mitigation that the defense would rely on in punishment." (Appellant's Brief, p. 22). In support of this contention, appellant refers to Powell's questionnaire, in which he disagreed that genetics, circumstances of birth, upbringing, and environment should be considered when determining punishment. He also cites to Powell's testimony that he felt incarceration was an insufficient punishment for some crimes. *Id*.

47

No juror is required to consider any particular fact as mitigating. *Standefer v. State*, 59 S.W.3d 177, 181 (Tex. Crim. App. 2001). Moreover, Powell made repeated and unwavering statements about his ability to follow the law and consider all of the evidence in answering the special issues. (RR6: 120, 122, 124). This is all the law required of him. Thus, if the court had been presented with this particular challenge, it would have been proper to deny it.

Powell was qualified to sit on the jury, and this Court should overrule Issue 1.

**Issue 2: Georgia Nichols**

Appellant exercised his second peremptory strike against venireperson Georgia Nichols. (RR10: 121). At trial, appellant objected that Nichols should have been excused for cause because (1) she would not hold the State to its burden of proving guilt beyond a reasonable doubt and (2) she could not consider the minimum punishment for the lesser-included offense of murder. (RR10: 118-19). On appeal, appellant does not complain that Nichols should have been excused for her position on the punishment range for murder. Thus, that ground is not presented for review.

Appellant does present and argue the other ground raised at trial –

Nichols's inability to hold the State to its burden of proof at guilt. Moreover, he

raises two new allegations: (1) that Nichols would automatically have assessed a

death sentence if she found him guilty of capital murder, and (2) that she was

"biased against any mitigation."[2] (Appellant's Brief, p. 29-30). Because these two

new grounds were not raised at trial, they are not preserved for review on appeal.

Tex. R. App. P. 33.1(a). Nevertheless, appellant fails to demonstrate that Nichols

should have been excused for cause on any of the three grounds argued on

appeal.

### State's Burden of Proof

Appellant contends Nichols should have been excused because her prior

jury service biased her against the law that required her to acquit if the State

failed to prove guilt beyond a reasonable doubt. Appellant cites to Nichols's

questionnaire in which she commented on the following statement: "Regardless

---

[2] In his brief, appellant also makes passing references to Nichols's questionnaire answers related to police officer credibility and her opinion about the rehabilitation of capital murderers. There is no accompanying argument nor were these answers raised at trial as a basis for challenging Nichols. (Appellant's Brief, p. 30; RR10: 118-19). If these references were intended to present additional grounds for excusing Nichols, they are inadequately briefed and will not be addressed by the State.

of what a judge says the law is, jurors should do what they believe is the right thing." Nichols agreed with the statement, saying, "I was on a criminal jury once; everything pointed to crime, but we let the criminal go free, because of 'evidence, beyond a doubt', which does not exist & is impossible if not witnessed; we let a bad man on the loose to hurt other children – I will never let this happen again." (Nichols Questionnaire, p. 7).

Both sides questioned Nichols about this statement and her prior experience as a juror. On both occasions, Nichols explained that she believed the defendant in the prior trial was guilty and that she was the lone "hold-out" juror. The other eleven jurors told her that she could not vote guilty unless she believed he was guilty "beyond a shadow of a doubt" or unless she was 100% certain of his guilt. She believed that the only way she could be that certain of guilt was if she witnessed the crime herself. (RR10: 41-42, 98-99).

The prosecutor explained that the burden of proof was beyond a reasonable doubt – not a shadow of a doubt – and that whatever convinced Nichols beyond a reasonable doubt was sufficient to convict. Nichols quizzed the prosecutor repeatedly to ensure that she understood the burden of proof if selected for appellant's jury. (RR10: 43-44, 73-74, 77-78). And when questioned

by defense counsel, she confirmed her accurate understanding of that burden. (RR10: 98-99, 100-01, 103). Furthermore, the prosecutor explained to Nichols that if the State failed to meet its burden on any element of the offense, she was required to acquit. Nichols understood and agreed with this law and repeatedly stated that she would hold the State to its burden, even if it meant an acquittal. (RR10: 49-53).

Nichols never demonstrated an unwillingness to hold the State to proof beyond a reasonable doubt. The statement in her questionnaire evinced only a misunderstanding of the law, not a bias against it, and her testimony resolved that misunderstanding. Thus, the court properly denied the challenge against her.

*Death Prone*

Appellant contends various answers in Nichols's questionnaire show that she would automatically assess a death sentence if she found someone guilty of capital murder. While apparently acknowledging that Nichols's testimony shows she would follow the law governing the assessment of punishment, appellant contends she was indoctrinated by the prosecutor and that her answers did not reflect her true opinions. (Appellant's Brief, pp. 29, 31). The record reflects otherwise.

Although Nichols strongly favored the death penalty, she stated that she could set aside her strong feelings and give full consideration to the evidence. (RR10: 71). She also agreed that a sentence of life without parole was an extreme punishment and that she could be satisfied with such a sentence. (RR10: 53, 97, 106). Furthermore, she stated on numerous occasions that she would wait and consider the evidence at punishment when assessing the sentence, even if she found the defendant guilty. Her answers were not merely one-word assents to propositions by the prosecutor. By all appearances, Nichols was a thoughtful, intelligent woman with a strong desire to follow the law. Her answers indicated an understanding and agreement with that law. (RR10: 45, 49, 54-55, 61-63, 65, 71, 77, 77-78). Indeed, she answered the same way when posed similar questions at length by defense counsel. (RR10: 93-94, 100, 102, 107-08, 111, 113). Not once did Nichols waver or give a conflicting answer on the matter. If appellant had challenged Nichols on this basis at trial, the denial of that challenge would have been proper.

*Mitigation Bias*

Appellant contends Nichols was biased against any mitigation because in her questionnaire she opined that genetics, circumstances, upbringing,

52

environment, and intoxication did not excuse criminal behavior. (Nichols Questionnaire, pp. 6, 10). Nichols had no duty to consider any particular fact as mitigating. *Standefer*, 59 S.W.3d at 181. She was only obligated to consider all the evidence presented at trial in determining her answers to the special issues. She unequivocally stated that she would do this, and she specifically stated that she would consider any mitigating evidence presented. (RR10: 45, 49, 54-55, 71, 107-08, 113). Thus, if the court had been presented with this particular challenge, it would have been proper to deny it.

Nichols was qualified to sit on the jury, and this Court should overrule Issue 2.

### Issue 3: Dee Jay Earley

Appellant exercised his third peremptory strike against Dee Jay Earley. (RR12: 244). At trial, appellant challenged Earley for lying on his questionnaire and refusing to consider evidence of intoxication in mitigation of punishment. (RR12: 238-43). On appeal, appellant contends the court should have granted his challenge on both of these grounds. He also contends the court should have excused Earley for cause because he was "death prone." (Appellant's Brief, pp. 32-35).

Because it was not raised at trial, the contention that Earley was death prone is not preserved for appellate review. Tex. R. App. P. 33.1(a). Nevertheless, appellant fails to demonstrate that Earley should have been excused for cause on any of the three grounds argued on appeal.

*Dishonesty in Questionnaire*

Appellant contends Earley was dishonest because he did not reveal his volunteer work as a victim's advocate in his questionnaire. Appellant characterizes the omission as an intentional deception. (Appellant's Brief, pp. 34-35). The record refutes this characterization.

Earley first mentioned his advocacy work during questioning by the prosecutor. The information was not directly solicited. Earley volunteered it. (RR12: 171-72). He testified that he served as a victim's advocate during his military service. It was not part of his regular duties; it was volunteer work that he agreed to do at the request of his commanding officer. He volunteered for two and a half years. He would assist victims of domestic assault, child abuse, etc. with finding food and shelter for the night and obtaining restraining orders. The offenses were typically minor; none involved a murder. (RR12: 171-72, 197-201).

Appellant claims that Earley should have provided the information in response to Question 58 in his questionnaire. The question asked Earley to list "any local, state or national citizens' law enforcement group such as a crime commission, group that supports the death penalty, group dedicated to victims' rights, traffic commission, neighborhood crime watch, Mothers Against Drunk Driving or police or sheriff's auxiliary." (Earley Questionnaire, p. 9). When the court asked Earley why he did not list his military advocacy work in response to this question, he explained that he did not belong to any organization. He and the other volunteers did not meet as a group. He would simply get a phone call and respond. Moreover, Earley explicitly denied any intent to deceive. (RR12: 239-43).

The court believed Earley and that credibility determination is entitled to deference. (RR12: 243). It is amply supported by Earley's explanation, by his express denial of any intent to deceive, and by the fact it was he who first volunteered the information. Thus, the court's denial of this challenge was proper.

*Consideration of Intoxication Evidence*

Appellant contends Earley was biased against any mitigation evidence because he did not believe evidence of intoxication should be considered in

mitigation of punishment. (Appellant's Brief, p. 34). Earley had no duty to consider any particular evidence mitigating. *Standefer*, 59 S.W.3d at 181. He was only obligated to consider all the evidence presented at trial in determining his answers to the special issues. Although he did not regard intoxication evidence as mitigating, he stated that he would consider it in answering the special issues. (RR12: 157-58, 225-30). Thus, Earley evinced no bias against the law and the court properly denied this challenge.

*"Death Prone"*

Appellant contends that Earley's responses to some of the questions in his questionnaire show that he would automatically assess a death sentence if he found the defendant guilty of murder or crimes against the elderly or children. (Appellant's Brief, p. 33). Earley's testimony dispelled any notion that he was "death prone."

Although Earley favored the death penalty for certain types of crimes, he had no problem with assessing a sentence of life without parole. (RR12: 204). He also repeatedly and unequivocally stated that he would hold the State to its burden of proof on the first special issue, he would wait, listen to, and consider the punishment evidence before answering the special issues, and he would not

56

automatically assess a death sentence just because he found appellant guilty. (RR12: 151-54, 159-66, 183, 188-89, 202-06, 215, 218-19, 224). The law required nothing more of Earley. Thus, any challenge that he was biased against the law would have been properly denied.

Earley was qualified to sit on the jury, and this Court should overrule Issue 3.

## Issue 4: Timothy Tinsley

Appellant exercised his fourth peremptory strike against Timothy Tinsley. (RR14: 116). At trial, appellant challenged Tinsley because: (1) he was unable to give "fair and accurate consideration to sufficient mitigating evidence"; (2) he was unable "to start police officers on the same level of credibility as other witnesses"; and (3) he was "death prone." (RR 14: 110-11). On appeal, appellant argues that the trial court abused its discretion in denying his challenge on all three grounds. (Appellant's Brief, p. 36-37). The record justifies the court's ruling.

### *Mitigation Bias*

Appellant contends Tinsley could not give full consideration to his mitigation evidence because of the "history of alcoholism in his family with his

brother as well as his stepdad." (RR14: 110, 112). Tinsley's testimony demonstrates otherwise.

Tinsley testified that his stepfather was an alcoholic who repeatedly went to prison. Tinsley lived with his stepfather for a year and a half and moved out when he turned 18. (RR14: 28-30, 78-80). Also, Tinsley acknowledged in his questionnaire and at trial that his brother is a recovering alcoholic. (RR14: 82; Tinsley Questionnaire, p. 10). Based on his experiences with his stepfather, as well as the lessons of his biological father who was a drill sergeant, Tinsley believed people should be held accountable for their actions. (RR14: 28-30). Furthermore, he expressly stated that he would not characterize evidence of voluntary intoxication as mitigating. (RR14: 80-81). Tinsley he had no duty to treat such evidence as mitigating, however. *Standefer*, 59 S.W.3d at 181. He was only obligated to consider any evidence of intoxication presented at trial by either side in determining his answers to the special issues. Tinsley's testimony reflects that he could fulfill that duty.

Tinsley never stated that he would not consider evidence of intoxication or drug use at punishment. He repeatedly assured both sides that he would have to hear the evidence before making any decisions on sentencing and that he would

wait and listen to the evidence in determining his answers to both special issues. (RR14: 38, 46-47, 49-50, 57, 104). He explained what types of intoxication evidence he would regard as mitigating, e.g., involuntary intoxication evidence. (RR14: 80-81). Then, referencing his feelings about drug and alcohol abuse, Tinsley avowed that his personal beliefs and the law "were two different things." (RR14: 85-86).

If there were any doubt as to Tinsley ability to consider voluntary intoxication evidence at punishment, it was dispelled during the court's questioning of Tinsley on the matter. When asked if he could keep an open mind as to any evidence either side might present on the punishment issues, Tinsley said, "I think I can." But when asked for a more definitive answer from the court, Tinsley said, "I can." (RR14: 113-15). Any vacillation in Tinsley's answer was for the trial court to resolve and that determination is entitled to deference. *Threadgill*, 146 S.W.3d at 667.

### *Police Officer Credibility*

Appellant contends Tinsley could not treat police officers the same as other witnesses, starting them out on an equal basis. Tinsley's testimony shows the opposite.

59

Tinsley stated that he would give a police officer "a little more respect" than the "average Joe." ((RR14: 105). But he was referring to how he would treat them outside of the courtroom. (RR14: 106). In court, Tinsley would treat all witnesses the same and wait until he heard the testimony to judge it, even if, generally, he thought police were more credible. (RR14: 55-57). In Tinsley's opinion, "Everybody's human, you know, so I would just – I would listen to the story and how it's presented to determine, yeah." (RR14: 105). Tinsley held no bias against the law governing police officer testimony, and the court properly overruled this challenge.

### "Death Prone"

Appellant contends that if he found appellant guilty of capital murder, Tinsley would automatically answer the special issues in a manner that resulted in a death sentence. (Appellant's Brief, p. 36). Nothing in Tinsley's testimony supports this contention.

Throughout his testimony, Tinsley repeatedly stated that he would not automatically vote for death if he found appellant guilty and that he would wait and consider the evidence presented at punishment in answering the special issues. (RR14: 38, 46-51, 57, 75, 86, 89, 104). By all appearances, Tinsley would

fulfill his duty of waiting and considering all the evidence before he determined his answers to the special issues. The court properly concluded that he was not challengeable as "death prone."

Tinsley was qualified to sit on the jury, and this Court should overrule Issue 4.

### Issue 5: Robin Linn

Appellant exercised his fifth peremptory challenge against venireperson Robin Linn. (RR14: 232). At trial, appellant objected that she was "death prone" and her testimonial responses were disingenuous and motivated by a strong desire to get on the jury. (RR14: 228-32).

Linn's questionnaire and testimony demonstrated that she strongly favored the death penalty and that she wanted to serve on the jury. (RR14: 127-28, 131-32; Linn Questionnaire). Neither of these facts rendered Linn challengeable for cause, however. And the remainder of Linn's testimony demonstrates an unequivocal understanding of and willingness to follow the law.

While she favored the death penalty, Linn stated that she did not believe it was appropriate for all homicides and that such a decision would have to be based on the particular facts and circumstances of each case. (RR14: 132-36). She

would not refuse to consider any punishment evidence, she would not answer the first issue affirmatively simply because she found appellant guilty of capital murder, and she believed that the special issues were a fair method for assessing whether the death penalty was appropriate. (RR14: 161-63, 169-70, 174). She could envision a scenario where a murderer might not be a future danger and where mitigating circumstances might warrant a life sentence. (RR14: 200, 210). And although she would like to know if a defendant were remorseful, she would not require him to testify to such in assessing his sentence. She understood that a defendant might feel remorseful but be unable to testify at trial for a variety of reasons. (RR14: 183, 201-02).

Appellant argued that Linn's demeanor during questioning told another story. According to defense counsel, Linn was simply saying what she needed to say to get on a death penalty jury. But Linn's desire to serve on appellant's jury was not motivated by a bloodlust. It was motivated by her faith in the system and her sense of civic duty. (RR14: 127-28). Her thoughtful explanations and responses throughout questioning by both sides evinced an intelligent woman who understood the gravity of serving in death penalty trial and who took the responsibility seriously.

Defense counsel argued that Linn's demeanor suggested otherwise. The prosecutor disputed that characterization. (RR14: 231). The trial court apparently disagreed as well because it overruled the challenge. (RR14: 232). The court's determination is entitled to deference and is amply supported by Linn's testimony, as detailed above.

Linn was qualified to sit on the jury, and this Court should overrule Issue 5.

### Issue 6: Charles Stout

Appellant exercised his sixth peremptory strike against venireperson Charles Stout. (RR16: 77). At trial, appellant objected that Stout would hold the decision not to testify against appellant, that he would put the burden of proof on appellant, that he would not presume appellant innocent, and that he did not understand the Texas death penalty sentencing scheme. (RR16: 74-76). On appeal, appellant focuses on one ground – holding his failure to testify against him. (Appellant's Brief, pp. 44-45). The court's rejection of this challenge was proper.

Appellant's contention that Stout would hold his failure to testify against him is premised on a mischaracterization of Stout's testimony. Although he would testify if he were a defendant, Stout repeatedly denied that he would hold

another's decision not to testify against him. Stout agreed that the defendant has no burden of proof, and he acknowledged that there could be a variety of reasons a defendant might not testify that had nothing to do with his guilt or innocence. (RR16: 36-38).

Stout did not equivocate or change his opinion when questioned on the matter again by defense counsel. He reiterated the responses he gave the prosecutor during earlier questioning. He also more specifically testified that he would not hold the decision not to testify against appellant in determining his guilt or innocence or in answering either of the special issues. (RR16: 47-48, 63-65). Stout's clear and unwavering responses show that he held no bias against appellant's Fifth Amendment right not to testify and would not consider it in his deliberations.

Stout was qualified to sit on the jury, and this Court should overrule Issue 6.

### Issue 7: Allen Harrington

Appellant exercised his seventh peremptory strike against venireperson Allen Harrington. (RR23: 82). At trial, appellant objected that Harrington could not consider evidence of intoxication, background, social issues, and expert mental health testimony. (RR23: 81-82). On appeal, appellant argues that the trial court

should have granted his challenge on that basis and on the ground that Harrington would automatically assess a death sentence if he found appellant guilty of capital murder. (Appellant's Brief, pp. 47-48).

Because the second ground was not raised at trial, it is not preserved for appellate review. Tex. R. App. P. 33.1(a). Nevertheless, appellant fails to demonstrate that Harrington should have been excused for cause on either ground argued on appeal.

*Mitigation Bias*

Appellant contends that Harrington's questionnaire responses and his testimony show that he would not consider evidence of genetics, background, environment, intoxication, or expert mental health testimony in answering the mitigation special issue. In actuality, Harrington's testimony shows that he would consider such evidence, but that he did not regard it as mitigating. (RR23: 46, 77-78). Harrington he had no duty to treat such evidence as mitigating. *Standefer*, 59 S.W.3d at 181. He was only obligated to consider any evidence presented in determining his answer to the mitigation special issue. Harrington's testimony reflects that he could fulfill that duty.

65

He stated that he would listen to the evidence and decide whether it was sufficiently mitigating. He agreed that the needed to wait and listen because "you never know what you'll hear." He also stated that his opinion about intoxication and background evidence in particular would not prevent him from given it consideration. (RR23: 77-78). Thus, the court properly denied this challenge.

*"Death Prone"*

Appellant contends Harrington's questionnaire responses reflect that he would automatically assess a death sentence if he found appellant guilty. Harrington's testimony reflects otherwise.

Harrington stated that although he strongly favors the death penalty, he would not automatically assess it if he found appellant guilty. (RR23: 27, 38-39). He agreed to wait and consider any evidence that would be offered on the special issues. (RR23: 38-39). He understood that the State had the burden of proof on the first issue and that he would hold the State to that burden. (RR23: 42-44). He acknowledged that he would set the bar very high on the mitigation issue, but he also stated that he wanted to hear evidence on the issue and that he would wait and consider it before assessing any sentence "because you never know." (RR23: 46-48).

Appellant attacks the veracity of Harrington's testimony. He argues that "Harrington was being more truthful when answering the questionnaire than when being examined" and that he "obviously wished to be on the jury and had been instructed by the State as to arrive there." (Appellant's Brief, p. 47). The totality of Harrington's testimony showed he was an intelligent man with a firm grasp of the law and a commitment to following it. Furthermore, Harrington explained that he was in a hurry when he filled out the questionnaire because he had to pick someone up from the airport. (RR23: 73-75). The court could have reasonably concluded that Harrington was rushed in his answers and took less care than if he had not been in such a hurry. Regardless, the trial court disagreed with appellant's characterization of Harrington's testimony and that determination is entitled to deference. *Threadgill*, 146 S.W.3d at 667.

Harrington was qualified to sit on appellant's jury. This Court should overrule Issue 7.

**Issue 8: Anthony Morrison**

Appellant exercised his eighth peremptory strike against venireperson Anthony Morrison. (RR24: 88). At trial, appellant objected that Morrison equated a death sentence with a guilty verdict on capital murder or murder and would not

67

consider certain types of mitigating evidence in answering the second special issue. (RR24: 78-79). On appeal, appellant contends the trial court abused its discretion in denying his challenge on both of these grounds. (Appellant's Brief, p. 49-52). The record supports the court's ruling.

*"Death Prone"*

Appellant argues Morrison's feelings about the death penalty were so strong that he would assess it as soon as the State proved appellant guilty of capital murder. In support, appellant cites Morrison's questionnaire responses and a portion of his testimony during defense counsel's examination. (Appellant's Brief, p. 52).

Morrison did not dispute that he strongly favored the death penalty, but he also stated that he was open to a sentence of life without parole. (RR24: 17-18, 29, 64-65). Then he repeatedly stated that even though he thought someone convicted of capital murder should get the death penalty, he would not let that feeling determine the punishment he assessed. Rather, he would apply the evidence to the law and let it determine his answers to the special issues and, consequently, the sentence. (RR24: 58-59, 61-62, 71, 73-74). The totality of

Morrison's testimony shows that he would not assess an automatic death sentence, and the court properly overruled this challenge.

*Mitigation Bias*

Appellant argues that Morrison was unable to give meaningful consideration to mitigation evidence that he intended to rely on. To the contrary, the record reflects that Morrison would consider appellant's evidence of background, environment, etc. Throughout his testimony, Morrison told both sides and the court the same thing. He felt that a person's background and upbringing do not excuse criminal behavior. Yet he would set aside those personal feelings and consider such evidence in answering the second special issue. (RR24: 41-42, 73-74, 84-85). At most, Morrison's testimony shows that he might not regard appellant's evidence of background, environment, etc. as mitigating. This did not render him challengeable because Morrison had no duty to treat any particular evidence as mitigating. *Standefer*, 59 S.W.3d at 181.

Morrison was qualified to sit on appellant's jury. This Court should overrule Issue 8.

## Issue 9: Enriquez Martinez

Appellant exercised his ninth peremptory challenge against venireperson Enriquez Martinez. (RR25: 205). At trial, appellant objected that Martinez would automatically assess a death sentence and that he would not give adequate and proper consideration to appellant's mitigation evidence. (RR25: 202). On appeal, appellant contends the trial court abused its discretion in denying his challenge on both these grounds and should also have excused Martinez because he would have required appellant to testify.

Because the third ground was not raised at trial, it is not preserved for appellate review. Tex. R. App. P. 33.1(a). Nevertheless, appellant fails to demonstrate that Martinez should have been excused for cause on any of the three grounds argued on appeal.

### *"Death Prone"*

Appellant argues that Martinez's questionnaire responses show that he would automatically assess a death sentence if he found appellant guilty of capital murder. Martinez's responses showed that he strongly favored the death penalty; they did not show that he would automatically assess it. (Martinez Questionnaire). Moreover, as appellant pointed out in his trial objection,

70

Martinez's testimony demonstrates that he understood and would follow the law in determining appellant's punishment. He repeatedly and emphatically differentiated between his feelings and the law and insisted that his feelings would not prevent him from following the law. He thought the special issues "process" was fair and preferable to jurors simply voting life or death. He would apply the evidence to the special issues and let that determine the punishment. (RR26: 160, 169-70, 172-76, 182, 191). He was not death prone and the court properly denied this challenge.

*Mitigation Bias*

Appellant argues that Martinez would not give adequate consideration to his mitigation evidence because he did not think a defendant's background, intoxication, or mental health excused their crime. Martinez's testimony shows that he would listen to any evidence appellant presented on the second special issue, including background, intoxication, etc., but he would not regard it as mitigating. This did not disqualify him from service because Martinez had no duty to treat any particular evidence as mitigating. *Standefer*, 59 S.W.3d at 181. The court properly denied this challenge as well.

*Failure to Testify*

Finally, appellant argues that Martinez would require appellant to testify in violation of his Fifth Amendment right against self-incrimination. Martinez denied this. Martinez said that he would be looking for signs of remorse or regret if a defendant did testify, but that he understood and respected the Fifth Amendment right and that a defendant's decision not to testify would not affect his verdict. (RR26: 162, 182-84). Thus, any challenge that Martinez was biased against Fifth Amendment law would have been properly denied.

Martinez was qualified to sit on appellant's jury. This Court should overrule Issue 9.

## Issue 10: Paul Zugelder

Appellant exercised his tenth peremptory strike against venireperson Paul Zugelder. (RR27: 226). At trial, appellant argued that Zugelder should be excused because the court and the prosecutor left him with the impression that defense counsel was misstating the law. On appeal, appellant reasserts this ground and claims the court abused its discretion in denying the challenge. (Appellant's Brief, p. 59). Apparently, it is appellant's contention that the alleged misimpression

biased Zugelder against the defendant. *See* Tex. Code Crim. Proc. Ann. art. 35.16 (a)(9). The record reflects no such bias.

Initially, defense counsel did make a misstatement of law. The misstatement arose during defense counsel's discussion of the concept of "mercy" and its relevance to mitigation special issue. When he first explained the law to Zugelder, defense counsel stated, "[T]he law specifically tells us, that a juror's concept of mercy, a juror's concept of mercy alone based on anything they have heard in the case is sufficient, if they believe it's sufficient." (RR27: 196-97). The prosecutor objected to this misstatement. Mercy could not be based on anything heard during trial; it had to be based on evidence. Defense counsel agreed and clarified his prior statement, and then the court sustained the objection. (RR27: 197).

When defense counsel continued his explanation, the prosecutor objected again to him omitting the phrase "based on the evidence." Defense counsel correctly noted that he had not omitted that phrase and then finished his explanation of the law. The prosecutor disagreed with defense counsel, but the court remained silent. (RR27: 198-99).

At this point, Zugelder interrupted and informed the court that he was confused about whether the law permitted him to disregard the mitigation special issue and assess life out of mercy. (RR27: 199). Thus, although defense counsel had not misstated the law, he had left a false impression with the juror. The court dispelled Zulgelder's confusion, explaining that he could answer the mitigation issue affirmatively based on mercy if that decision was based on some evidence at trial. (RR27: 199-01). Defense counsel and Zugelder continued to discuss the issue and, eventually, defense counsel acknowledged, "Maybe I didn't explain that too well to you the first time . . ." (RR27: 202-04).

In short, defense counsel did misstate the law initially and he did leave a false impression with Zugelder. Thus, if Zugelder had reacted negatively to defense counsel's miscommunications, that would have been counsel's fault. Zugelder did not react negatively, however. He remained communicative and engaged throughout the entirety of defense counsel's questioning. He remarked on counsel's candor and, in return, was himself candid. He did not express anger or even frustration. By all appearances, he was emotionally unaffected by the exchange and was concerned only with understanding the law and answering

74

questions honestly. (RR27: 196-207). The trial court reasonably concluded the same and properly denied this challenge.

Zugelder was qualified to sit on appellant's jury, and this Court should overrule Issue 10.

## Issue 11: David Hornstein

Appellant exercised his eleventh peremptory challenge against venireperson David Hornstein. (RR28: 116). At trial, appellant objected that Hornstein would not give consideration to appellant's mitigation evidence at punishment. Specifically, he would not consider appellant's character and background, mental health, or voluntary intoxication. (RR28: 114-15). On appeal, appellant claims the trial court abused its discretion in denying his challenge on this ground. (Appellant's Brief, p. 60-61).

Hornstein's testimony shows that he would listen to any evidence appellant presented on the second special issue, including background, intoxication, and mental health evidence, but that he might not regard it as mitigating. (RR28: 53-54, 61-63, 67, 95-112). This did not disqualify him from service because Hornstein had no duty to treat any particular evidence as mitigating. *Standefer*, 59 S.W.3d at 181. The court properly denied this challenge.

Hornstein was qualified to serve on appellant's jury, and this Court should overrule Issue 11.

## Issue 12: Andrea Griffith

Appellant exercised his twelfth peremptory challenge against venireperson Andrea Griffith. (RR30: 84). At trial, appellant objected that Griffith would not consider his mitigation evidence at punishment. Specifically, she would not consider genetics, background, upbringing, environment, or voluntary intoxication. (RR30: 82-83). On appeal, appellant claims the trial court abused its discretion in denying his challenge on this ground. (Appellant's Brief, p. 60-61).

Griffith's testimony shows that she would listen to any evidence appellant presented on the second special issue, but that she might not regard it as mitigating. (RR30: 58-59, 65, 70-76). This did not disqualify her from service because she had no duty to treat any particular evidence as mitigating. *Standefer*, 59 S.W.3d at 181. The court properly denied this challenge.

Griffith was qualified to serve on appellant's jury, and this Court should overrule Issue 12.

## Issue 13: Bradford McCutheon

Appellant exercised his thirteenth peremptory strike against venireperson Bradford McCutheon. (RR31: 112). At trial, appellant objected that McCutheon would not be able to give fair and accurate consideration to the special issues. (RR31: 111). On appeal, appellant contends the trial court abused its discretion in denying this challenge. (Appellant's Brief, pp. 64-65). The record supports the court's ruling.

Appellant argues that McCutheon's questionnaire and testimony show that he would automatically assess a death sentence if he found appellant guilty of capital murder. (Appellant's Brief, p. 65). Although McCutheon's responses showed that he strongly favored the death penalty, they also showed that he would not automatically assess it. Throughout his testimony, McCutheon repeatedly and expressly stated that he would not automatically answer the special issues "yes" and "no" just because he found someone guilty of capital murder. He also denied that he would let his feelings rather than the law control his answers to the issues. He stated that he would follow the law, keep an open mind to any evidence presented, and let the evidence determine his answers. (RR31: 35, 46-48, 51, 53, 57, 59-60, 82-84,87-89, 102-03). He thought that the

process of answering the special issues made sense and was better than jurors simply voting for a life or death sentence. (RR31: 61, 75-76). He was not death prone and the court properly denied this challenge.

McCutheon was qualified to serve on appellant's jury, and this Court should overrule Issue 13.

## Issue 14: Elvira Corpus

Appellant exercised his fourteenth peremptory against venireperson Elvira Corpus. (RR3: 70). At trial, appellant objected that Corpus would automatically assess a death sentence if she found him guilty of capital murder and that she would not consider his mitigating evidence. (RR33: 68-69). On appeal, appellant argues that the trial court abused its discretion in denying his challenge on both these grounds. He also argues that the court should have excused Corpus because she would not fairly assess the credibility of police officers. (Appellant's Brief, pp. 66-68).

Because the third ground was not raised at trial, it is not preserved for appellate review. Tex. R. App. P. 33.1(a). Nevertheless, appellant fails to demonstrate that Corpus should have been excused for cause on any of the three grounds argued on appeal.

*"Death Prone"*

Appellant argues that Corpus's questionnaire responses and testimony both show that she would automatically assess a death sentence if she found appellant guilty of capital murder. In particular, he cites responses in her questionnaire that show she strongly supports the death penalty. He also cites two excerpts from her testimony in which she appears to be saying that she would automatically answer the mitigation issue "no." (Corpus Questionnaire, pp. 2, 5-6; RR33: 55-56).

Corpus's questionnaire showed that she strongly favored the death penalty, but it also showed that she did not think it was appropriate in every case. (Corpus Questionnaire, p. 1). Nowhere in her questionnaire did she state that she thought a death sentence should be automatically assessed. (Corpus Questionnaire).

The two testimonial excerpts appellant cites show only that Corpus was confused by and misunderstood defense counsel's questions at one point. The prosecutor objected to the nature of defense counsel's questions several times during these excerpts, and Corpus expressed her confusion. (RR33: 58-59). Both before and after those two exchanges, Corpus consistently maintained that she

would not automatically answer either issue, that she would wait and listen to the evidence, and that she would keep an open mind. (RR33: 22, 25, 27-30, 34-35, 40-41, 49-50, 60-66). To the extent Corpus made any statements that reflected otherwise, the conflict was the court's to resolve, and it resolved it against appellant. That determination was proper and is entitled to deference. *Threadgill*, 146 S.W.3d at 667.

### *Mitigation Bias*

Appellant argues that Corpus would not give adequate consideration to his mitigation evidence because she did not think evidence of background, intoxication, or mental health excused crime. Corpus's testimony shows that she would listen to any evidence appellant presented on the second special issue, but she might not regard it as mitigating. (RR33: 63-66). This did not disqualify her from jury service because Corpus had no duty to treat any particular evidence as mitigating. *Standefer*, 59 S.W.3d at 181. The court properly denied this challenge as well.

### *Police Officer Credibility*

Appellant contends Corpus was biased because she thought "police officers were more likely to tell the truth." (Appellant's Brief, p. 67). Corpus did make that

statement in her questionnaire. (Corpus Questionnaire, p. 5). But at trial, Corpus agreed that all witnesses start out on equal footing and that she would wait and listen to an officer's testimony before determining his credibility. (RR33: 38-39). Thus, Corpus held no bias against the law governing police officer testimony, and the court properly overruled this challenge.

Corpus was qualified to serve on appellant's jury, and this Court should overrule Issue 14.

## Issue 15: Temple Koestner

Appellant exercised his fifteenth peremptory strike against venireperson Temple Koestner. (RR33: 157). At trial, appellant objected that Koestner would automatically equate a guilty verdict with a death sentence and that she would not consider his mitigation evidence. (RR33: 154-55). On appeal, appellant argues that the trial court abused its discretion in denying his challenge on both these grounds. He also argues that the court should have excused Koestner because she would not fairly assess the credibility of police officers and because she would disregard the court's instructions. (Appellant's Brief, pp. 66-68).

Because these two additional grounds were not raised at trial, they are not preserved for appellate review. Tex. R. App. P. 33.1(a). Nevertheless, appellant

81

fails to demonstrate that Koestner should have been excused for cause on any of the four grounds argued on appeal.

*"Death Prone"*

Appellant contends Koestner's questionnaire responses show that she was prone to vote for death if she found him guilty of capital murder. (Appellant's Brief, pp. 70-71). In actuality, her questionnaire shows only that she strongly favored the death penalty and that she thought it was an appropriate punishment in some murder cases, not all. She considered the death penalty and life without parole equally severe sentences. (Koestner Questionnaire, pp. 1, 3).

Koestner's testimony also shows that she was not predisposed to assess a death sentence. She confirmed her opinion that a life sentence was as severe as the death penalty. She repeatedly stated that she would not automatically assess a death sentence if she found him guilty. She said her feelings favoring the death penalty would not prevent her from following the law. She would keep an open mind to the evidence presented, and she would wait and apply the evidence to the special issues. (RR33: 87, 92, 99, 108, 116-17, 132-37, 148-49). At one point during questioning by defense counsel, Koestner became confused about whether counsel was asking her about her feelings or her ability to follow the law

in assessing punishment. (RR33: 142-46). To the extent Koestner's answers during that exchange created any conflict in her testimony, that conflict was the court's to resolve and it resolved it against appellant. *Threadgill*, 146 S.W.3d at 667. Given the totality of Koestner's testimony, that decision was reasonable and proper.

*Mitigation Bias*

Appellant argues that Koestner would not give adequate consideration to his mitigation evidence because on her questionnaire, she stated that she did not think evidence of genetics, environment, upbringing, and background should be considered when determining punishment. (Koestner Questionnaire, p. 6). At trial, however, Koestner testified that she would set aside those feelings and consider the evidence in determining her answers to the special issues. (RR33: 149-52). At most, her testimony and questionnaire showed that she might not regard such evidence as mitigating. This did not disqualify her from jury service because Koestner had no duty to treat any particular evidence as mitigating. *Standefer*, 59 S.W.3d at 181. The court properly denied this challenge as well.

## Police Officer Credibility

Appellant contends Koestner was biased because in her questionnaire she agreed that "police officers were more likely to tell the truth." (Appellant's Brief, p. 71). In addition to that statement, Koestner added, "With cameras in the cars now the officers have to tell the truth. The cameras don't lie." (Koestner Questionnaire, p. 5). But at trial, Koestner agreed that all witnesses start out on equal footing and that she would wait and listen to each witness's testimony before determining his credibility. (RR33: 118-19). Thus, Koestner held no bias against the law governing police officer testimony, and the court properly overruled this challenge.

## Following Court's Instructions

Appellant contends Koestner's response to question 41 in her questionnaire shows that she would not follow the court's instructions on the law. In question 41, Koestner agreed with the statement, "Regardless of what a judge says the law is, jurors should do what they believe is the right thing." She also added, "The jury must do as instructed, but can give the judge what they believe is right." (Koestner Questionnaire, p. 7).

No one questioned Koestner about this statement during her testimony or explained the law to her. Without first explaining to her that the law required jurors to follow the court's instructions, Koestner could not be deemed biased against the law. *Threadgill*, 146 S.W.3d at 667. Moreover, the totality of Koestner's testimony shows that she understood and considered herself duty bound to follow the law if selected for the jury. Thus, if appellant had challenged Koestner on this basis at trial, denial of that challenge would have been proper.

Koestner was qualified to serve on appellant's jury, and the Court should overruled Issue 15.

### Issue 16: Nancy Munn

Appellant exercised his sixteenth peremptory strike against venireperson Nancy Munn. (RR36: 176-77). At trial, appellant objected that Munn was "death prone," would not hold the State to its burden of proof regarding a "technicality," and would presume police officers were more credible. (RR36: 170-74). On appeal, appellant contends the trial court abused its discretion in denying the foregoing challenges. (Appellant's Brief, pp. 75-78). The record reflects otherwise.

*"Death Prone"*

Appellant contends Munn so strongly favored the death penalty that she would automatically answer the future dangerousness special issue affirmatively if she found him guilty of capital murder. He claims she would also automatically answer the second special issue "no" if she found him to be a future danger. (Appellant's Brief, pp. 74-78).

Although Munn's questionnaire and testimony both show her strong support for the death penalty, her testimony shows that her feelings would not affect her ability to follow the law and assess a sentence based on the law and the evidence. Munn stated that she believed there could be some cases where life without parole would be an appropriate sentence. (RR36: 112). She also stated that she believed some people could be rehabilitated. (RR36: 113). During questioning by both sides, she repeatedly stated that she would not automatically answer either special issue, that she thought the special issues were fair, and that she would consider any evidence offered in determining her answers to the issues. She also stated that she believed there could be evidence that would convince her appellant deserved a life sentence. (RR36: 117, 129-30, 134-35, 143-44, 150-62).

Appellant argues that some of Munn's answers were equivocal, demonstrating an uncertainty about her ability to follow the law. Any equivocation in Munn's answers was for the trial court to resolve, and it was resolved against appellant. That determination is entitled to deference and is supported by the totality of Munn's testimony. *Threadgill*, 146 S.W.3d at 667.

### *State's Burden of Proof*

Appellant argues that Munn could not hold the State to its burden of proof on the issue of guilt because she would have difficulty acquitting someone based on the State's failure to prove a "technicality," such as venue in Dallas County. (Appellant's Brief, p. 77). Munn's testimony reflects, however, that she understood the State's burden and her duty if the State failed to meet it. (RR36: ). When presented with the scenario of the State failing to prove venue, Munn stated, "It would have to be that he was innocent because it had to be in Dallas County." (RR36: 124). During defense questioning, Munn expressed some distress at being put in the position of acquitting in that scenario. Still, she stated that she believed she could follow the law and acquit. (RR36: 145-47). The court properly found no bias on this basis.

*Police Officer Credibility*

Appellant argues that Munn would give police officers more credibility than other witnesses. (Appellant's Brief, p. 76). The record reflects the opposite. In her questionnaire, Munn stated that she believed police officers are more likely to tell the truth than the average person. But she also wrote, "I think they are people so they make mistakes, however & also I think that suit gives some people a perceived power." (Munn Questionnaire, p. 5). Furthermore, during her testimony, Munn stated that she would treat all witnesses the same, that she did not believe everyone tells the truth all of the time, and that police officers are human. She also stated that she would not automatically find an officer credible, but would wait and listen to their testimony to judge their credibility. (RR36: 162-63). The court properly concluded that Munn held no bias in favor of a police officer's testimony.

Munn was qualified to serve on appellant's jury, and this Court should overrule Issue 16.

## Issue 17: Ernest Hand

Appellant requested additional strike to eliminate venireperson Ernest Hand. The trial court denied the request, having already given appellant two

additional strikes.[3] (RR39: 90-91). At trial, appellant objected that Hand was "death prone." (RR39: 89-90). On appeal, appellant contends the trial court abused its discretion in denying this challenge. He also argues that the court should have excused Hand because he would not fairly assess the credibility of police officers and would not consider appellant's mitigation evidence. (Appellant's Brief, pp. 80-81). Because the two additional grounds were not raised at trial, they are not preserved for appellate review. Tex. R. App. P. 33.1(a). Nevertheless, appellant fails to demonstrate that Hand should have been excused for cause on any of the three grounds argued on appeal.

### *"Death Prone"*

Appellant argues that Hand was "death prone" because he strongly favored the death penalty. In support of this contention, appellant cites Hand's questionnaire in which he stated that he thought the death penalty was used to seldom and that it took too long to administer. Also, he stated that he thought the justice system was too lenient, slow, and inconsistent. (Appellant's Brief, p. 80).

---

[3] Appellant exercised his second extra strike (strike 17) against venireperson Robin Schwartz (RR37: 85). He challenged Schwartz for cause at trial, but does not complain about the denial of that challenge on appeal. (RR37: 81-83).

Although Hand did strongly support the death penalty, his questionnaire reflects that he did not think it should be applied in all murder cases. Furthermore, during his testimony, Hand stated that he believed some murderers deserve a life sentence. He also testified that he would not automatically assess a death sentence. He would wait and listen to the evidence and apply it to the special issues. (RR39: 27, 32, 37, 43-46, 64-65, 75-78, 83). The trial court properly denied this challenge.

*Police Officer Credibility*

Appellant argues that Hand was biased toward police officers. (Appellant's Brief, p. 80). In support of this argument, appellant cites Hand's questionnaire in which he stated that he agreed police officers were more likely to tell the truth than the average person. According to Hand, "They are more accountable." (Hand Questionnaire, p. 5).

On their own, Hand's statements in his questionnaire do not evince a bias in favor of officers. His statements reflect only that he expects officers to be truthful, not that he will automatically find them more credible. Furthermore, Hand testified that he understood he must treat all witnesses, including officers, alike, and wait until they testified to assess their credibility. (RR39: 44-46). Thus, if

appellant had challenged Hand on this basis at trial, denial of that challenge would have been proper.

*Mitigation Bias*

Appellant argues that Hand would not give adequate consideration to his mitigation evidence because on her questionnaire, he stated that he did not think evidence of genetics, environment, upbringing, and background should be considered when determining punishment. In addition, he wrote that "there is no circumstance that gives a person the right to murder except in personal danger." (Hand Questionnaire, p. 6).

At trial, Hand testified that he would listen to any evidence presented on the special issues. (RR39: 43, 64-65, 75). At most, Hand's questionnaire showed that he might not regard evidence of background, environment, etc. as mitigating. This did not disqualify him from jury service. Hand had no duty to treat any particular evidence as mitigating. *Standefer*, 59 S.W.3d at 181. Thus, if appellant had challenged Hand on this basis at trial, denial of that challenge would have been proper as well.

Hand was qualified to serve on appellant's jury, and this Court should overrule Issue 17.

**Issue 18: Elizabeth McDaniel**

Appellant challenged McDaniel on the basis that she was death prone and would automatically assess a death sentence if she found the appellant guilty of capital murder. Appellant argued that he did not believe she would give adequate consideration to special issue number one. He also argued that, with regard to special issue number two, she would require him to testify and show remorse in violation of his Fifth Amendment rights. (Appellant's Brief, pp. 81-83).

Nothing in McDaniel's questionnaire or testimony supports appellant's contentions. McDaniel's questionnaire showed that she strongly favored the death penalty, but it also showed that she did not think it was appropriate in every case. (McDaniel Questionnaire, p. 1). Nowhere in her questionnaire did she state that she thought a death sentence should be automatically assessed. (McDaniel Questionnaire). Throughout her testimony, McDaniel repeatedly affirmed that she would not automatically vote for death if she found appellant guilty and that she would wait and consider the evidence presented at punishment in answering the special issues. (RR39: 134, 142-43, 156-58, 163, 165). She affirmed her understanding of special issue number one and that the jury could not answer that issue "yes" unless the State met its burden of proof.

92

(RR39: 134-38, 160-62). She affirmed that if she heard sufficiently mitigating evidence she could assess a life sentence. (RR39: 141). She stated her understanding that a defendant does not have testify and confirmed that she would follow the court's instruction not to consider a defendant's failure to testify for any purpose during her deliberation. (RR39: 144, 166).

McDaniel was qualified to sit on the jury, and this Court should overrule Issue 18.

### Issue 19: Arleen Jimenez

Appellant challenged Jimenez on the basis that she would automatically assess the death penalty if she found the defendant guilty of capital murder. He also challenged her on the basis that she viewed the death penalty as a deterrent and was not used enough. (Appellant's Brief, pp. 83-85).

Jimenez's questionnaire shows only that she strongly favored the death penalty and that she thought it was an appropriate punishment in some murder cases, not all. She considered the death penalty and life without parole equally severe sentences. (Jimenez Questionnaire, pp. 1-2). Further, Jimenez's testimony shows that she was not predisposed to assess a death sentence. Jimenez stated that she could follow the law and not automatically give someone a death

sentence just because they have been found guilty. (RR40: 39-40, 48, 56, 60). She affirmed that she would keep an open mind and wait to hear all the evidence before she answered special issues. (RR40: 42, 48, 57-60, 62, 71-72). Appellant fails to demonstrate that Jimenez had a bias against him or the law in any way.

Jimenez was qualified to sit on the jury, and this Court should overrule Issue 19.

## Issue 20: Dan Blanks

In his final issue, appellant complains that the trial court improperly denied his challenge for cause against Dan Blanks. However, Mr. Blanks was the alternate and did not participate in jury deliberations. As such, appellant cannot show he was harmed by the trial court's ruling on his challenge for cause against Blanks.

In any event, appellant's claims are without merit. Appellant challenged Blanks on the basis that he equated the death penalty with a guilty verdict. On appeal, appellant also argues that Blanks thought police officers were more likely to tell the truth that the average person. (Appellant's Brief, pp. 84-85). Because this additional ground was not raised at trial, it is not preserved for appellate review. Tex. R. App. P. 33.1.

Blanks' questionnaire showed that he strongly favored the death penalty, but it also showed that he did not think it was appropriate in every case. (Blanks Questionnaire, p. 1). Nowhere in his questionnaire did he state that he thought a death sentence should be automatically assessed. (Blanks Questionnaire). During his testimony, Blanks affirmed that he would not automatically vote for death if he found appellant guilty and that he would wait and consider all the evidence before making any decision on how to answer the special issues. (RR41: 36-37, 48-49, 53, 59-60, 64). He also affirmed that he would judge the credibility of the witness based on their testimony, not before he or she testifies. (RR41: 38-39). As such, Blanks was qualified to sit on the jury, and this Court should overrule Issue 20.

## *Conclusion*

Appellant has not shown even one erroneous ruling on his challenges for cause, much less three erroneous rulings. Therefore, he has not shown this Court that he was denied the use of a statutorily provided peremptory strike. Issues 1 through 20 should be denied.

**Issues 21 and 22: Constitutional Right To Fair And Impartial Jury**

In Issues 21 and 22, appellant contends the trial court's denial of his challenges for cause deprived him of a lawfully constituted jury resulting in violations of his rights under the state and federal constitutions and under article 35.16 of the Texas Code of Criminal Procedure. (Appellant's Brief, pp. 88-89).

Appellant's contentions are meritless. He has failed to show the trial court's rulings on any of the challenges resulted in the seating of a juror who was biased or prejudiced. If an appellant does not present record evidence demonstrating that the trial court's error deprived him of a jury comprised of legally qualified jurors, he has suffered no harm and the reviewing court should presume the jurors are qualified. *See Gray v. State*, 233 S.W.3d 295, 301 (Tex. Crim. App. 2007). Therefore, this Court should overrule Issues 21 and 22.

**Issues 23-26: Admission Of Autopsy Photographs**

In Issues 23 through 26, appellant contends that the trial court erred in overruling his Rule 403 objections to State's Exhibits 4-9, 11-23 and 77-78, autopsy photographs of the victims. (Appellant's Brief, pp. 90-97). He does not address the photographs individually, but generally contends they were excessive. He also complains they were unfairly prejudicial because there were no

96

controverted issues as to cause of death. His contentions are without merit and should be overruled.

### *Applicable Law*

The admissibility of a photograph is within the sound discretion of the trial judge. *Paredes v. State*, 129 S.W.3d 530, 539 (Tex. Crim. App. 2004); *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997). Generally, a photograph is admissible if verbal testimony about the subject of the photographs is also admissible. *Id*.; *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007) (holding that, if verbal testimony is relevant, photographs of the same are also relevant). More specifically, a visual image of the injuries appellant inflicted on the victim is evidence that is relevant to the jury's determination and is admissible. *Gallo*, 239 S.W.3d at 762; Tex. R. Evid. 401. The fact that the jury also heard testimony regarding the injuries depicted does not reduce the relevance of the visual depiction. *Id*.

Rule 403, on the other hand, allows for the exclusion of otherwise relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

*See* Tex. R. Evid. 403. Rule 403 favors the admission of relevant evidence and presumes that relevant evidence will be more probative than prejudicial. *Williams*, 958 S.W.2d at 196. A court may consider several factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, including but not limited to: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, and whether the body depicted is naked or clothed. *Id*. A reviewing court must also consider the availability of other means of proof and the circumstances unique to each individual case. *Id*.

### *Issues 23 and 24: The Trial Court Did Not Abuse its Discretion by Overruling Appellant's Objections to State's Exhibits 4-9 and 11-23*

In a pretrial hearing held outside the presence of the jury, appellant requested that the trial court make a threshold determination of the admissibility of autopsy photographs of the victims. (RR42: 28-30). He argued that because the defense was conceding guilt and there was no issue with regard to the cause of death of the victims, no autopsy photographs should be admitted because they have no probative value and are only being offered to inflame the jury. (RR42: 28-34). The State notified the trial court that it was in possession of over 170 photographs, some of them quite graphic, but that they had met with the medical

examiner and selected only the ones necessary to aid her in explaining the injuries sustained by the children. (RR42: 30, 34, 39). The trial court examined the thirteen photographs of Elijah Muhammad and six photographs of Naim Muhammad that the State planned to offer. (RR42: 34-38; State's Exhibits 4-9, 11-23). The trial court found the probative value the photographs outweighed the prejudicial effect and overruled appellant's objections. (RR42: 36-38).

All of the photographs admitted were in color and were 8 ½ by 11 inches. State's Exhibits 11-23 are autopsy photographs of Elijah. Exhibits 11 and 12 depict how Elijah appeared when he arrived at the medical examiner's office and the clothes he was wearing. Additionally, Dr. Dyer used exhibit 11 to explain the process of postmortem purging, and exhibit 12 to explain their standard practice for collecting fingernail clippings. (RR42: 122-23; State's Exhibits 11-12). She explained that after the "as-is" photographs are taken of the victim, the body is cleaned up for the autopsy and re-photographed, which is what is depicted in exhibit 13. (RR42: 124; State's Exhibit 13).

Dr. Dyer used exhibits 14-21 to describe the various injuries she observed during the external examination of Elijah. Although Elijah is not clothed, all of the photographs are close-ups of specific parts of his body. The photographs are not

repetitious and each depicts a different area of injury. Specifically, exhibits 14 and 15 depict the facial injuries he sustained; exhibit 16 depicts a linear abrasion on his back; exhibit 17 depicts abrasions on the outside of the leg; exhibit 18 depicts abrasions and a blister on the sole of his left foot; exhibit 19 depicts abrasions on the top of the right foot; exhibit 20 depicts abrasions on the back side of his right leg; and exhibit 21 depicts an abrasion on his wrist. (RR42: 124-26; State's Exhibits 14-21). Dr. Dyer used exhibits 22 and 23 to describe the injuries she observed during the internal examination of Elijah. Exhibit 22 depicts the bruising on the inside of his scalp and exhibit 23 depicts the dirt and debris that were found in his airway. (RR42: 126-28; State's Exhibits 22-23).

State's Exhibits 4-9, autopsy photographs of Naim, were used in the same manner as the photographs of Elijah contained in State's Exhibits 11-23. State's Exhibit 4 is the "as-is" photograph of Naim – it depicts the clothes he was wearing and how he presented when he arrived at the medical examiner's office. (RR42: 135; State's Exhibit 4). It also depicts white foam coming from his nose, the result of postmortem purging. (RR42: 134-36; State's Exhibit 4). Exhibit 5 shows how Naim appeared after the debris was removed and he was cleaned by the medical examiner. (RR42: 136; State's Exhibit 5). Exhibits 6-8 are close-ups of specific parts

of Naim's body, each depicting a different area of injury observed during the external examination. Specifically, exhibits 6 and 7 depict abrasions on the side of the face and forehead, and exhibit 8 depicts abrasions on the back of hand. (RR42: 136-37; State's Exhibits 6-8). Exhibit 9, taken during the internal examination, depicts the bruising he sustained on the inside of his scalp. (RR42: 137-38; State's Exhibit 9).

The medical examiner was entitled to testify to the manner of death, the cause of death, and the number and types of injuries sustained by each victim, issues to which these photographs were relevant. The fact that appellant did not contest the manner of death does not render the photos irrelevant. *See Long v. State*, 823 S.W.2d 259, 274, 275 (Tex. Crim. App. 1991) (holding that testimony and photographs as to manner, cause, and time of death are relevant to capital murder prosecution even though defendant pled guilty).

Mindful of the potential for unfair prejudice, the State took great care to reduce the number of autopsy photographs and utilized only the ones necessary for Dr. Dyer's testimony. Furthermore, in the realm of capital murder victim photos, the pictures are nothing close to gruesome. *See, e.g., Gallo*, 239 S.W.3d at 763-64 (upholding admission of twenty-three photographs of 3 year-old victim

including photographs of vaginal injuries, internal injuries including close-ups of cracked ribs, a picture in which the rib had been removed from the body, various views of the underside of the victim's scalp and the victim's skull, and one picture of the victim's brain). Sixteen of the nineteen photos admitted in this case are pre-autopsy and show only external abrasions inflicted during the offense. And while exhibits 9, 22 and 23 are slightly more graphic, the photographs show bruising or other damage that is attributable to appellant's actions but is not visible externally, thereby making the photographs highly relevant to the manner of death. *See Ripkowski v. State*, 61 S.W.3d 378, 392-93 (Tex. Crim. App. 2001).

The trial court did not abuse its discretion in determining that the probative value of these photographs was not substantially outweighed by unfair prejudice. Accordingly, Issues 23 and 24 are without merit and should be overruled.

### Issues 25 and 26: The Trial Court Did Not Abuse its Discretion by Overruling Appellant's Objections to State's Exhibits 77 and 78

At a hearing outside the presence of the jury, appellant made a Rule 403 objection to State's Exhibits 77 and 78, autopsy identification photographs of the children. (RR43: 133). Appellant argued that, in light of their concession of guilt, there was no probative value in admitting the photographs and they were only being offered to provoke a visceral response from the mother on the witness

stand. (RR43: 133-35). The State argued that, despite any conciliatory statements made by appellant during voir dire and the guilt phase, he did not plead guilty and they are still required to prove the identity of the decedents beyond a reasonable doubt. (RR43: 135). The trial court examined the two photographs and overruled appellant's objection. (RR43: 136-41).

State's Exhibit 77 is an autopsy identification photo of Elijah. He is shown unclothed from the chest up, lying on a table. The medical examiner's placard showing autopsy identification number IFS-11-12022 is placed across his chest. (State's Exhibit 77). State's Exhibit 78 is an autopsy identification photo of Naim. He is also shown unclothed from the chest up, lying on a table, and a placard with autopsy identification number IFS-11-12023 is across his chest. (State's Exhibit 78). At the conclusion of the direct examination of Kametra, the State showed her exhibits 77 and 78. (RR43: 141). Kametra identified the individual in exhibit 77 as Elijah and the individual in exhibit 78 as Naim. (RR43: 141). There was no outburst or visceral response by Kametra when she viewed the photographs. (RR43: 141).

Kametra's identification of the individuals in State's Exhibits 77 and 78 linked Dr. Dyer's autopsy reports to the named victims. (RR43: 141-42; State's Exhibits 10, 24, 77-78). As such, they were highly relevant. These exhibits are not

particularly gruesome or detailed, are not enhanced in any way, and portray no more than the condition of the victims due to the injuries inflicted by appellant. As such, the trial court did not abuse its discretion in holding that the probative value of the photographs outweighed the danger of unfair prejudice. *See, e.g., Young v. State*, 283 S.W.3d 854, 875 (Tex. Crim. App. 2009) (trial court did not abuse its discretion in determining that an autopsy identification photograph used to tie the victim to his assigned case number was relevant and that its probative value outweighed the danger of unfair prejudice).

Issues 25 and 26 are without merit and should be overruled.

**Issues 27 and 41: Jury Argument**

In Issues 27 and 41, appellant contends that the trial court erred in denying his objections to the State's closing argument during both the guilt-innocence and punishment phases of trial. (Appellant's Brief, pp. 97-99, 124-25). His contentions are without merit and should be overruled.

*Applicable Law*

The purpose of closing argument is to facilitate the jury's proper analysis of the evidence presented at trial so that it may arrive at a just and reasonable conclusion based on the evidence alone and not on any fact not admitted into

evidence. *Campbell v. State*, 610 S.W.2d 754, 756 (Tex. Crim. App. [Panel Op.] 1980). Proper jury argument generally falls within one of four areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to an argument of opposing counsel, and (4) plea for law enforcement. *Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011). Counsel is generally afforded wide latitude in drawing inferences from the record, as long as the inferences are reasonable and offered in good faith. *Coble v. State*, 871 S.W.2d 192, 205 (Tex. Crim. App. 1993) (en banc).

Even when an argument exceeds the permissible bounds of these approved areas, such will not constitute reversible error unless, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial proceeding. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). The remarks must have been a willful and calculated effort on the part of the State to deprive appellant of a fair and impartial trial. *Id*. An instruction to disregard, which the jury is presumed to follow, will generally cure the improper argument. *Id*.

## *Closing Argument at Guilt-Innocence*

In Issue 27, appellant contends that the trial court erred in overruling his objection to the State arguing outside the scope of the guilt-innocence stage of trial. The complained-of argument went as follows:

> MS. SWEET: He told you what he did. He took those two little boys down to the nasty, smelly overgrown creek, and he carried one down, and the other one he was holding a hand. The little boy was reaching out and grabbing Daddy's shirt. Did they know what Daddy was going to do? They did because they were crying, Daddy, Daddy, we love you. We love you, Daddy. They knew they were going to die. He had already told them. What did he tell them? Your mama don't want us anymore. Your mama doesn't want us. That's what he told them. What better way to get back at her than to kill those two kids? That's why he did it. He did it to get back at her. He did it to make sure that no other man would ever show them any real love, so no other man would be a real father like he never was.

> MR. JOHNSON: Excuse me, Judge. I'm going on object to this argument, the entirety of this argument. It is outside the scope of the guilt/innocence issue before this jury, and I would ask the Court to instruct the prosecutor to limit her remarks to the evidence that goes to the proof or denial of whether or not the Defendant committed the offense.

> THE COURT: Ms. Sweet, just argue the evidence and the law. Thank you.

> MR. JOHNSON: And, Judge, I'm going to ask that the instruction be limited further to argue the evidence and the law as it applies to whether or not the Defendant committed the offense.

> THE COURT: I have already instructed the prosecutor. Argue the

evidence and the law. Proceed, Ms. Sweet.

MS. SWEET: Y'all can remember the evidence that you heard yesterday, Monday. He took those kids down there and he knew what he was going do, and he told them to sit down. What did he tell them? Put your head down in the water and act like you are swimming. And that's when he took his hands and he put them on each kid and he held their head under the water. ***Can you imagine what that must have felt like? What were those kids thinking?***

MR. JOHNSON: Judge, again, I'm going to object again. This entire argument is now outside the scope of guilt/innocence and we're going to object to it at this phase of the trial.

THE COURT: I will overrule the objection.

MS. SWEET: That's how he killed them, in a dirty, nasty creek. That's where their life ended. It's the first day of school for Naim, but it was the last day of his life. So these two little precious boys, two little precious innocent babies, they were crying for their mother. That was in evidence. They were crying for mom. They are crying for mom to help them. And this is how they end up. This is his handiwork right here. That is how they ended up. That's what he did to them. That's how much they meant to him and then he left them there like garbage.

(RR44: 25-28).

### *Appellant's complaint was not preserved and is not properly briefed*

To preserve a complaint regarding improper jury argument for appellate review, a party must make a timely request, objection, or motion with sufficient specificity to apprise the trial court of the complaint. *See* Tex. R. App. P. 33.1(a);

*Estrada v. State*, 313 S.W.3d 274, 303 (Tex. Crim. App. 2010). Trial counsel failed to explain how the argument fell outside the scope of the guilt-innocence portion of the trial, nor is it apparent from the face of the argument. Consequently, trial counsel's objection lacked sufficient specificity to make the trial court aware of the exact nature of his complaint, and therefore, has failed to preserve this issue for review. *See* Tex. R. App. P. 33.1(a) .

Additionally, appellant has failed to adequately brief this issue on appeal. Appellant claims that the prosecutor's remarks concerning what the victims felt when their heads were held under water was improper because it was outside of the scope of guilt-innocence because it injected facts not in the record, was "maudlin" and "in poor taste," and its only purpose was to begin to create prejudice toward appellant. (Appellant's Brief, pp. 98-99). However, appellant fails to cite any case law that supports his assertion that the prosecutor's argument was improper. Rule 38.1 of the Texas Rules of Appellate Procedure requires that a brief contain a clear and concise argument for the contentions made with appropriate citations to authorities and to the record. *See* Tex. R. App. P. 38.1(i). Because appellant has wholly failed to make a clear argument and cite

appropriate authorities, his argument is inadequately briefed and should be summarily denied.

### *The trial court did not err by overruling appellant's objection*

Should this Court consider this issue, despite counsel's failure to properly preserve and brief the issue, the record reflects that the trial court properly overruled appellant's objection. The complained-of argument fell within the permissible areas of argument because the remarks were a proper summation and called for reasonable deductions from the evidence presented at trial.

The evidence presented at trial indicated that appellant abducted Kametra, Naim, and Elijah as the three of them walked to Naim's school. As appellant then drove them through the neighborhood, he threatened Kametra and the boys. When appellant stopped at a red light, Kametra saw a constable parked nearby and jumped out of the car, to get the constable's help. Appellant, who had warned Kametra not to jump out of the car, sped off with Naim and Elijah. Elijah, who was in the backseat of the car with Naim, began to cry and ask for his mother. Appellant told both boys that she did not love them. Appellant then drove to a secluded creek. Because Elijah did not have shoes on, he carried Elijah down to the creek bed, while Naim walked beside them, holding on to appellant's

shirt. Next, appellant forced them to sit down in the water with their backs to him. Both boys were crying; Elijah asking for his mother and Naim telling appellant that he loved him. Appellant then forced both boys to place their heads under the water, telling them to pretend like they were swimming, and held their heads under the water until both boys stopped moving.

Accordingly, the prosecutor's remarks merely asked the jury to use their experience and knowledge to deduce from the evidence the level of confusion and fear the boys felt as a result of the appellant's actions. Such argument was permissible and appropriate. *See Palermo v. State*, 992 S.W.2d 691, 696 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (stating prosecutor may ask jurors to imagine what a victim experienced during a crime as long as the argument is based on the evidence and reasonable deductions from the evidence, rather than sheer conjecture); *see also, e.g., Torres v. State*, 92 S.W.3d 911, 920-22 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) (finding prosecutor's argument stating "I want you to close your eyes and think of how that young man felt" asked the jury to make reasonable deductions from the evidence regarding the degree of terror and pain experienced by the complainant shortly before his death and was permissible); *Linder v. State*, 828 S.W.2d 290, 303 (Tex. App.—

Houston [1st Dist.] 1992, pet. ref'd) (determining prosecutor's argument asking "Can you imagine what it was like to be that woman?" asking jurors to imagine what a victim of a burglary and attempted sexual assault to imagine what it was like to be the victim was a legitimate appeal to the jury to apply their general knowledge and experience to the evidence presented at trial). Consequently, the trial court did not err in overruling appellant's objection to this argument.

### *Error, if any, was harmless*

Nevertheless, even if this Court were to find that the State's argument was improper, any error was harmless.

Improper argument is non-constitutional error, and non-constitutional error that does not affect a defendant's substantial rights must be disregarded. *Brown v. State*, 270 S.W.3d 564, 572 (Tex. Crim. App. 2008); Tex. R. App. P. 44.2(b). To determine whether an appellant's substantial rights were affected, an appellate court balances three factors: (1) the severity of the misconduct (i.e., the prejudicial effect), (2) any curative measures, and (3) the certainty of conviction absent the misconduct. *See Brown*, 270 S.W.3d at 572-73. In evaluating the severity of the misconduct, the reviewing court must assess whether the argument injected new and harmful facts or was, in light of the entire argument,

111

extreme or manifestly unjust and willfully calculated to deprive appellant of a fair and impartial trial. *Id*. at 573.

Viewing the State's closing argument as a whole, the record does not demonstrate that there was a willful, calculated effort to deprive the appellant of a fair and impartial trial. The argument made no reference to the punishment phase or special issues and did not inject new facts into the record. The prosecutor was simply asking the jury to apply their general knowledge and experience to the evidence that was properly before them and imagine what was going through the minds of the victims during the murders. The details in the argument were summations and reasonable deductions from the evidence, most of which came from appellant's statement to the police. While the trial court did not take any curative measures, this was because the judge overruled the appellant's objection. Finally, the evidence of appellant's guilt was overwhelming. Appellant gave a voluntary statement to the police in which he confessed to the murders. Appellant did not present any evidence during the guilt-innocence phase of the trial and, in fact, conceded guilt during his closing argument. Furthermore, witness testimony corroborated appellant's confession, as did the forensic evidence establishing the cause of death of both victims. Based on the

112

evidence presented, the jury most certainly would have convicted appellant regardless of the prosecutor's statements. Thus, any error in the prosecutor's argument did not affect appellant's substantial rights. *See Brown*, 270 S.W.3d at 572; Tex. R. App. P. 44.2(b).

Based on the foregoing, Issue 27 is without merit and should be overruled.

### *Closing Argument at Punishment*

In Issue 41, appellant contends that the trial court erred in overruling his objection to the State's closing argument during the punishment phase of trial.

During closing argument at the punishment phase, defense counsel made the following argument:

> MR. JOHSNON: The evidence in this case from Kametra, this history of domestic violence, folks, all I can tell you is that, by all accounts, we've got a situation where now Kametra comes in and I agree with what was said earlier, she hates the Defendant for what he did, and reasonably so. And unlike what she told us when I met with her and my consultants, now the violence has escalated, it is more of it.
>
> You know, that's what happens in courtrooms, folks. What we really know is that about the time when Rasool is locked up for that incident with his sister, we know that she is running around on him, and she is writing him letters, and then we know that then while he is still incarcerated, she gets caught for leaving her kids locked up in a car outside while she is off galavanting, and we know now that she ran off and she is now this sophisticated prostitute. And think about this, folks. And like I said, Kametra is not on trial. But they are wanting you to think that she is only this victim because it fits well

into their theory, but she has told you, folks, that she is out there and she is running around with a guy twice her age. She has got the wherewithal to start running the internet prostitution scheme. She said it is her idea. She has got a $3,000 a month drug habit. $3,000 a month. And she tells you she had no way to get away from the Defendant.

(RR50: 72-73). In rebuttal, the State made the following complained-of argument:

MS. KEMP: Now, I asked Kametra. Do you know who Maya Angelou is? You all know who she is, Poet Laureate. You know Maya Angelou was raped when she was --

MR. JOHNSON: Judge, I'm going to object. We're outside the record.

MS. KEMP: This is argument.

MR. JOHNSON: I know. We're still arguing the record.

MS. KEMP: Maya Angelou was raped when she was 8 years old.

MR. JOHNSON: Judge, I'm going to ask for a ruling on my objection.

THE COURT: I didn't hear an objection. Sorry.

MR. JOHNSON: I objected. I said, we're outside of the record.

THE COURT: Okay. I will overrule the objection.

MS. KEMP: Maya Angelou had a child when she was 17 years old. Maya Angelou was a full-grown madam, running a brothel.

MR. JOHNSON: Judge, I'm going to ask for an opportunity to reopen my argument and start talking about things than there is no evidence also, if we're going to allow this.

114

THE COURT: All right.

MS. KEMP: Kametra --

THE COURT: That's denied. Go ahead.

MS. KEMP: Kametra --

MR. JOHNSON: I'm going to object to the argument that's continued to admission of evidence not before this jury.

THE COURT: This is argument.

MS. KEMP: This is argument, sir.

MR. JOHNSON: I understand, Judge. She can't argue the life history of people.

THE COURT: Argue the evidence and the law.

MS. KEMP: This is evidence. You have a young lady who was raped when she was 8. She had a child when she was 17. She decided to be a prostitute rather than be with Mr. Muhammad, to provide for her kids. One way or another, he is no longer in her life, and like Maya Angelo, she can go on and be anything she wants to, if she decides.

(RR50: 84-86).

On appeal, appellant argues that the remarks about Maya Angelou's life history were outside of the record and therefore, impermissible. Appellant contends that the statements were calculated to inflame the minds of the jury

115

and prejudice the appellant such that the jury would be certain to return a verdict of death.

### *The trial court did not err by overruling appellant's objection*

The record reflects that the trial court properly overruled appellant's objection because the argument was made in response to the argument of defense counsel and also constituted a summation and reasonable deduction from the evidence.

During his closing argument, defense counsel attacked the credibility and character of State's witness Kametra Sampson, stating that the instances of domestic violence she testified to had "escalated" from those that she had described to defense counsel in a previous meeting. Counsel described Kametra as a "sophisticated prostitute" running an "internet prostitution scheme" with a $3,000 a month drug habit, and that she was only being presented as a victim because it fit the State's theory. (RR50: 72-73). The State's argument challenged this characterization of Kametra by comparing her to another reputable and well-known woman with a similar background. The State's comparison was based on Kametra's testimony and reasonable deductions from that testimony.

116

The testimony presented at trial revealed that Kametra was raped by her mother's boyfriend when she was eight years old. She began a sexual relationship with the appellant when she was just fifteen and appellant was twenty-five. Kametra had her first child when she was seventeen and had two more children in the next few years. Kametra testified that she endured violent beatings at the hands of the appellant throughout their relationship, and eventually resorted to prostitution in order to provide for herself and her children so that she did not have to remain in an abusive relationship with the appellant. Kametra also admitted to an expensive drug habit. However, she also testified that she was no longer a prostitute and had sought treatment for her drug addiction in order to improve her life.

Accordingly, the prosecutor appropriately analogized Kametra's life to Maya Angelou. It was a reasonable deduction from the evidence that Kametra, like Angelou, could change her life. While appellant is correct that there was no evidence before the jury specifically concerning Maya Angelou's life, Angelou is a public figure whose life history is common knowledge. Arguing facts that are common knowledge is an exception to the prohibition against arguing facts outside the record. *See Nenno v. State*, 970 S.W.2d 549, 559 (Tex. Crim. App.

1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720 (Tex. Crim. App. 1999); *Carter v. State*, 614 S.W.2d 821, 823 (Tex. Crim. App. [Panel Op.] 1981).  Therefore, the trial court did not err in overruling appellant's objection.

### *Error, if any, was harmless*

Even if this Court were to find that the State's argument was improper, any error was harmless. As previously noted, improper jury argument is non-constitutional error that must be disregarded unless it affects the defendant's substantial rights. *Brown*, 270 S.W.3d at 572; Tex. R. App. P. 44.2(b).

Viewing the State's closing argument as a whole, it cannot be concluded that there was a willful and calculated effort to deprive appellant of a fair and impartial trial. The prosecutor's remarks were made in response to defense counsel's argument and were summations and reasonable deductions from the evidence. It is clear that the prosecutor did not have an improper motive. While the trial court did not take any curative measures, the prosecutor's reference to Angelou was brief and only a small portion of the entire argument.

Furthermore, the evidence supporting the jury's answer to the special issues was overwhelming.  In addition to the evidence showing the calculated and deliberate nature of the heinous double-murder for which the jury had just found

118

appellant guilty, the State also presented considerable evidence during the punishment phase showing appellant's extensive juvenile record, his inability to follow instructions or rules while confined as a juvenile or while awaiting trial for capital murder, and his acts of violence against women. Accordingly, this Court can be assured that the jury would have returned the same answer to the special issues absent the prosecutor's comment. Thus, any error in the prosecutor's argument did not affect appellant's substantial rights. *See Brown*, 270 S.W.3d at 572; Tex. R. App. P. 44.2(b).

Based on the foregoing, Issue 41 is without merit and should be overruled.

### Issue 28: Admission of Appellant's Statements to CPS Worker

In Issue 28, appellant contends that the trial court erred in overruling his objection to the testimony of CPS worker Pamela Womack. According to appellant, it was improper for Womack to testify regarding statements made to her by appellant while he was in custody where the State failed to show that he was given the proper *Miranda* warnings. (Appellant's Brief, 99-102).

#### *Pertinent Facts*

Womack serves as a Special Investigator for CPS, where she assists primary case workers with their interviews and investigations. (RR46: 118-19). Womack

interviewed appellant and assisted in interviews with other members of appellant's family. (RR46: 119-20). Womack explained that she does these interviews as part of the development of a social history for the primary case worker's file. (RR46: 120-21). CPS was conducting an investigation in this instance because they were trying to determine the placement of appellant's and Kametra's remaining child, Jeremiah. (RR46: 121).

Appellant objected to Womack testifying to any statements made by appellant during the interview unless the State could establish he was given *Miranda* warnings. (RR46: 122, 124-25). When taken on voir dire by defense counsel, Womack made it clear that she did not speak with anyone in law enforcement prior to her interview of appellant and that her interview was conducted for CPS, not law enforcement. (RR46: 122-24). In response to appellant's objection and argument, the State reiterated that the purpose of the CPS investigation in this case was to determine what to do with Jeremiah. (RR46: 125). The trial court overruled appellant's objection. (RR46: 125).

### *Applicable Law*

A trial court's decision to admit testimony of a CPS worker is reviewed for an abuse of discretion and must be affirmed so long as the decision is within the

zone of reasonable disagreement. *See Berry v. State*, 233 S.W.3d 847, 856 (Tex. Crim. App. 2007); *Wilkerson v. State*, 173 S.W.3d 521, 524 (Tex. Crim. App. 2005).

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself . . ." U.S. CONST. amend. V. As a corollary to that provision, in *Miranda v. Arizona,* 384 U.S. 436 (1966), the United States Supreme Court held that the State may not use any statements stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Id*. at 444.

The procedural safeguards of *Miranda*, however, do not apply to all custodial questioning. They generally apply only to custodial interrogation by law enforcement officers or their agents. *Wilkerson*, 173 S.W.3d at 527. Although a CPS worker is an employee of the state, state employment does not, by itself, make a person a state agent for purposes of defining custodial interrogation. *Id*. at 528. As the *Wilkerson* court explained:

> Although state employment clearly makes a person an "agent of the State," that label does not, by itself, make the person an "agent of the State" for the purpose of defining "custodial interrogation." Not all government workers must be familiar with and ready to administer *Miranda* warnings . . . . [W]hen "the official has not been

121

given police powers, *Miranda* has been held inapplicable to questioning by [state officials]."

*Id*. at 528. The court further observed that different types of state employees serve different roles. *Id*. CPS workers are charged with protecting the welfare and safety of children in the community while the police are responsible for investigating crime. *See id*. Therefore, police officers and CPS workers generally run on separate, yet parallel paths. *Id*. at 529. CPS's role may be converted if its parallel path converges with police, and the organizations are investigating a criminal offense in tandem. *Id*.

To determine whether the two paths have converged, courts must examine the entire record. *Id*. at 530. The thrust of the inquiry is whether the custodial interview was conducted explicitly or implicitly on behalf of the police for the purpose of gathering evidence or statements to be used in a later criminal proceeding against the interviewee. *Id*. at 531. The defendant bears the burden of proving that a particular person is working in tandem with police in a joint investigation, primarily because the law does not presume such a relationship. *Id.* at 529-30, 32.

### *Womack's Testimony Was Properly Admitted*

Appellant has failed to meet that burden in this case. Womack's testimony unequivocally showed that she did not interview appellant at the behest of law enforcement. She was not gathering information to be used in a later criminal proceeding. Rather, her primary purpose in interviewing appellant was to determine the future care of the surviving child. (RR46: 120-21, 125, 130-31). Regardless of the outcome of appellant's criminal case, it is not surprising that that CPS would need to collect data to determine the best interests of the child following the tragedy. *See Wilkerson*, 173 S.W.3d at 530. Having that limited purpose does not somehow magically connect Womack with the police investigation of appellant's case.

Womack was not an agent of law enforcement who was required to comply with *Miranda*. Therefore, the trial court did not abuse its discretion in overruling appellant's objection to Womack's testimony. *See, e.g, Berry*, 233 S.W.3d at 856 (trial court did not abuse its discretion in admitting testimony of CPS worker; because the CPS worker's purpose in interviewing Berry was to find placement for Berry's children, she was not an agent of the law enforcement who was required to comply with *Miranda*).

***Any Error Harmless***

Even if the court should have excluded Womack's testimony, the admission of this evidence did not violate appellant's substantial rights. *See* Tex. R. App. P. 44.2(b). The statements made by appellant to Womack did not shed new light on the offense or appellant's feelings about his childhood or his relationship with Kametra. Appellant generally denied having a bad childhood or any mental health issues; and while he disclosed Kametra's previous drug-usage and prostitution, he did not claim she was an unfit mother or otherwise speak badly about her. Same or similar testimony regarding appellant's perception of his childhood, mental health, and feelings toward Kametra was admitted without objection through other witnesses. Moreover, counsel used cross-examination of Womack to show that appellant became quite emotional on multiple occasions during the interview when describing what had happened with the kids and the things that had gone on in his life. Thus, any error in the admission of this testimony was harmless. Issue 28 is without merit and should be overruled.

## Issue 29: Admission of State's Exhibit 173

In Issue 29, appellant contends that the trial court erred in overruling his objection to State's Exhibit 173, certified business records pertaining to

124

appellant's prior conviction for evading arrest in cause number MB97-57574-K. Appellant contends that because the judgment did not contain an identifying fingerprint, the conviction was not properly tied to appellant and should not have been admitted. (Appellant's Brief, pp. 102-04).

### Pertinent Facts

On July 30, 1997, appellant committed two offenses as part of a continuous criminal episode: burglary of a motor vehicle and evading arrest. He was charged with these offenses in cause numbers MA97-57573-K and MB97-57574-K. On September 19, 1997, appellant pleaded guilty to both offenses and was sentenced to 120 days confinement, probated for twelve months in each case. (State's Exhibits 172-73). Subsequently, his community supervision was revoked and he was sentenced to 120 days' confinement in each case.[4] (State's Exhibit 173).

During the punishment phase of trial, the State offered exhibits 172 and 173, certified copies of the judgments and other business records pertaining to

---

[4] The State's electronic records reflect that appellant's community supervision was revoked in both cases on March 31, 1998. The State received a certified copy of the Judgment Revoking Community Supervision from the county clerk in the burglary case (State's Exhibit 172); however, the State did not receive a certified copy of the Judgment Revoking Community Supervision from the county clerk in the evading arrest case for an unknown reason. (State's Exhibits 173).

these convictions. (RR44: 106-07, 109; State's Exhibits 172-73). Exhibit 172 contained a fingerprint which was matched to the fingerprint of appellant taken that day. (RR44: 100-01, 103-04; State's Exhibits 169, 172). Exhibit 173 contained no fingerprint for comparison. (RR44: 100-01, 103, 106). The State presented testimony that exhibits 172 and 173 pertained to offenses with consecutive cause numbers, contained matching identifying information of appellant, and reflected that appellant pleaded guilty and was adjudicated guilty of these offenses on the same day. (RR44: 106). Appellant did not object to exhibit 172. (RR44: 106). He objected to exhibit 173 on the basis that there was lack of a predicate and failure to establish correlation between the exhibit and the appellant. (RR44: 106). Appellant's objection was overruled. (RR44:106).

## Applicable Law

To establish a defendant's prior criminal conviction, the State must prove beyond a reasonable doubt the following: (1) that a prior conviction exists, and (2) that the defendant is linked to that conviction. *See Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). Texas law does not require that the prior conviction be proven in any specific manner. *Id*. at 922. Any type of evidence, documentary or testimonial, might suffice. *Id*.

126

Often the proof that is adduced to show the defendant on trial is one and the same person that is named in the prior criminal conviction "closely resembles a jigsaw puzzle" where the pieces standing alone usually have little meaning but, when fitted together, form the picture of the person who committed the prior conviction. *Id*. at 923 (*citing Human v. State*, 749 S.W.2d 832, 835-36 (Tex. Crim. App. 1988). The trier of fact fits the pieces together and weighs the credibility of each piece. *Id*. It looks at the totality of the evidence admitted to determine if there was a prior conviction and if the defendant was the person convicted. *Id*.

### *The Trial Court Did Not Abuse its Discretion by Admitting State's Exhibit 173*

State's Exhibit 173, when considered in conjunction with State's Exhibit 172, was sufficient to prove appellant's 1997 conviction for evading arrest.

Exhibits 172 and 173 show that the offenses of burglary of a vehicle and evading arrest were committed on the same date, July 30, 1997. They were filed under the same service number, 640854F, and same arrest number, 052103. They contain the same identifying information for appellant, including his full name as Naim Muhammad; physical description of "BM;" birthdate of 05-03-79; address of 3326 Kyser, Dallas, Texas 75216; and phone number of 214-374-0141. The signature of "Naim Muhammad" contained on the court's admonishments and

127

order appointing counsel in each case is the same. Finally, the "Judgment on Negotiated Plea of Guilty or Nolo Contendere Before Judge Community Supervision Granted" in each case reflects that appellant pleaded guilty and was adjudicated of both offenses on the same date, September 19, 1997. (State's Exhibits 172-73). Viewing the totality of the evidence, the trier of fact could have reasonably determined that there was a prior conviction for evading arrest and that appellant was the person convicted. *See Flowers*, 220 S.W.3d at 923. Accordingly, the trial court did not abuse its discretion by overruling appellant's objection to State's Exhibit 173.

### *Any Error Harmless*

Even if this Court were to find error in the trial court's ruling, the admission of this evidence did not violate appellant's substantial rights. *See* Tex. R. App. P. 44.2(b). Exhibit 173 was one of seven prior convictions, the rest of which were unquestionably proven by documentary and testimonial evidence. The State proved that appellant committed numerous extraneous unadjudicated offenses during his twenty-year history of criminal activity. The State presented evidence of appellant's repeated infractions while in Daytop, TYC and Dallas County Jail, and his violence toward women. The jury also had before it the heinous facts of

the capital murder. In viewing the entire record as a whole, it is highly unlikely that the inclusion of exhibit 173 influenced the outcome of the trial. Accordingly, any error in the admission of this exhibit was harmless.

Issue 29 is without merit and should be overruled.

## Issues 30-32: Admission of Testimony from Refreshed Memory

In Issues 30-32, appellant contends that the trial court erred in overruling his objections to the testimony of police officers who used police reports to refresh their memory. He contends that State allowed its witnesses to testify from documents not in evidence under the guise of refreshing their recollection in order to get in evidence that was otherwise not admissible. (*See* App. BR. at 105-07). His contentions are wholly without merit.

### *Applicable Law*

Texas evidentiary rules allow a witness in a criminal case to refresh his or her memory either while testifying or before testifying. Tex. R. Evid. 612. A police officer may review written reports to refresh his or her memory, then testify from a "refreshed memory." *McCoy v. State*, 877 S.W.2d 844, 845 (Tex. App.—Eastland 1994, no pet.). As long as the witness had personal knowledge at some time in the past and that memory has been refreshed by review of the writing, the testimony

itself is received as substantive evidence. *See Young v. State*, 891 S.W.2d 945, 951 (Tex. Crim. App. 1994). Further, a writing need not be prepared by the person who is having their memory refreshed, but rather, the focus should be that the person testifying has their own personal recollection refreshed. *See id.*

### Officer Chris Havens

According to appellant's brief, the complaints raised in issues 30 and 31 pertain to the testimony of Officer Chris Havens. (*See* App. Br. at 105). However, the portions of the record he cites pertain to the testimony of Officer Harold Andrews. To the extent that his record citation is a typographical error and his claims do relate to the testimony of Chris Havens, the record shows they are wholly without merit.

Former Dallas Police Officer Chris Havens was the officer who arrested appellant following his burglary of the habitation of Ivis Wright. Wright sold candy to kids in her neighborhood. (RR44: 131). Prior to testifying, Officer Havens reviewed the police report and recalled the incident because of the candy that was stolen during the burglary. (RR44: 125, 131). Officer Havens testified that he responded to a call reporting a burglary on February 26, 1993. (RR44: 124-25). After a witness at the scene identified a group of juveniles nearby as the

130

perpetrators of the burglary, Officer Havens and other officers pursued them in a foot chase, eventually catching them and taking them into custody. (RR44: 125-26). When Officer Havens was asked whether he could identify the individual that he arrested and booked-in on that date, he responded, "According to the arrest report, yes, ma'am." (RR44: 126). Appellant objected to Officer Havens testifying to details he did not have personal knowledge of. (RR44: 126-27). His objection was overruled. (RR44: 126). The State rephrased its question and Officer Havens testified that, based on his refreshed recollection from the police report, Naim Rasool Muhammad was the individual he arrested and booked-in on that date. (RR44: 127).

Appellant did not object at trial on the basis that Officer Havens was testifying from a record not in evidence and offering personal information after using a document he did not prepare to refresh his memory. As such, his complaints have not been preserved for review. *See* Tex. R. App. P. 33.1(a).

In any event, the record shows that Officer Havens did not testify from a document. Rather, he properly refreshed his memory using his report. Based on this refreshed memory, he was able to recall that Naim Rasool Muhammad was the individual he arrested and booked-in for burglary on the date in question. The

trial court did not err in allowing Officer Havens to testify from his refreshed memory. *See Young*, 891 S.W.2d at 951.

### *Officer Harold Andrews*

To the extent that appellant's record citations are correct and the complaints raised in issues 30 and 31 pertain to the cited testimony of Officer Harold Andrews, these contentions are also without merit.

Dallas Police Lieutenant Harold Andrews was the officer who detained appellant for burglary of a vehicle on July 27, 1994. (RR44: 140-41). Lt. Andrews was driving around the area where the burglary occurred and spotted appellant, who matched the description of one of the suspects. (RR44: 142). Lt. Andrews detained appellant and brought him back to the scene of the burglary, where he was identified by the complainant as one of the perpetrators. (RR44: 142-43). Lt. Andrews testified that it was standard procedure for him to gather personal information from appellant at the time he detained him. (RR44: 146, 148-49, 150-51). He relayed that information to another officer at the scene, who compiled the information from all the officers involved and made a single report of the incident. (RR44: 142-43, 154).

Lt. Andrews reviewed this report prior to testifying to refresh his memory of the incident. (RR44: 141, 145). He was also asked to review this report during his testimony to refresh his recollection of appellant's full name and date of birth. (RR44: 144). Appellant objected to Lt. Andrews testifying from a report not in evidence and to him refreshing his memory from a document he did not prepare. (RR44: 144, 148-49, 151-52). The trial court overruled his objections and allowed Lt. Andrews to refresh his memory. (RR44: 144-45). After refreshing his memory, Lt. Andrews testified that the person he detained that day was named Naim Muhammad with a birthdate of May 3, 1979. (RR44: 152-53).

The record demonstrates that Lt. Andrews did not read from a document not in evidence, as appellant claims. Rather, he properly used the police report to refresh his memory of the incident. After refreshing his memory, Lt. Andrews stated appellant's name and date of birth from memory. Lt. Andrews established how he would have had personal knowledge of appellant's identity by referencing to the standard procedures that he habitually follows. (RR44: 146, 148, 150). The fact that Lt. Andrews did not prepare the report in its entirety is irrelevant; what matters is that his memory was, in fact, refreshed. *See Young*, 891 S.W.2d at 951.

The trial court properly overruled appellant's objections and allowed Lt. Andrews to testify from his refreshed memory.

Based on the foregoing, Issues 30 and 31 are without merit and should be overruled.

### *Officer Brandon Hernandez*

In Issue 32, appellant complains about the testimony of Garland Police Officer Brandon Hernandez. Officer Hernandez arrested appellant on July 4, 1999. Officer Hernandez reviewed his report and refreshed his memory of the incident prior to testifying. (RR45: 61, 71). Officer Hernandez testified that he and his partner performed a felony stop of a vehicle that fled the scene of a burglary. (RR45: 60-65). There were three passengers in the vehicle, one of whom was appellant. (RR45: 67). The officers obtained the passengers' identifying information and entered that information into the police computer to check for outstanding warrants. (RR45: 67). Although Officer Hernandez could not recall offhand whose information he obtained or which officer ran the information through the police system, he testified that they were able to confirm appellant's identity in their system and confirm that he had outstanding warrants. (RR45: 67-69). Appellant objected to this testimony on the basis that Officer Hernandez did

134

not have personal knowledge of the facts he was testifying to. (RR45: 69). The objection was overruled. (RR45: 69).

The record reflects that Officer Hernandez was the author of the report and collected the information found in the report documenting appellant's arrest on July 4, 1999. He was there for the duration of the detention and arrest and compiled information regarding all three suspects. The personal knowledge Hernandez gained during the investigation was incorporated into his report, which Hernandez used to refresh his memory for testimony. *See, e.g., McCoy*, 877 S.W.2d at 844. Officer Hernandez did not read from the report, but simply used the report to refresh his memory of the incident. The trial court did not err in allowing him to testify from his refreshed memory. *See Young*, 891 S.W.2d at 951. Issue 32 is without merit and should be overruled.

### Issues 33 and 37: Testimony of Officer David Solomon

In Issues 33 and 37, appellant contends that the trial court erred in overruling his objection to the testimony of Officer David Solomon regarding an arrest of appellant. He argues that allowing the officer to testify that appellant was pulled over for suspicion of being involved in an attempted auto theft, when

he was later cleared of any involvement, was not relevant and highly prejudicial. (Appellant's Brief, pp. 108-10, 116-18).

Dallas Police Officer David Solomon arrested appellant on October 4, 1993. (RR45: 83, 87). Early that morning, the police pulled over a vehicle matching the description of a vehicle involved in an attempted auto theft. (RR45: 84-86, 126-27). There were multiple passengers in the vehicle, including appellant; the officers obtained personal information from all the passengers. (RR45: 88, 127-28). The officers determined that appellant and the other passengers were not involved in the attempted auto theft. (RR45: 99, 103, 129-30). Appellant, however, was arrested for two outstanding warrants for burglary of a habitation. (RR45: 88-89, 128-30). One of those warrants was for the burglary of Ivis Wright, the woman who sold candy in the neighborhood. (RR45: 97-98, 100).

Appellant objected to Officer Solomon being allowed to testify that appellant was pulled over because the vehicle was suspected of being involved in an attempted auto theft when the passengers were later cleared of any involvement in that offense. Appellant argued that the reason for the stop was irrelevant and prejudicial. (RR45: 100, 104-05, 124). The trial court ruled that Officer Solomon could testify about how appellant came to be pulled over by

136

police, so long as the State made clear that he was cleared of any involvement in the attempted auto theft. (RR45: 100-01). The State complied with the Court's ruling. (RR45: 129). Counsel also elicited this information on cross-examination. (RR45: 130).

Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tex. R. Evid. 401. Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Williams*, 958 S.W.2d at 196.

Officer Solomon's testimony was not introduced for the purpose of proving any crime related to the attempted auto theft, but rather to show appellant's arrest for the burglary of Ms. Wright's home. Although Ms. Wright had previously testified about the circumstances of the burglary, she testified that she did not know who had committed the offense. (RR44: 119-27). And while appellant was identified as one of the suspected perpetrators by Officer Havens, there was no further evidence before the jury regarding any further disposition of the case. Officer Solomon's testimony demonstrated that appellant was charged and

137

arrested for that offense. Officer Solomon's explanation for the stop was relevant to show how and why he came into contact with appellant on October 4, 1993, since he had no involvement in the investigation of the burglary offense. Without this explanation, his testimony regarding appellant's arrest would be incomplete and confusing.

Furthermore, appellant cannot show harm. Officer Solomon made clear during his testimony before the jury that appellant was cleared of any involvement in the attempted auto theft. (RR45: 129, 130).

Based on the foregoing, the trial court did not abuse its discretion in overruling appellant's objection to the testimony of Officer Solomon. Issue 33 is without merit and should be overruled.

## Issue 34: Testimony of Warden Melodye Nelson

In Issue 34, appellant contends that the trial court erred in overruling his objection to Warden Nelson's anecdotal testimony about weapons produced in prison by other inmates. He claims that this evidence was not relevant and was prejudicial to him because he had no connection to the weapons presented. (Appellant's Brief, pp. 110-11).

Rule 702 of the Texas Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Tex. R. Evid. 702. The proponent of evidence under Rule 702 must show, by clear and convincing proof, that the evidence is sufficiently relevant and reliable to assist the jury in accurately understanding other evidence or in determining a fact in issue. *See Gallo*, 239 S.W.3d at 765. A trial court's decision to admit or exclude expert testimony is reviewed under an abuse of discretion standard. *Id*.

Warden Nelson was qualified as an expert by virtue of her knowledge and experience in the Texas prison system. Her testimony was relevant to helping the jury determine Special Issue No. 1, whether appellant would commit criminal acts of violence that would constitute a continuing threat to society. It is well settled that "society" includes the prison population. *See Estrada v. State*, 313 S.W.3d 274, 281 (Tex. Crim. App. 2010). Warden Nelson's testimony described for the jury what appellant's life would be like if he were sentenced to life in prison and his society became prison society. Prison society is not something within a juror's common knowledge. Warden Nelson testified regarding staffing, classification,

housing, daily routine, discipline and the potential for violence within Texas prisons. She did not specifically testify that appellant would be more or less likely to commit violent acts in prison, only that there is a *potential* for violence in all classification levels of the prison system. Warden Nelson showed weapons that were found and confiscated in prison over the years in an effort to illustrate her testimony for the jury. The trial court did not abuse its discretion in admitting this evidence. *See Threadgill v. State*, 146 S.W.3d 654, 670-671 (Tex. Crim. App. 2004) (finding no abuse of discretion in trial court's admission of photographs of weapons made in prison which were used by a prison expert to illustrate his testimony regarding inmate violence within various classifications of prison society).

Even if the trial court erred in admitting Nelson's testimony, any alleged error was harmless. *See* Tex. R. App. P. 44.2(b). Warden Nelson's testimony was offered by the State in rebuttal during the punishment phase. The jury had already seen and heard evidence regarding the instant capital murder. The jury had already heard about appellant's lengthy history of criminal activity, his numerous violations while on probation, his failure to obey orders while incarcerated, his anger issues, and his violence toward women, including his own

sister. Furthermore, the prejudicial effect of Warden Nelson's testimony was minimized by its general nature. It was neither graphic nor disturbing in content. That fact, in conjunction with the admission of other more compelling punishment evidence by the State, rendered harmless any error in the admission of Warden Nelson's testimony. Issue 34 is without merit and should be overruled.

## Issue 35: Denial of Hearing on Extraneous Offenses and Bad Acts

In Issue 35, appellant contends that the trial court erred in denying his request to hold a hearing outside the presence of the jury on the admissibility of any extraneous offense evidence the State planned to offer during the punishment phase of trial. (Appellant's Brief, pp. 112-14).

### *Pertinent Facts*

Appellant filed a pretrial motion requesting that the trial court hold a hearing and make a threshold determination as to the admissibility of every extraneous offense or bad act the State planned to present during the punishment phase. (CR2: 273-78). Appellant's motion also requested that (1) the trial court give an oral instruction at the conclusion of the admission of each extraneous offense that it is not be considered unless proven beyond a reasonable doubt, and (2) a reasonable doubt instruction with respect to all

extraneous offenses admitted at punishment be included in the jury charge at punishment. (CR2: 273-78).

These motions were discussed at a pretrial hearing, but no ruling was made. Defense counsel argued that the "heart" of his motion was a concern that the State would attempt to prove extraneous offenses through the use of business records. (RR42: 46-48). The State responded that it intended to present all extraneous offense evidence through live witnesses who could testify about what happened and that it was appellant who did it. (RR42: 46-47, 50).

Appellant re-urged this motion during the punishment phase. (RR44: 42-53, 133-39). The State responded that it had turned over an exhaustive 404(b) notice to appellant and that it would only be presenting extraneous offenses that it had a good faith belief could be proven in accordance with the law. (RR44: 42-43). Appellant's requests for a hearing on each extraneous offense and an oral instruction following the admission of each extraneous offense were denied, but his request for a written instruction in the jury charge was granted. (RR44: 48-55). The trial court later granted appellant's request for an oral instruction, which was given to the jury during the presentation of the State's extraneous offense evidence. (RR45: 41-42).

### *Applicable Law*

Pursuant to Article 37.071 of the Code of Criminal Procedure, a trial court has wide discretion in admitting evidence, including extraneous offenses, relevant to the jury's determination of a capital murder defendant's death-worthiness. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(a)(1) (West Supp. 2014); *Powell v. State*, 898 S.W.2d 821, 830 (Tex. Crim. App. 1994). Extraneous offenses are admissible whether adjudicated or unadjudicated, violent or nonviolent. *Kemp v. State*, 846 S.W.2d 289, 307 (Tex. Crim. App. 1992).

When offering an extraneous offense at the punishment phase of a capital trial, the State neither has to prove all of the elements of the extraneous offense, nor prove beyond a reasonable doubt that the defendant committed the extraneous offense. *See Adanandus v. State*, 866 S.W.2d 210, 234 (Tex. Crim. App. 1993); *Spence v. State*, 795 S.W.2d 743, 759 (Tex. Crim. App. 1990). Rather, the State must "clearly prove" that an offense was committed and that the accused was the perpetrator. *Young*, 283 S.W.3d at 876.

### *Applicability of Mitchell v. State*

In his brief, appellant cites *Mitchell v. State*, 931 S.W.2d 950 (Tex. Crim. App. 1996), in support of his argument that he was entitled to a hearing to determine the admissibility of extraneous offense evidence. In *Mitchell*, this Court held that the trial court has the responsibility of determining the threshold admissibility of extraneous offense evidence at the punishment phase of a non-capital trial; that is, the court must make an initial determination at the proffer of the evidence that the evidence is relevant and that a jury could reasonably find beyond a reasonable doubt that the defendant committed the extraneous offense. *See Mitchell*, 931 S.W.2d at 954. The Court also held that, if requested, the defendant is entitled to a limiting instruction that informs the jury that extraneous offenses offered during the punishment phase must not be considered unless they are proven beyond a reasonable doubt. *Id*. at 954.

*Mitchell* was a non-capital case and was based on the language in Article 37.07. Capital cases, however, are governed by Article 37.071. This article clearly imbues the trial judge with wide discretion to admit *any* evidence relevant to the jury's determination of a capital defendant's deathworthiness, including evidence of adjudicated and unadjudicated extraneous offenses, so long as the State can

144

sufficiently connect the appellant to the alleged extraneous offense. *See Kemp*, 846 S.W.2d at 307. There is no requirement that they be proven beyond a reasonable doubt or that the trial court give any additional instructions on the burden of proof beyond what is already included in the instructions on the special issues. *See Jackson v. State*, 992 S.W.2d 469, 477 (Tex. Crim. App. 1999). As such, *Mitchell* is inapplicable. *See id.; see also Prystash v. State*, 3 S.W.3d 522, 533 (Tex. Crim. App. 1999) (finding *Mitchell* "inapplicable to the capital sentencing structure" in addressing appellant's complaint regarding the trial court's refusal to give separate jury instruction on burden of proof of extraneous offenses).

### *Appellant Has Not Shown an Abuse of Discretion or Harm*

In any event, the trial court did not abuse its discretion in denying appellant's request. Even if appellant was entitled to a threshold determination of admissibility under the rules of evidence, he was not necessarily entitled to hearing on each separate extraneous offense. *See* Tex. R. Evid. 104. There is no set method the court must use to make this threshold determination; it could base the decision on an assessment of testimony and argument made at a hearing outside the presence of the jury, an evaluation of a written proffer by the State, or some other method. *See Arzaga v. State*, 86 S.W.3d 767, 781 (Tex. App.—El

145

Paso 2002, no pet.); *Mann v. State*, 13 S.W.3d 89, 94 (Tex. App.—Austin 2000), *aff'd*, 58 S.W.3d 132, (Tex. Crim. App. 2001); *Welch v. State*, 993 S.W.2d 690 (Tex. App.—San Antonio 1999, no pet.).

Here, the State filed a detailed, chronological 404(b) notice outlining the various extraneous offenses committed by appellant. Outside the presence of the jury, the State made an oral proffer to the trial court that it planned to prove extraneous offenses through live witnesses who could testify about what happened and show that appellant was the perpetrator. (RR42: 46, 50; RR44: 44). The State also assured the trial court that it had no intention of offering evidence of an extraneous offense that it did not have a good faith belief it could prove in accordance with the law. (RR44: 42). While the trial court made no express ruling on the admissibility of the extraneous offenses prior to trial, its denial of appellant's request for a hearing following the State's proffer constitutes an implied ruling of admissibility. *See Mann*, 13 S.W.3d at 94.

Further, any error in the trial court's failure to hold a hearing was harmless. With regard to each extraneous offense presented at punishment, which are outlined in detail in the State's Summary of Facts (*Infra* pp. 11-26), the State

146

provided clear proof that an offense occurred and that appellant was the perpetrator. *See Young*, 283 S.W.3d at 876.

In addition, the trial court gave both an oral and written instruction to the jury that they were not to consider extraneous offenses for any purpose unless they found and believed beyond a reasonable doubt that appellant committed the offenses, if any were committed, and even then they could only consider them in determining their answers to the special issues. (RR45: 41-42; CR2: 406). The jury is presumed to have followed this instruction and disregarded any offenses they did not believe were proven beyond a reasonable doubt. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) (noting jury presumed to follow the judge's instructions). This extra safeguard, which was not required but operated to appellant's benefit, rendered any error in the trial court's failure to hold a hearing harmless.

Appellant wholly fails to show how he was harmed by the trial court's ruling. All of the extraneous offenses presented were relevant to the jury's determination of appellant's deathworthiness. *See Powell*, 898 S.W.2d at 830; *Kemp*, 846 S.W.2d at 307. Appellant does not argue that he did not commit the extraneous offenses presented. He also makes no attempt to explain for the Court

which, if any, extraneous offenses would have been excluded by the court if the requested hearing had been held. Appellant argues that if the trial court had acknowledged his request for a threshold hearing, Issues 42, 43 and 44 raised in his brief would have been prevented. (Appellant's Brief, p. 113). However, these issues do not pertain to the admission of extraneous offense evidence. In Issue 42, appellant challenges the sufficiency of the evidence supporting the jury's answer to the future-dangerousness special issue; and Issues 43 and 44 are constitutional challenges to Texas' death penalty statute. Based on the foregoing, Issue 35 is without merit and should be overruled.

## Issue 36: Denial of Motion for Mistrial

In Issue 36, appellant contends that the trial court erred in overruling his motion for a mistrial. (Appellant's Brief, pp. 114-16).

### *Pertinent Facts*

Dallas Police Officer Ryan Swain testified that he responded to a suspicious person call on July 18, 2010. (RR45: 73-74). Before he could elaborate further, appellant requested a bench conference, where he notified the State and the trial court that he did not have notice of the incident Officer Swain was about to offer testimony on. (RR45: 75). The trial court removed the jury and appellant objected

to Officer Swain's testimony on the basis that he was not provided notice by the State. (RR45: 75-76). The prosecutors, realizing that the offense had been mistakenly omitted from the State's Notice of Extraneous Offenses, notified the Court that it would not present any further testimony from Officer Swain. (RR45: 76).

Counsel stated that the absence of any further testimony would invite the jury to speculate and he requested that an instruction to disregard the testimony be given. (RR45: 78). The trial court granted appellant's request. (RR45: 78-79). Appellant expressed his concerns that a curative instruction was inadequate and also moved for a mistrial. (RR45: 79). That request was denied. (RR45: 79-80). When the jury was returned to the courtroom, the trial court orally instructed them to "disregard any testimony that was offered by Officer Swain, the last witness that the State presented to you." (RR45: 81). Appellant moved for a mistrial in the presence of the jury and his request was denied. (RR45: 81). In the punishment charge, the jurors were further instructed: "During your deliberations upon the special issues, you must not consider, discuss, nor relate any matters not in evidence before you." (CR2: 405).

### Applicable Law

A mistrial is the trial court's remedy for improper conduct that is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required. *Id*. When the trial court sustains an objection and grants an instruction to disregard, but denies a motion for mistrial, the proper issue is whether the trial court abused its discretion by denying the motion for mistrial. *Id*.

In determining whether the trial court abused its discretion in denying the mistrial, an appellate court considers the following factors: (1) severity of the misconduct (the magnitude of the prejudicial effect); (2) measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Mosley v. State,* 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

### The Trial Court Did Not Abuse Its Discretion by Denying Appellant's Motion for Mistrial

Here, Officer Swain's testimony is two pages from one volume of a 52-volume record. He was cut off before he could offer any substantive, much less

prejudicial, testimony about his encounter with appellant. The State did not present any further testimony from him after realizing the error in their notice. Clearly, his testimony was not offered to inflame the jurors, nor was it of such a character as to suggest the impossibility of withdrawing the impression left on the jury. The trial court's prompt instruction to disregard was sufficient to cure any harm resulting from the impression left on the jury. This Court presumes the jury followed the trial court's instruction. *See Gamboa*, 296 S.W.3d at 580 (noting that a reviewing court generally considers instructions given to the jury sufficient to remedy most improprieties that occur during trial and presumes the jury will follow the trial court's instructions).

Given the strength of the evidence supporting the jury's answers to the special issues, the trial court's prompt instruction to disregard, and the inconsequential nature of the complained-of testimony, the trial court did not abuse its discretion in denying appellant's motion for mistrial. As such, Issue 36 is without merit and should be overruled.

### Issues 38 and 39: Cross-Examination of Appellant's Experts

In Issues 38 and 39, appellant contends that the trial court erred by overruling his objections and permitting the State to cross-examine his experts,

Dr. Kellie Gray-Smith and Dr. Gilbert Martinez, on antisocial personality disorder. He claims that the State's cross-examination was an attempt to convert his experts into State's witnesses and elicit opinions on matters that were outside their field of expertise. (Appellant's Brief, pp. 118-21). Appellant's contentions are without merit and should be overruled.

### *Applicable Law*

Texas Rule of Evidence 611(b) provides "a witness may be cross-examined on any matter relevant to any issue in the case, including credibility." Tex. R. Evid. 611(b). The scope of appropriate cross-examination is necessarily broad. *Carroll v. State*, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996). The parameters of cross-examination are within the trial court's discretion, and its decision is not subject to reversal on appeal absent a clear abuse of discretion. *Cantu v. State*, 939 S.W.2d 627, 635 (Tex. Crim. App. 1997); *Chambers v. State*, 866 S.W.2d 9, 27 (Tex. Crim. App. 1993).

### *Issue 38: Dr. Kellie Gray-Smith*

In Issue 38, appellant contends that the trial court erred in overruling his objection to the State's cross-examination of Dr. Kellie Gray-Smith, a psychologist retained by the defense to provide expert testimony on special education and the

multi-cultural aspects of psychology. The cross-examination of which appellant complains went as follows:

Q (MS. KEMP): And you are familiar with the criteria for antisocial personality disorder; is that correct?

A (DR. GRAY-SMITH): Yes.

Q: All right.

A: Yes, that's correct. Yeah.

Q: So you know that they, typically, have a reckless disregard for the safety of others?

A: Yes. That can be part of the profile.

Q: And that they fail to conform to the norms?

MR. JOHNSON: Excuse me, Judge. I'm going to object. This is outside of the area that we brought in any testimony in regards -- and she is talking about -- if she is talking symptomology of ASPD, in general, that's one thing, but now she is going to try to associate these symptom-ologies to a particular individual who this witness has not interviewed or examined, so I'm going to object to her stating a litany of the ASPD criteria and stating that they are all attributed to a particular person when she has not examined the person. You cannot attribute it to that person.

MR. HEALY: Judge, she has not examined the person, but she gave the opinion that he has antisocial personality disorder.

MR. JOHNSON: She has not given a diagnosis of that, Judge. There's a big difference. She is not allowed to sit there and say to somebody that she --

153

THE COURT: I understand and I heard her testimony. I will overrule the objection. Go ahead.

(RR49: 76-77).

### *Appellant Failed to Preserve His Complaint for Review*

To preserve a complaint for appellate review, a party must have presented a specific and timely request, motion, or objection to the trial court and, further, must have obtained a ruling. *See* Tex. R. App. P. 33.1(a); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995); *Burks v. State*, 876 S.W.2d 877, 899 (Tex. Crim. App. 1994); *Turner v. State*, 805 S.W.2d 423, 431 (Tex. Crim. App. 1991). Because appellant failed to object to the prosecutor's preceding question, which asked Dr. Gray-Smith about one of the criteria or symptoms present in someone with antisocial personality disorder, appellant's objection was untimely and failed to preserve the issue for review. Additionally, Dr. Gray-Smith had already testified, without objection, that she was of the opinion that appellant had antisocial personality disorder:

> Q (MS. KEMP): And so as you conclude throughout your report here that Mr. Muhammad has antisocial personality disorder, you connected those dots on your own; is that correct?
>
> A (DR. GRAY-SMITH): Yes.

154

Q: You are a licensed psychologist; is that correct?

A: Yes.

Q: And you are familiar with all behavioral disorders; is that correct?

A: That's correct.

Q: So given a limited amount of information, you can make a diagnosis of antisocial personality disorder, could you not?

A: I would form an opinion. I don't know if I would say it is a diagnosis, but I would form an opinion.

Q: Yeah, I think that's more accurate. So any licensed psychologist with the appropriate training and behavioral and studies, which all licensed psychologists have, could form an opinion, even with the limited amount of records that you have; is that correct?

A: It's possible.

(RR49: 58-59). Appellant also failed to object to the following exchange:

Q (MS. KEMP): You have an opinion that Mr. Muhammad is a sociopath, don't you?

A (DR. GRAY-SMITH): I have an opinion that his pattern of academic records and psychological records suggest that he has an antisocial personality disorder.

Q: Same as a sociopath?

A: Yes, in a generic sense.

Q: Okay. Thank you.

(RR49: 72). Accordingly, appellant has failed to preserve his complaint for review. *See* Tex. R. App. P. 33.1(a).

### *The Trial Court Did Not Abuse Its Discretion by Permitting the State's Cross-Examination of Dr. Gray-Smith*

Nevertheless, should this Court consider this issue, the record reflects that the trial court properly overruled appellant's objection. A witness may be cross-examined on any issue relevant to the case. Tex. R. Evid. 611(b). Clearly, whether appellant possesses the diagnostic criteria for antisocial personality disorder is relevant to future danger and admissible in a capital murder trial. *See Powell*, 898 S.W.2d at 830 (trial court has wide discretion in admitting evidence any evidence relevant to the jury's determination of a capital murder defendant's death-worthiness). Additionally, here, this was certainly a relevant area of cross-examination since it was raised by Dr. Gray-Smith's testimony on direct examination.

On direct examination, Dr. Gray-Smith testified that she had reviewed a 1994 psychological evaluation of the appellant, in which appellant was diagnosed with conduct disorder. (RR49: 41, 55-57). Defense counsel then elicited the following testimony:

156

Q (MR. JOHNSON): Doctor, do you -- when you have an individual that goes forward from the Oppositional Defiant Disorder and into the Conduct Disorder, if the behaviors never, actually, got ahold of or actually intervened and treated, is there a predictability as to where that person is going to end up?

A (DR. GRAY-SMITH): Yes. They usually end up being diagnosed with antisocial personality disorder, which is the adult form of conduct disorder.

. . . .

Q: And as an expert here testifying today, would it surprise you, not that there has been a finding of this, but would it surprise you that the person whose records that you examined there would have gone from the point of ODD to conduct disorder to the symptom-ologies of antisocial personality behavior disorder?

A: Not at all. It would have been predictable.

(RR49: 43, 45-46). Because the issue of antisocial personality disorder was relevant and was raised on direct examination by appellant, the State was permitted to cross-examine Dr. Gray-Smith concerning her knowledge about the disorder and whether she believed that the appellant exhibited the criteria necessary for such a diagnosis. Accordingly, the trial court properly overruled appellant's objection.

### *Issue 39: Dr. Gilbert Martinez*

In Issue 39, appellant contends that the trial court erred in overruling his objection to the State's cross-examination of Dr. Gilbert Martinez, a clinical neuropsychologist retained by the defense to provide expert testimony on appellant's cognitive and intellectual functioning. The cross-examination of which appellant complains went as follows:

> Q (MS. KEMP): So, doctor, would someone with antisocial personality disorder have an impulsiveness problem?
>
> A (DR. MARTINEZ): Impulsivity is one of the diagnostic criteria for antisocial personality disorder, yes.
>
> Q: Would someone with antisocial personality disorder have a failure to conform to society's norms and general rules and regulations of society?
>
> A: That's another one of the diagnostic criteria for antisocial personality disorder.
>
> Q: Would they have a history of lying, or conning other people for their own personal gain or pleasure?
>
> A: That's another one of the descriptors for antisocial personality disorder. That's correct.
>
> Q: Would they have difficulty in planning ahead?
>
> A: Yes. That can be one of the symptoms, one of the features of antisocial personality disorder.

Q: Would they be seen as irritable and aggressive by having repeated fights in school?

MR. JOHNSON: Excuse me, Judge. All of these questions here are clearly outside of the referral question. He has testified in regards to what he was asked to do by me in regards to this case. He has not been asked to do any kind of psychological assessment in regards to any ASPD factors. She is, basically, just running down the DSM 4 and asking if these are the criteria for antisocial personality disorder. He was not asked, in any way, to do any type of evaluation in this case in those regards. He is testifying only towards his cognitive deficits, and that's all that he is on for. We've got other individuals to speak to those matters where that would be relevant, but not this doctor.

MR. HEALY: Judge, he made an Axis II diagnosis and that included antisocial personality disorder.

THE COURT: Overruled. Please proceed.

MS. KEMP: Thank you. That person will show a reckless disregard for the safety of others, wouldn't he?

DR. MARTINEZ: That's another feature of the antisocial personality disorder, yes.

(RR48: 153-54).

### *Appellant Failed to Preserve His Complaint for Review*

To the extent that appellant is complaining about the line of questioning concerning the symptoms or diagnostic criteria associated with antisocial personality disorder, appellant failed to raise a timely objection. *See* Tex. R. App. P. 33.1(a). The prosecutor had already posed several questions regarding this

159

subject prior to appellant's objection. Error is defaulted when the same evidence is presented elsewhere without objection. *McFarland v. State*, 845 S.W.2d 824, 840 (Tex. Crim. App. 1992); *Narvaiz v. State*, 840 S.W.2d 415, 430 (Tex. Crim. App. 1992). Appellant also failed to object to additional questions concerning the same subject matter. (RR48: 155-56). Accordingly, appellant has failed to preserve this complaint for review.

To the extent that trial counsel was objecting to the prosecutor's questions concerning whether Dr. Martinez was of the opinion that appellant had antisocial personality disorder, his objection was premature because the prosecutor had not elicited such testimony. Furthermore, when the State did pose such questions to Dr. Martinez, appellant failed to object. (RR48: 157-60). Consequently, this complaint has also not been preserved for review.

### The Trial Court Did Not Abuse its Discretion by Permitting the State's Cross-Examination of Dr. Martinez

Alternatively, appellant's claim fails on the merits. Dr. Martinez, a licensed neuropsychologist, testified that he was familiar with the diagnostic criteria for antisocial personality disorder. (RR48: 156). That diagnostic criteria is found in the Diagnostic and Statistical Manual for Mental Disorders ("DSM"), which Dr. Martinez testified is used by most clinicians and was, in fact, used by Dr. Martinez

160

in his evaluation of the appellant. (RR48: 155-56; Defendant's Exhibit 11). Therefore, questions concerning the criteria or symptoms exhibited by someone with antisocial personality disorder were not outside his area of expertise. Additionally, because Dr. Martinez had reviewed appellant's medical records and a 1994 psychological evaluation, conducted a face-to-face interview with appellant, and administered a battery of neuropsychological tests to the appellant, it was reasonable to question him concerning whether he had an opinion as to whether appellant met the criteria for a diagnosis of antisocial personality disorder. (RR48: 102-07, 111-12). Accordingly, the State's cross-examination of Dr. Martinez was appropriate, and the trial court properly overruled appellant's objection.

### Error, If Any, Was Harmless

Finally, even if the trial court erred in overruling the appellant's objections, the error was harmless. Error in the admission of evidence is non-constitutional error and must be disregarded unless the error affects a defendant's substantial rights. *See* Tex. R. Evid. 103; Tex. R. App. P. 44.2(b); *Walters v. State*, 247 S.W.3d 204, 218-19 (Tex. Crim. App. 2007). "[S]ubstantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the

161

record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001) (internal quotation marks omitted).

Examining the record as a whole, it is clear that any error in the trial court's rulings did not have a substantial and injurious effect or influence on the jury. First, Dr. Gray-Smith had already testified, without objection, that appellant's academic and psychological records suggested that he had antisocial personality disorder. Additionally, while Dr. Martinez was questioned by the prosecutor concerning whether appellant met the criteria for antisocial personality disorder, Dr. Martinez testified that he had not been asked to evaluate the appellant for antisocial personality disorder and had not performed the necessary assessments to make that determination. Accordingly, his testimony had no negative impact on the appellant. Therefore, any error in the trial court's rulings did not affect appellant's substantial rights. *See* Tex. R. App. P. 44.2(b).

Based on the foregoing, Issues 38 and 39 should be overruled.

### Issue 40: Trial Court's Statement Regarding Sequestration

In Issue 40, appellant contends that the trial court improperly commented on the weight of the evidence in his statement to the jury concerning being

162

sequestered after they had begun deliberating. (Appellant's Brief, pp. 121-24).

The record reflects that the trial court's statement was not an improper comment

on the evidence, nor did it prejudice the rights of appellant.

### *Pertinent Facts*

After both sides rested and closed at punishment, the trial court gave the

following instructions to the jury:

> THE COURT: All right. Ladies and gentlemen of the jury, that closes the evidence in the case. Now, it is almost 3:00, so what I'm going to do, it is too late to start your deliberations because once I charge you, we have closing arguments, then I can't let you separate, so what I'm going to do this evening is send you-all home and bring you back at 9:00 o'clock in the morning, at which time I will read the charge to you. We will have closing arguments of counsel, and then I will send you out to deliberate punishment. All right. So remember the instructions that I have given you earlier, not to discuss any of the evidence in this case with anyone, not even among yourselves. Do not watch any of the TV or read the newspaper accounts or any of those things. Have a good evening, and we will see you back here at 9:00 o'clock tomorrow morning.
>
> MR. JOHNSON: Judge, they're going to need --the future instructions.
>
> THE COURT: Okay. I was going to tell you about bringing –
>
> THE BAILIFF: I will tell them back here.
>
> THE COURT: Mike has some instructions. I've asked Mike to have you, in the morning, bring with you a change of clothes just in case. I don't think you are going to need it, but just in case you do not finish your deliberations tomorrow, then I will have to sequester you as long as

163

you are in deliberations, or before you return to court with a verdict on punishment, then I will have to keep y'all together. And so -- just bring a change of clothes with you. Anything else, Mike, that I need to tell them about?

THE BAILIFF: No.

THE COURT: You think that covers it?

THE BAILIFF: Yes, sir.

THE COURT: All right. Very good. Thank y'all. We will see you tomorrow morning at 9:00 o'clock tomorrow morning.

(RR49: 151-53). After the jury was removed, appellant moved for a mistrial. (RR49: 157). He argued that the trial court's statement "I don't think you are going to need it" in regards to the change of clothes he instructed them to bring was an improper comment on the weight of the evidence and an indication from the bench that the court is of the opinion there is nothing in the case worthy of deliberation. (RR49: 157-58). When asked to explain what he meant by the comment, the trial judge stated: "I was only explaining to them why I'm going to start them in the morning and give them all day long, but if they don't reach a verdict, then they need to be prepared to - … - so I could sequester them. And if I didn't think that that was necessary, I wouldn't have told them to bring any clothes." (RR49: 158-59).

164

The following morning, the jury heard the argument of counsel and was given instructions for their deliberation of the special issues. (CR2: 402-07). They were instructed that it would not be proper for them to arrive at their answers to the special issues by any other method other than by a full, fair, and free exchange of the opinion of each individual juror. (CR2: 405). They were further instructed that they may, and should, deliberate for as long as they felt was necessary to arrive at their answers to the special issues. (CR2: 405).

### Applicable Law

There are no set time limits on jury deliberations, and the length of time the jury may be held to deliberate is left to the sound discretion of the trial court. *See Guidry v. State*, 9 S.W.3d 133, 155 (Tex. Crim. App. 1999). "The court on its own motion may and on the motion of either party shall, after having given its charge to the jury, order that the jury not be allowed to separate . . . ." Tex. Code Crim. Proc. Ann. art. 35.23 (West 2006).

Article 38.05 of the Texas Code of Criminal Procedure provides, in part, that a judge may not at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case. Tex. Code Crim. Proc. Ann. art. 38.05 (West 1979). A trial court improperly

comments on the weight of the evidence if it makes a statement that implies approval of the State's argument, indicates any disbelief in the defense's position, or diminishes the credibility of the defense's approach to its case. *Hoang v. State*, 997 S.W.2d 678, 681 (Tex. App.—Texarkana 1999, no pet.); *Clark v. State*, 878 S.W.2d 224, 226 (Tex. App.—Dallas 1994, no pet.).

To be reversible, a violation of Article 38.05 must be reasonably calculated to benefit the State or prejudice the rights of the defendant. *Becknell v. State*, 720 S.W.2d 526, 531 (Tex. Crim. App. 1986); *Simon v. State*, 203 S.W.3d 581, 592 (Tex. App.—Houston [14th Dist.] 2006, no pet.). In evaluating whether the court's comment on the evidence was reasonably calculated to benefit the State or prejudice the defendant, the reviewing court first examines whether the comment was material, *i.e.*, if the jury was considering the same issue. *Clark*, 878 S.W.2d at 226. The reviewing court must then consider the consequences that probably resulted from the trial court's comment to determine whether the comment prejudiced appellant's rights. *Id*.; Tex. R. App. P. 44.2(b).

### The Trial Court's Statement Was Not an Improper Comment on the Weight of the Evidence

During the complained-of statement, the trial court admonished the jury that they could be sequestered. *See* Tex. Code Crim. Proc. Ann. art. 35.23. The

166

court instructed them to bring a change of clothes in the event that they were not finished deliberating at the end of the day. As reflected by the trial court's explanation following the removal of the jury, the intent of the statement was simply to inform the jurors of the possibility of sequestration. The court further explained that if it did not believe the jury had anything worthy of deliberation he would not have instructed them to bring a change of clothes.

The record reflects that the trial court's statement "I don't think you will need them" with regard to the extra clothes was an offhand comment with no calculated intent. It is possible the trial court was trying to put the jurors at ease about the potential sequestration. It is also possible that the trial court reasonably believed that the jury would reach a verdict after a full day of deliberation based on his experience as a judge who has presided over multiple capital murder cases. Regardless, the trial court's comment did not imply approval of the State's position or indicate any disbelief in the appellant's position. As such, this statement was not an improper comment on the weight of the evidence. *See Hoang*, 997 S.W.2d at 682.

Even if this comment could be construed, as appellant claims, to convey the trial court's perception of the state of the evidence and belief that the jury would

167

not need to give much time in deliberation of the special issues, this comment did not necessarily benefit the State. The comment contains no expression of the trial court's view of how the jury should resolve the special issues. There was compelling punishment evidence presented by both sides during appellant's trial. The trial court's comment could have just as easily been perceived to mean that the court did not think it would not take the jurors longer than a day to resolve the special issues in such a way that resulted in a life sentence for appellant.

To the extent that the trial court's comment could be perceived as rushing the jurors in their deliberation with a threat of sequestration, this claim is equally without merit. The jurors were sent home for the evening following the trial court's statement. The following morning, they were given detailed instructions regarding their deliberation of the special issues. The jurors were instructed that they may, and should, deliberate for as long as necessary to arrive at their answers to the special issues. (CR2: 405). Judicial instructions to the jury are presumed to be effective unless evidence shows the jury did not follow the directive. *See Gamboa*, 296 S.W.3d at 580 (a jury is presumed to follow the trial court's instructions). There is no indication in the record that the jurors were not allowed to deliberate as long as they felt was necessary.

### *The Trial Court's Comment Was Not Calculated to Benefit the State or Prejudice Appellant*

Even if this Court were to find that this was an improper comment on the weight of the evidence, it does not constitute reversible error. There is simply no indication that the comment was reasonably calculated to benefit the State or prejudice the rights of the defendant. *See Becknell*, 720 S.W.2d at 531; *Simon*, 203 S.W.3d at 592. First, it was not material. The issue before the jury was resolution of the special issues, the outcome of which would determine whether appellant was going to receive a sentence of life or death. The trial court's comment, which referred to its belief on the time deliberations might take and whether the jury would be sequestered, pertained more to the logistics of deliberations and was immaterial to their resolution of the special issues.

Moreover, a review of the record indicates that the comment did not affect appellant's substantial rights. *See* Tex. R. App. P. 44.2(b). The trial court's comment did not inject harmful new facts and was not calculated to deprive appellant of a fair and impartial trial. The jury instructions included in the punishment charge – instructing the jurors to deliberate for as long as necessary and to arrive at their answers to special issues only after a full, fair, and free exchange of the opinion of each juror – helped to cure any error. Further, in light

169

of the heinousness of appellant's offense of drowning his two young sons and the voluminous and compelling punishment evidence presented by the State, it is unlikely that the trial court's offhanded comment had any influence on the jury's verdict. Issue 40 is without merit and should be overruled.

## Issue 42: Legal Sufficiency of Future Dangerousness Special Issue

In Issue 42, appellant contends that there was insufficient evidence to support the jury's answer to Special Issue No. 1, the future dangerousness special issue. Specifically, he contends that he had no prior violent offense convictions that sent him to the penitentiary. He also contends that the offense was the result of family conflict about his children that would not exist in prison, thereby removing the probability that he would constitute a future danger. (Appellant's Brief, pp. 126-27). Appellant's contentions are without merit and should be overruled.

### *Applicable Law*

The State has the burden of proving the punishment issue of future dangerousness beyond a reasonable doubt. Tex. Code Crim. Proc. Ann. art. 37.071, §§ 2(b)(1), 2(c). In assessing the legal sufficiency of the evidence of future dangerousness, this Court views the evidence in the light most favorable to the

verdict to determine whether a rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. *See Estrada*, 313 S.W.3d at 284.

In its determination of the special issues, the jury is entitled to consider all the evidence presented at the guilt phase of the trial, in addition to the evidence presented at the punishment phase. *Young*, 283 S.W.3d at 863. Some factors the jury may consider when determining whether appellant will pose a continuing threat to society include: (1) the circumstances of the offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of his acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the offense; (7) psychiatric evidence; and (8) character evidence. *See Wardrip v. State*, 56 S.W.3d 588, 594 (Tex. Crim. App. 2001); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). The circumstances of the offense and the events surrounding it may

be sufficient in some instances to sustain a "yes" answer to the future-dangerousness special issue. *Young*, 283 S.W.3d at 863.

### *The Evidence is Legally Sufficient to Support the Jury's Finding of Future Dangerousness*

The State presented sufficient evidence to support the jury's finding of future dangerousness. First, the gruesome facts of the offense alone were sufficient to support a finding of future dangerousness. The evidence presented at trial showed that appellant murdered his two young sons because he was angry with their mother Kametra. On the Saturday prior to the offense, appellant saw Kametra with another man at a back-to-school barbeque and became angry that she was seeing another man and that the man was in his sons' lives. The evidence reflects that appellant asked to borrow his friend Christal's car so that he could drive Naim to school on his first day, despite not having obtained permission to take him. On the day of the offense, after being told he could not drive Naim to school, appellant saw Kametra, Naim and Elijah walking toward Naim's school. Appellant stopped the car and forced Kametra and the boys to get into the car. Appellant then drove them aimlessly around the neighborhood, all the while threatening to harm Kametra. When appellant stopped the car for a red light, Kametra saw a constable one lane over. Despite appellant's warnings not to get

172

out of the car, Kametra jumped out of the car and flagged down the constable. Angry that Kametra disobeyed him, appellant sped off with the boys. He then took them to a creek, told them to sit in the water, place their heads under the water, and pretend like they were swimming. Appellant then held their heads under the water until they drowned. Afterward, appellant attempted to break into the house where his youngest son Jeremiah was sleeping, but was forced out of the house by Kametra's brother.

The calculated and deliberate nature of appellant's actions in committing this violent and heinous double-murder was sufficient to support the jury's finding of future dangerousness. *See Druery v. State*, 225 S.W.3d 491, 507 (Tex. Crim. App. 2007) (the circumstances of an offense can be some of the most revealing evidence of future dangerousness and may be sufficient to independently support an affirmative answer to the future dangerousness issue). The State, however, did not rely solely on the facts of the offense to prove appellant's future dangerousness.

The State also presented evidence of appellant's extensive criminal history, spanning nearly twenty years, back to when appellant was thirteen-year-old juvenile. Between January 1993 and August 1994, appellant was arrested seven

times. Appellant's offenses included: two burglaries of a habitation, possession of a stolen vehicle, burglary of a coin operated machine, burglary of a motor vehicle, unauthorized use of a motor vehicle, and evading arrest. After numerous attempts to place appellant on probation and home supervision, appellant was confined to Daytop Village, where appellant received individual and group counseling. However, appellant was unable to follow the rules, and after numerous infractions, concluding with his assaulting the same juvenile twice in one day, appellant was discharged from the facility on July 1, 1995.

Following his discharge from Daytop Village, appellant was sent to TYC, where his violent behavior and inability to follow the rules continued. In general, appellant was explosive and disrespectful to the TYC staff. This was particularly evident in his treatment of female staff. On one occasion appellant approached female staff member Nina Adams as she was teaching class, and began bumping his erect penis against her leg. On several other occasions, appellant called female staff bitches, fat mother fuckers, and "ho's." Appellant's infractions, however, were not restricted to the TYC staff. Appellant was involved in a three-on-one fight in the dormitory restroom in which he punched a juvenile that was being held down on a toilet. Appellant was also caught with razor blades and crushed

174

aspirin. Appellant admitted that he had stolen the razor blades and was trading the aspirin for snacks.

After he was released from TYC, appellant continued to have trouble with the law. Appellant picked up three new offenses in 1997: burglary of a vehicle, evading arrest, and theft of check. The following year, appellant was arrested for burglary of a vehicle. Appellant's encounters with the law continued in 1999, when appellant was arrested on a warrant when he was stopped, along with two other men, during an investigation into a burglary. While the officers determined that the appellant and other men were not involved in the burglary, a loaded shotgun was found inside the vehicle and a bag of marijuana and screwdriver were found tossed just outside of the vehicle.

Additionally, the State presented substantial evidence of appellant's violence against women. In 2001, appellant was caught peering in the window of a female neighbor. When the neighbor confronted appellant, he denied looking in the window and threatened to beat her if she continued to say that he had. Appellant also exhibited physical violence toward his sister Sekinah. In 2009, appellant took a hammer and hit her twice in the back of the head. Appellant was sentenced to five years' deferred adjudication for the charge of aggravated

175

assault with a deadly weapon. Appellant received probation at the request of his sister, who wanted him to be able to provide for his children. Appellant was on probation for this offense when he committed the instant capital murder.

The State also presented considerable evidence concerning appellant's violent relationship with Kametra. Appellant began a sexual relationship with Kametra when he was twenty-five and she was fifteen. Appellant began hitting her only a few short weeks into their relationship. The jury heard how appellant repeatedly physically abused Kametra, even when she was pregnant with his three children. After learning that she was pregnant with their first child, Appellant kicked her in the stomach in an attempt to cause a miscarriage. When that failed, appellant suggested that she drink bleach or use a wire hanger.

The jury also heard about two particularly violent encounters Kametra had with the appellant in the months preceding the capital murder. In February 2011, appellant punched Kametra in the face, forced his way into her mother's house, and grabbed Naim. Appellant then kicked down a door in order to flee the house. Approximately one month later, appellant forced his way into the car Kametra was driving when she came to pick the boys up from a visit with him. Appellant demanded that she take him to the store, and when she refused to take him,

176

Appellant choked her until she was unconscious. When she woke up, she was inside the house where appellant was living with his brother, but had no recollection of how she got there. Appellant, who was still angry that she had refused his earlier demand, hit Kametra in the head with a heavy object she believed was a gun, when she said she needed to leave. Later, when she convinced appellant that she needed to return her sister's car, appellant insisted on going with her. When Kametra's sister saw the bruised and bloody condition she was in, she called the police. Appellant then grabbed Elijah and told Kametra she and Jeremiah had to come with him or he would kill Elijah. When appellant saw the police coming, he threw Elijah to the ground and took off running.

The jury also heard testimony concerning appellant's actions during his arrest for the instant offense. Appellant resisted when officers tried to handcuff him, and it ultimately took four officers to restrain him. Appellant was tased three times before the officers were finally able to place him in handcuffs.

Moreover, while in jail awaiting his trial for capital murder, appellant continued to have disciplinary infractions and violent outbursts. On October 25, 2011, appellant refused to comply with instructions from an officer when he was told he was going to be moved to a different cell. Appellant refused to move and

told the officer that he would have to physically be picked up and moved to the other cell. Ultimately, appellant was picked up and moved by two officers.

On April 25, 2012, appellant refused to return a breakfast tray after receiving a different breakfast from the one he ordinarily received. Appellant swung at Officer Thomas when the officer went into appellant's cell to retrieve the tray. It took approximately three to four officers to restrain the appellant.

On November 24, 2012, in a jail phone call to his brother Jamal, appellant told his brother that the only reason he had not "fired off on some of these fools" was because he wanted to keep up with his sports and visits.

Finally, on March 26, 2013, appellant fought with another inmate over the television. Officer Moreno observed appellant and another inmate in a fighting stance. The other inmate received scratches to his chest and appellant was given fifteen days' full restrictions following the fight.

It is clear that the State presented sufficient evidence of appellant's future dangerousness. Appellant's argument that he lacked any prior violent convictions which sent him to the penitentiary ignores the evidence presented by the State that appellant had committed numerous unadjudicated violent assaults, including the assaults against Kametra that occurred in the months preceding the instant

offense. It also ignores the fact that he was on probation for aggravated assault with a deadly weapon at the time he committed capital murder. Viewed in the light most favorable to the verdict, appellant's criminal history – whether or not it involved trips to prison – evidence a violent, unrepentant man.

The state presented sufficient evidence from which the jury could find beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. Thus, the evidence was legally sufficient to support the jury's answer to the future dangerousness special issue, and Issue 42 should be overruled.

### Issues 43-54: Federal Constitutional Issues

In Issues 43 through 54, appellant challenges the constitutionality of the Texas death penalty statute. He acknowledges that these issues have been previously overruled and are asserted mainly to preserve each issue for further review in the federal courts. (Appellant's Brief, pp. 128-36).

In Issue 43, appellant contends that the statute under which he was sentenced to death is unconstitutional in violation of the cruel and unusual punishment prohibition of the Eighth Amendment because it allows the jury too much discretion to determine who should live and who should die and because it

179

lacks the minimal standards and guidance necessary for the jury to avoid the arbitrary and capricious imposition of the death penalty.

In Issue 44, appellant contends that the statute under which he was sentenced to death violates the due process requirements of the Fourteenth Amendment because it implicitly puts the burden of proving the mitigation special issue on appellant rather than requiring a jury finding against appellant on that issue under the beyond a reasonable doubt standard.

In Issue 45, appellant contends that the trial court erred in denying his motion to hold Article 37.071, § 2(e) and (f) concerning the burden of proof unconstitutional as a violation of Article I, §§ 10 and 13 of the Texas Constitution.

In Issue 46, appellant contends that the Texas death penalty scheme violates due process protections of the United States Constitution because the punishment special issue related to mitigation fails to require the State to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt, contrary to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny.

In Issue 47, appellant contends that the Texas death penalty scheme violated his rights against cruel and unusual punishment and to due process of law under the Eighth and Fourteenth Amendments to the United States

Constitution by requiring at least ten "no" votes for the jury to return a negative answer to the punishment special issues.

In Issue 48, appellant contends that the Texas death penalty scheme violated his rights against cruel and unusual punishment, to an impartial jury and to due process of law under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because of vague, undefined terms in the jury instructions at the punishment phase of the trial that effectively determine the difference between a life sentence and the imposition of the death penalty.

In Issue 49, appellant contends that the trial court erred in overruling his motion to hold Art. 37.071, § 2(e) and (f) unconstitutional because said statute fails to require the issue of mitigation be considered by the jury.

In Issue 50, appellant contends that the mitigation special issue is unconstitutional because it fails to place the burden of proof on the State regarding aggravating evidence.

In Issue 51, he claims that the mitigation special issue is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution because it permits the very type of open-ended discretion condemned by the United States Supreme Court in *Furman v. Georgia*, 408 U.S. 238 (1972).

181

In Issue 52, appellant contends that Texas' statutory capital sentencing scheme is unconstitutional under the Eighth and Fourteenth Amendments because it does not permit meaningful appellate review.

In Issue 53, appellant contends that the trial court erred in overruling his motion to quash the indictment as being unconstitutional based on the enumerated constitutional defects of Texas capital-murder death-penalty law.

In Issue 54, he contends that the cumulative effect of the above-enumerated constitutional violations denied him due process of law in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

Appellant invites the Court to revisit its stand on these issues, which he concedes have all been previously overruled. *See* App. Brief, p. 128; *Saldano*, 232 S.W.3d at 107-09 (overruling multiple challenges to death penalty statute); *Escamilla v. State*, 143 S.W.3d 814, 838-829 (Tex. Crim. App. 2004) (same). Appellant presents no new arguments for the State to address. This Court should decline appellant's invitation to revisit these legal claims and overrule Issues 43 through 54.

## **PRAYER**

The State prays that this Honorable Court will overrule appellant's issues on appeal and affirm the trial court's judgment.

Respectfully submitted,

/s/ Jaclyn O'Connor Lambert

**Susan Hawk**
**Criminal District Attorney**
Dallas County, Texas

**Jaclyn O'Connor Lambert**
**Assistant District Attorney**
State Bar No. 24049262
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *fax*

## CERTIFICATE OF COMPLIANCE

I hereby certify that there are 37,663 words in this document excluding the statement regarding oral argument, table of contents, index of authorities, statement of the case, signature, certificate of service, and certificate of compliance. This number exceeds the maximum allowable number of words provided in the Texas Rules of Appellate Procedure. *See* Tex. R. App. P. 9.4(i)(2)(A). The State is filing a Motion to Exceed the Word Count contemporaneously with this brief.

/s/ Jaclyn O'Connor Lambert

Jaclyn O'Connor Lambert

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing brief was served on appellant's attorney, John Tatum, 990 S. Sherman Street, Richardson, Texas 75081, jtatumlaw@gmail.com, via email and U.S. mail on January 30, 2015.

/s/ Jaclyn O'Connor Lambert

Jaclyn O'Connor Lambert